IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

CHIRAG SHAH,            |

          |

    Plaintiff,         |

          |

    vs.             |       Civil Action No. 1:13CV1481 AJT/JFA

          |

SOUTHWEST AIRLINES, *et al.*,   |

          |

    Defendants.      |

_____ |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
SOUTHWEST'S MOTION FOR SUMMARY JUDGMENT OR,
IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**

## I.    INTRODUCTION

Airline crewmembers work in a high-stakes environment. In addition to normal aircraft operations, they also must make sensitive security decisions to protect the safety of passengers, the airplane, its crew, and—in this remarkable era—persons and property on the ground. Because the stakes are so high, federal law gives airline captains very broad discretion to decline to transport passengers whose presence is, or <u>even</u> <u>might</u> <u>be</u>, contrary to safety. Simply put, in this setting, better safe than sorry.

Southwest moves for summary judgment because the record contains no evidence that race played any role in the decision to decline to transport the plaintiff. Instead, the evidence reflects a crew focused entirely on behaviors, plaintiff's and that of another passenger sitting across the aisle in the front row of the airplane. These behaviors alarmed the two flight attendants working in the front of the airplane. With no mention of plaintiff's race or appearance, they contacted the captain to alert him to their concerns. The captain appropriately decided to return to the gate to sort things out and ultimately declined to reboard the two men because the flight attendants were still uncomfortable with what they had seen and security officials shared

no information to ameliorate their concerns. Southwest is entitled to summary judgment because no reasonable jury could conclude from this evidence that the captain's decisions were arbitrary or capricious.

In the alternative, Southwest is entitled to partial summary judgment on plaintiff's claim for punitive damages. There is no basis to impute punitive liability to Southwest.

## II.    MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

### A.    Background

On April 15, 2013, at approximately 2:49 pm, two bombs exploded near the finish line of the Boston Marathon. Shortly thereafter, CNN and other networks began airing newscasts from the site of the bombings.[1] Later that afternoon, plaintiff arrived at Dulles International Airport to fly on Southwest Flight 392 to Denver, Colorado.[2]

The crew of Southwest Flight 392 consisted of George "Curt" Cannon, Captain; Rod Ennis, First Officer; Shannon Ramos, "A" Flight Attendant; Ava Alley, "B" Flight Attendant; and Regina Paschall, "C" Flight Attendant.[3] Captain Cannon, who had been an Air Force pilot before joining Southwest, had been flying for Southwest for 17 years.[4] The flight attendants had been flying with Southwest for between 14 and 21 years.[5]

Southwest has an open seating policy. Plaintiff sat in 1F—the window seat of the first row on the plane's right side.[6] Passengers were instructed to fasten their seat belts, and the airplane pushed back from the gate and began to taxi.[7]

---

[1] Statement of Stipulated Material Facts (Doc. No. 27) (hereinafter "Stip.", #1).
[2] Stip., #2.
[3] Stip., #4.
[4] Cannon Depo. at 5.
[5] Ramos Depo. at 4, 7; Paschall Depo. at 5; Alley Depo. at 5.
[6] Stip., #7.
[7] Stip., #9.

## B. Briefing the Passengers

After the boarding process is completed, the "A" and the "C" flight attendants work in the front of the airplane and the "B" flight attendant works in the back.[8] The "A" flight attendant does the oral safety briefing while the "C" flight attendant does the safety demonstration at the front of the cabin and the "B" flight attendant does it in the back of the cabin.[9]

The "A" and "C" flight attendants face the passengers, whose seats are identified as follows:[10]

| 3F | 3E | 3D | Aisle ←aft | 3C | 3B | 3A |
|----|----|----|----|----|----|----|
| 2F | 2E | 2D | | 2C | 2B | 2A |
| 1F | 1E | 1D | | 1C | 1B | 1A |

"C"

"A"

Ms. Paschall, as the "C" flight attendant, did the safety demonstration at the front of the cabin.[11] While doing the safety demonstration, she noticed that the man sitting in 1C would not make eye contact with her and was otherwise not paying any attention to the demonstration.[12] That passenger appeared "very nervous and not quite there with us."[13] She told 1C that, contrary to federal law, his seat belt was not fastened, but he did not respond. She

---

[8] Ramos Depo. at 8, 20-21; Paschall Depo. at 6-7, Exhibit 1 (hereinafter, "Paschall Irregularity Report") at 1.

[9] Ramos Depo. at 22-23, Exhibit 1 (hereinafter, "Ramos Irregularity Report") at 1; Paschall Irregularity Report at 1; Alley Depo. at 10.

[10] Shah Depo. at 42-44, Exhibit 5.

[11] Paschall Irregularity Report at 1.

[12] Paschall Depo. at 8; Paschall Irregularity Report at 1.

[13] Paschall Irregularity Report at 1.

repeated herself but, again, he did not respond. Yet again, she told 1C his seat belt was not fastened, this time touching his knee to get his attention. He finally responded, nodding his head "yes," but he still did not attempt to fasten his seat belt. The fourth time Ms. Paschall told the man his seat belt was not fastened, he responded by saying "Oh, oh. I'm sorry. I'm so out of it!" Ms. Paschall was troubled by this: "it was as if I was not standing right in front of him."[14]

Ms. Ramos noticed the man in 1F behaving erratically.[15] He could not sit still, was flipping through magazines, looking out his window and the window across the aisle in what appeared to be an effort to "track time on the ground."[16] He was

> [v]ery fidgety in his seat, sitting up almost up out of his seat as much as he could with his seatbelt on. Moving quickly -- moving his head quickly through looking at the windows, in and out of the windows, darting his head in different directions, looking at me, looking out the windows, sitting up out of his seat, looking at the passengers across from him in the opposite row one, … leaning forward taking that magazine out, flipping through it abruptly, not reading anything, just quickly thumbing through it and putting it back, and then back to the same what he was doing before. Looking through all the windows, sitting up out of his seat looking at the other row out their windows, looking at me.[17]

Although Ms. Ramos had been a flight attendant for 14 years, she had never seen behavior like this before.[18]

### C. The Flight Attendants Discuss Their Observations

Ms. Paschall was sufficiently concerned about 1C's behavior that she asked Ms. Ramos if she noticed anything strange about the man.[19] Ms. Ramos stated that she was watching the man since the briefing, and pointed to 1F.[20] Ms. Paschall stated that she was referring to the

---

[14] *Id.*
[15] Ramos Depo. at 9, 14, 16.
[16] *Id.* at 9.
[17] *Id.* at 14-15. Instead of "fidgety" or "nervous," Mr. Shah prefers to characterize his behavior as "maybe more of an ADD disorder kind of thing." Shah Depo. at 37-38.
[18] Ramos Depo. at 17.

man in 1C and described the behaviors she had observed.[21] Ms. Ramos, in turn, explained 1F's erratic behaviors that had concerned her.[22] Ms. Ramos thought that it was "strange that we are both noticing odd behavior, but it was not coming from the same man, and they are both seated in the front row."[23]

Ms. Ramos and Ms. Paschall then wondered whether 1F and 1C knew each other.[24] Ms. Ramos suspected that the passengers were together because she thought 1F was trying to get 1C's attention when he was "nearly out of this seat trying to look over in [1C's] direction."[25] Ms. Paschall thought she saw the men making eye contact.[26] And both men at the same time flipped through the information card and in-flight magazine as the plane taxied for departure.[27] Ultimately, Ms. Ramos and Ms. Paschall concluded that 1F and 1C might be together since they were both sitting in the first row, 1F was looking over toward 1C, and the men were both acting "differently" than other passengers.[28]

As they talked about these passengers' behaviors, the two flight attendants noticed 1F buckle his previously unfastened seat belt.[29] They "began to get extremely uncomfortable, uneasy, and alarmed."[30] In fact, they were sufficiently concerned that they independently looked

---

*Continued from previous page*
[19] Paschall Irregularity Report at 1.
[20] Ramos Irregularity Report at 1.
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] Paschall Irregularity Report at 1; Ramos Irregularity Report at 1.
[25] Ramos Depo. at 28; Paschall Depo. at 27.
[26] Paschall Irregularity Report at 1.
[27] Ramos Irregularity Report at 1; Paschall Irregularity Report at 1.
[28] Ramos Depo. at 29-30; Paschall Depo. at 27.
[29] Ramos Depo. at 48; Ramos Irregularity Report at 1; Paschall Depo. at 21; *see also* Shah Depo. at 34-35 (stating that he realized during taxi that his belt was not fastened so he fastened it then).
[30] Ramos Irregularity Report at 1.

for "Able Bodied Assistants" to help in the event of a security event.[31] Ms. Ramos "was getting so uneasy that she told [Ms. Paschall] that after [they] took off she should go get her food from the back and come up and eat it with [Ms. Ramos] because [she] did not want to be in front alone."[32]

As Ms. Ramos and Ms. Paschall talked about what they were observing and how they felt about it and the training they had, they weighed whether they should call the captain to alert him of their concerns.[33] Under controlling federal law, the captain ultimately is responsible for the safety of the flight and for making the decision to remove a passenger.[34] The flight attendants serve as the pilots' "eyes and ears" in the cabin.[35] Indeed, for security reasons, the pilots generally do not leave the cockpit unless the plane is parked at the gate.[36] If the "B" or "C" flight attendants see a potential safety or security problem in the cabin, for example, they are to notify the "A" flight attendant.[37] The "A" flight attendant, in turn, notifies the captain.[38]

The Aviation Security Program does not rely entirely on Transportation Security Administration ("TSA") passenger screening to avert passenger-based security risks.[39] Aviation security has multiple layers.[40] The layers include, among others, hardened cockpit doors, armed pilots, federal air marshals, and—as is significant in this case—crewmembers trained to

---

[31] Paschall Irregularity Report at 1; Ramos Irregularity Report at 1; Ramos Depo. at 36.
[32] Ramos Irregularity Report at 1.
[33] Ramos Irregularity Report at 1.
[34] 49 U.S.C. § 44902(b); 14 C.F.R. § 91.3; Chaussee Depo. at 26-27; Leonard Depo. at 21; *see also* Ramos Depo. at 8 (stating that flight attendants have no authority to remove a passenger from a flight).
[35] Paschall Depo. at 14, 34-35; Bohlin Depo. at 28.
[36] Cannon Depo. at 15.
[37] Ramos Depo. at 8.
[38] *Id.*
[39] Chaussee Depo. at 21-24.
[40] Chaussee Depo. at 18.

recognize and report unusual passenger behaviors.[41] Southwest flight attendants are trained to detect potential security threats by maintaining situational awareness and being observant.[42] This training teaches flight attendants to focus on passenger behavior and to ask themselves if the behavior they are observing seems out of context.[43]

If flight attendants observe behavior that is odd or otherwise out of the ordinary, they are trained to listen to their gut and involve other crewmembers.[44] Southwest, in its security instruction, trains crewmembers to focus on behaviors rather than demographics.[45] Southwest teaches its crewmembers to use their judgment and instinct in observing these behaviors.[46] The familiar phrase, "If you see something, say something," applies with special force to the cabin crew.[47] To encourage the flow of information and ensure passenger and crew safety, the captain must take seriously the concerns of the flight crew.[48] Because of the context in which no fly decisions have to be made, crewmembers have little if any time to investigate and must rely on gut intuition in addition to behavioral training.[49]

---

[41] Chaussee Depo. at 21-24; Bohlin Depo at 28-29.

[42] Harper Depo. at 11-12, 18-9; Expert Rpt. of Brent Harper at 2; Bohlin Depo. at 50-1, 93.

[43] *Id.*; Leonard Depo. at 64-5.

[44] Chaussee Depo. at 27, 52, 58-9; Harper Depo. at 18-9, 60; Cannon Depo. at 30; Leonard Depo. at 20; Bohlin Depo. at 26, 50-1, 66-7; Paschall Depo. at 14, 35; *see also* Expert Rpt. of John Chaussee at 2 ("Southwest trains its flight crewmembers in behaviors to watch for and to rely on gut and intuition."); Expert Rpt. of Brent Harper at 2.

[45] Bohlin Depo. at 88-89; Cannon Depo. at 30; Ramos Depo. at 47. Indeed, Southwest's company policy requires that its employees provide equal service to customers, regardless of race, creed, or color. Leonard Depo. at 56.

[46] Chaussee Depo. at 27, 52, 58-9; Harper Depo. at 18-9, 60; Cannon Depo. at 30-2.

[47] Bohlin Depo. at 89 ("And that is why behavior is so important. You must watch what people are doing because the behaviors are what are going to give you those clues and get that gut instinct going, whoa, that's – that's a little beyond what a nervous flier would do. That's out of the norm of what we would see passenger behavior. And at that point, then if you see something, say something, and we'll look at that."); Harper Depo. at 18-9; Expert Rpt. of Brent Harper at 2.

[48] Leonard Depo. at 52.

[49] *Id.*; *see also* Bohlin Depo. at 50-51 (stating that flight attendants and pilots have to rely on their instinct and their "gut feeling" to recognize potential security threats).

## D. The Flight Attendants Involve the Pilots

When the pilots signaled that they had been cleared for takeoff, Attendants Ramos and Paschall "looked at each other and knew we could not go."[50] Ms. Paschall said, "You know, Shannon, I'm not sure if I feel comfortable. I don't feel safe. I'm not sure what's going on."[51] So Ms. Ramos "dinged" the cockpit and explained the situation to Captain Cannon.[52]

Captain Cannon, just prior to taking the runway for takeoff had been told that "the flight attendants … were very alarmed about the behavior of two male passengers seated in the front row. After discussing the details of their behavior, which included fidgety body movements and nervous glancing, we decided to return to the gate and deplane them."[53] At no time did Ms. Ramos tell Captain Cannon the races of the two passengers causing her and Ms. Paschall concern. In fact, she did not give any physical description to Captain Cannon.[54]

## E. Return to Gate and Deplaning

Ms. Ramos sensed that 1F was "looking out the window for what we believed was trying to track time on the ground."[55] It was an accurate perception. 1F was doing a mental countdown to takeoff.[56] He was familiar with the layout of Dulles Airport and was aware of the airplane's proximity to the runway and to takeoff.[57] He knew before any announcement that the

---

[50] Ramos Irregularity Report at 1; *see also* Paschall Depo. at 22-23 (explaining that because two passengers were "doing similar things and looking at each other," she "just didn't feel safe proceeding with the flight with those passengers on board").

[51] Paschall Depo. at 23.

[52] Ramos Irregularity Report at 1; Ramos Depo. at 4.

[53] Cannon Depo. at 8-10, Cannon Exhibit 1 (hereinafter, "Cannon Irregularity Report") at 1.

[54] Ramos Depo. at 43-44; *see also* Cannon Depo. at 18.

[55] Ramos Depo. at 9, 23 ("I felt like he was trying to figure out where we were in regards to -- where we were in our taxi, where we were out, how close we were to the runway, how close we were to taking off, where our location was out in the airfield.").

[56] Shah Depo. at 35-6.

[57] Shah Depo. at 35-9.

airplane had turned <u>away</u> from the runway.[58] He looked out of the window next to his seat and "stooped over a couple times" to look out the window on the opposite side of the plane, *i.e.*, in the direction of 1C.[59]

Captain Cannon taxied the airplane back to the gate, and the flight was met by TSA and Airport Police. Flight Attendants Ramos and Paschall first spoke with the officials on the airport bridge just outside the airplane. Ms. Ramos and Ms. Paschall described their observations to the officials, who then boarded the plane to retrieve 1F and 1C.[60]

After completing duties in the cockpit, Captain Cannon stepped outside of the plane and joined Ms. Ramos and Ms. Paschall to discuss what the two flight attendants had witnessed.[61] The flight attendants shared with him their thoughts that the two men were together, although seated across the aisle from one another.[62]

TSA agents, members of airport security, and several Southwest employees also were on the airport bridge.[63] The TSA and Airport Police interviewed 1F and 1C up the airport bridge, some distance from the cabin door, where Captain Cannon spoke with the flight attendants.[64]

When they were done, one of the TSA agents asked Captain Cannon whether he wanted to reboard 1C and 1F. Neither he nor any of the officials told the crew anything about the

---

[58] Shah Depo. at 36.

[59] Shah Depo. at 36-37.

[60] Ramos Irregularity Report at 1; Shah Depo. at 58.

[61] Paschall Depo. at 24; Cannon Depo. at 58.

[62] Cannon Depo. at 20; Ramos Depo. at 28; Paschall Depo. at 27, Paschall Irregularity Report at 1 ("We were trying to figure out if they knew each other because they were giving constant eye contact between the two of them?").

[63] Ramos Irregularity Report at 1.

[64] Shah Depo. at 31 (the only thing he overheard of the discussion among the crewmembers standing at the cabin door was the flight attendant stating that he had been "fidgety"), 59.

interviews or any conclusions reached.[65] "They offered no opinion one way or the other to me."[66] The agent simply stated that they spoke with 1F and 1C and asked, "Do you want to allow them back on the aircraft?"[67]

Captain Cannon ultimately declined to reboard 1F and 1C because the flight attendants were still uncomfortable.[68] Indeed, according to Captain Cannon's observations on the airport bridge, the flight attendants seemed genuinely fearful.[69]

## F. Rebooking

Southwest offered to book plaintiff on another flight.[70]

## G. The Role of Race

At no time did Captain Cannon, Ms. Ramos, or Ms. Paschall make a comment about the race or perceived race of 1C or 1F.[71] Captain Cannon knew nothing about the race or races of the two passengers when he returned the airplane to the gate.[72] The only time Captain Cannon, Ms. Ramos, or Ms. Paschall described the physical appearances or possible races of these men was when they were asked to do so by plaintiff's counsel in their depositions.[73]

The only mention of race in any of the reports is in the report prepared by the "B" flight attendant, who had no involvement whatsoever in the events or the decision to remove the passengers.[74] Flight Attendant Ava Alley, when she completed a company report the next afternoon, wrote:

---

[65] Cannon Depo. at 22; Paschall Depo. at 26; Ramos Depo. at 42-43.
[66] Cannon Depo. at 34.
[67] Ramos Depo. at 43.
[68] Cannon Depo. at 34-35.
[69] Id. at 38-39.
[70] Shah Depo. at 64.
[71] Cannon Depo. at 18; Ramos Depo. at 43-44; Paschall Depo. at 37; Shah Depo. at 65-66.
[72] Cannon Depo. at 18, 34; Ramos Depo. at 43-44; Paschall Depo. at 37; Shah Depo. at 65-66.
[73] Cannon Depo. at 36; Ramos Depo. at 10, 13; Paschall Depo. at 11.
[74] Alley Depo. at 9-10, 13-14, Alley Exhibit 1 (hereinafter, "Alley Irregularity Report") at 1.

I did not witness the event,.. all I knew was that we had aborted take-off from the Captain announcing we had to go back to the gate for a passenger incidence. As soon as we arrived at the gate, & the doors were disarmed, two police persons came aboard and escorted 2 middle eastern looking men off the plane. After some time, we closed the doors and pushed back without them.[75]

Alley first saw the two removed passengers after they were removed. She "walked to the front," "looked out in the jetway," and saw them outside the airplane.[76] She discussed the event with the other flight attendants only after it was over and she did not recall either of the other flight attendants describing the men as Middle Eastern.[77]

## H. Complaint to Southwest and Investigation

Plaintiff called and emailed Southwest's customer relations department the next morning.[78] In his email, plaintiff described his experience on, and removal from, the flight and asserted that a flight attendant "stare[ed] at [him] for no reason."[79] Shortly thereafter, Southwest's Customer Relations Department initiated an investigation of the incident, emailing a number of company managers to gather information about plaintiff's complaint.[80]

After reviewing the irregularity reports filed by the flight attendants, Southwest's Assistant Manager of Inflight Safety reported that Ms. Ramos and Ms. Paschall "did exactly what they are trained."[81] The Phoenix Assistant Base Manager agreed, stating that Ms. Ramos

---

[75] Alley Irregularity Report at 1.
[76] Alley Depo. at 9-10.
[77] *Id.* at 15, 26. Flight Attendant Shannon Ramos confirmed that she did not discuss the events with Alley at any time during the flight. Ramos Depo. at 38. Flight Attendant Paschall told Ms. Alley on the jetway only that she had to ask one of the passengers four times to fasten his seat belt. Paschall Depo. at 27; Alley Depo. at 23.
[78] Shah Depo. at 29-30.
[79] Shah Depo. at 29, Exhibit 1.
[80] Behrens Declaration.
[81] Behrens Declaration.

and Ms. Paschall followed their training and "acted appropriately in th[e] situation."[82] The crew was not disciplined because the information gathered in the investigation demonstrated that the crew followed their training.

## III.    ARGUMENT

Because of the extraordinary consequences of carrying passengers intent on harming our country, federal law bestows very broad discretion on airlines to decline passage to a person whose presence is or <u>might be</u> contrary to safety. As a result, plaintiff's claim is governed by an entirely different standard than that which applies in a typical section 1981 case. Here, in order to prevail, plaintiff would have to prove that Captain Cannon acted arbitrarily and capriciously in removing him from Flight 392. Captain Cannon relied on the reports of his experienced crew, which focused on plaintiff's behaviors, not his race. Because no reasonable jury could conclude from the record evidence that Captain Cannon acted arbitrarily or capriciously, summary judgment should be entered.[83]

Alternatively, Southwest seeks partial summary judgment on plaintiff's claim for punitive damages, because none of the alternatives that would allow punitive liability to be imputed to an employer is supported by the record. First, it is clear that the crew acted to protect the airplane, its occupants, and those on the ground, not with malicious intent or recklessness. Second, there is no evidence to support the conclusion that Southwest authorized or approved racial discrimination, that Southwest was reckless in hiring the crewmembers, or that the crewmembers acted in a managerial capacity.

---

[82] Behrens Declaration.

[83] A party raises a genuine issue of material fact with respect to a claim only if a reasonable jury could return a verdict for that party on each element necessary to that claim. *Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1027 (4th Cir. 1997).

### A. Southwest is entitled to summary judgment on plaintiff's section 1981 claim.

#### 1. Because the security of airline flights is a high national priority, air carriers are immune from liability for removing passengers unless the plaintiff proves that the captain's decision was arbitrary or capricious.

"As a matter of federal policy, under the Federal Aviation Act, 'assigning and maintaining safety [ranks] as the highest priority in air commerce.'" *Cerqueira v. Am. Airlines, Inc.*, 520 F.3d 1, 11 (1st Cir. 2008) (quoting 49 U.S.C. § 40101(a)(1)). Pursuant to this policy, Congress passed 49 U.S.C. § 44902(b), which provides that an air carrier "may refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety." *Cerqueira*, 520 F.3d at 12 ("It is obvious that § 44902(b) was enacted in furtherance of the first priority of safety in air traffic.").[84] The air carrier's discretion to decline transport is "very broad," in part, because "the air carrier need not decide that the passenger or property *is* inimical to safety, the authorization extends to situations in which the air carrier decides the passenger or property 'might be' inimical to safety." *Cerqueira*, 520 F.3d at 12 (citation omitted). Indeed, "§ 44902(b) does not merely create a defense: the statute is an affirmative grant of permission to the air carrier." *Cerqueira*, 520 F.3d at 13-14.

Relying on this statutory scheme, courts have long immunized air carriers for refusing to transport passengers on the basis of safety concerns so long as the decision to refuse transport was not arbitrary or capricious.[85] The Fourth Circuit has recognized that federal law

---

[84] Under the statute, this authority is "[s]ubject to regulations of the Under Secretary," but "the Under Secretary has not promulgated regulations limiting the airline's discretion directly under 49 U.S.C. § 44902(b)." *Cerqueira*, 520 F.3d at 12.

[85] *See Cerqueira*, 520 F.3d at 14 ("Congress left decisions to refuse passage to the air carrier, and any review in the courts is limited to review for arbitrariness or capriciousness."); *Cordero v. Cia Mexicana De Aviacion, S.A.*, 681 F.2d 669, 671-72 (9th Cir. 1982); *Williams v. Trans World Airlines*, 509 F.2d 942, 948 (2d Cir. 1975) (holding that the test of whether an air carrier properly refused passage to a ticket holder is whether or not the "opinion and decision were rational and reasonable and not capricious or arbitrary"); *Al-Watan v. Am. Airlines, Inc.*, 658 F. Supp. 2d 816,

accords airlines "broad discretion" in making decisions necessary to safeguard passengers from potential security threats.[86] This same standard applies to federal anti-discrimination claims.[87]

The following five principles apply to the determination of whether an air carrier's decision to refuse transport is arbitrary or capricious:

- The captain's decision stands as the decision of the air carrier;[88]

- The decision is evaluated solely on the information the captain possessed when the decision was made;[89]

- The captain is not obligated to investigate;[90]

---

*Continued from previous page*

822 (E.D. Mich. 2009) (providing that the court had earlier "adopted the arbitrary and capricious standard applied in the U.S. Court of Appeals for the Second Circuit" in *Williams*); *Dasrath v. Continental Airlines, Inc.*, 467 F. Supp. 2d 431, 445 (D.N.J. 2006) ("[T]he standard for reviewing a carrier's decision is an objective one and the carrier's discretion is protected so long as it acted in good faith and its decision was rational."); *Al-Qudhai'een v. Am. W. Airlines, Inc.*, 267 F. Supp. 2d 841, 846 (S.D. Ohio 2003) (recognizing that, pursuant to § 44902(a), an air carrier's refusal to transport "cannot give rise to a claim for damages under either federal or [state] law unless the carrier's decision was arbitrary or capricious"); *Christel v. AMR Corp.*, 222 F. Supp. 2d 335, 340 (E.D.N.Y. 2002) (same).
[86] *Smith v. Comair, Inc.*, 134 F.3d 254, 259 (4th Cir. 1998) ("Pursuant to 49 U.S.C. § 44902(b), airlines must be accorded broad discretion in making boarding decisions related to safety. Allowing Smith's claim to proceed would frustrate this important federal objective. Airlines might hesitate to refuse passage in cases of potential danger for fear of state law contract actions claiming refusal to transport."); *see also Dasrath v. Continental Airlines, Inc.*, 228 F. Supp. 2d 531, 540 (D.N.J. 2002) ("In this case Plaintiffs' burden will be a heavy one considering the heightened actual dangers arising from the increased risk of terrorist acts, the catastrophic consequences in the case of air travel of the failure to detect such acts in advance, and the necessity that pilots make safety decisions on short notice without the opportunity to make extensive investigations.").
[87] *E.g.*, *Cerqueira*, 520 F.3d at 13 ("It is clear that § 44902(b), being the more specific statute [compared to § 1981], applies to this case."), 14 ("We also agree with *Williams* that Congress did not intend the non-discrimination provisions of the FAA or of § 1981 to limit or to render inoperative the refusal rights of the air carrier...."); *Al-Watan*, 658 F. Supp. 2d at 822-23; *Al-Qudhai`een*, 267 F. Supp. 2d at 846.
[88] *E.g.*, *Cerqueira*, 520 F.3d at 14; *see also* 14 C.F.R. § 91.3(a) ("The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft.").
[89] *E.g.*, *Cerqueira*, 520 F.3d at 14; *Lozada v. Delta Airlines, Inc.*, No. 13 Civ. 7388 (JPO), 2014 U.S. Dist. LEXIS 82441, at *16 (S.D.N.Y. June 17, 2014); *Christel*, 222 F. Supp. 2d at 340; *Al-Qudhai'een*, 267 F. Supp. 2d at 847 (S.D. Ohio 2003).

- Biases of others may not be attributed to the captain.[91]

- The person challenging removal from a flight bears the burden of proof.[92]

### 2. *McDonnell Douglas* burden shifting does not apply to Section 44902(b) cases.

The determination of whether the captain's removal decision was arbitrary or capricious is not subject to the burden-shifting framework established in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). The First Circuit in *Cerqueira* explained why *McDonnell Douglas* burden shifting is inconsistent with section 44902(b):

> This claim, however, is not an employment discrimination claim arising under Title VII; it arose under § 1981 and challenged a decision made pursuant to the authorization given an air carrier by Congress in § 44902(b). As we have held, the burden is on the plaintiff to show the decision not to transport was arbitrary or capricious…. The jury must be instructed that the Captain has the power to refuse transport of a passenger "might be" inimical to safety unless that decision was arbitrary or capricious…. It is the plaintiff's burden to show the Captain's decision was arbitrary or capricious. The test we have outlined under § 44902(b) is inconsistent with the use in Title VII cases of prima facie case methodology and the burden-shifting test.

520 F.3d at 18 (footnotes and citations omitted). Decisions subsequent to *Cerqueira* have followed this rule.[93]

The First Circuit's conclusion necessarily follows from Congress's recognition that safety is the highest priority in air travel. *See* 49 U.S.C. § 40101(a)(1). When an air carrier

---

*Continued from previous page*

[90] *E.g.*, *Cerqueira*, 520 F.3d at 14; *Williams*, 509 F.2d at 948 ("The statute did not contemplate that the flight would have to be held up or cancelled until certainty was achieved."); *Lozada*, 2014 U.S. Dist. LEXIS 82441, at *16-*17 ("[A] 'captain of an airplane is entitled without further inquiry to rely upon a flight attendant's representations that a … passenger might distract the flight attendant from performing his or her safety-related duties.'"); *Ruta v. Delta Air Lines, Inc.*, 322 F. Supp. 2d 391, 397-98 (S.D.N.Y. 2004); *Christel*, 222 F. Supp. 2d at 340.

[91] *E.g.*, *Cerqueira*, 520 F.3d at 14; *Al-Qudhai'een*, 267 F. Supp. 2d at 848.

[92] *E.g.*, *Cerqueira*, 520 F.3d at 14; *Hammond v. Northwest Airlines*, No. 09-12331, 2010 U.S. Dist. LEXIS 72007, at *13 (E.D. Mich. July 19, 2010); *Al-Watan*, 658 F. Supp. 2d at 824, 826.

[93] *E.g.*, *Hammond*, 2010 U.S. Dist. LEXIS 72007, at *13; *Al-Watan*, 658 F. Supp. 2d at 824, 826.

decides to refuse to transport a passenger because that passenger is or may be contrary to safety, the carrier is acting to protect the other passengers and crew, the airplane, and persons and property on the ground. Similar considerations simply do not apply in other types of section 1981 cases, such as employment cases or those alleging discrimination in retail establishments. As such, using the same *McDonnell Douglas* burden-shifting framework would fail to account for the safety and security concerns associated with air travel.

### 3. Captain Cannon's decisions were neither arbitrary nor capricious.

There are two relevant decisions to plaintiff's claims: first, Captain Cannon's decision to return to the gate after he received a call from Ms. Ramos describing the concerns she and Ms. Paschall had about two passengers in the front row; and second, Captain Cannon's decision declining to reboard the men.[94] Plaintiff cannot demonstrate that Captain Cannon acted arbitrarily or capriciously on either account.[95]

### a. Captain Cannon's decision to return to the gate was neither arbitrary nor capricious.

Captain Cannon's decision to return to the gate is evaluated based on the information that he knew at the time he made the decision.[96] Here, the decision to return to the gate was based on information provided to him by the flight attendants. Captain Cannon, just prior to taking the runway for takeoff had been told that "the flight attendants … were very

---

[94] *See generally Cerqueira*, 520 F.3d 1; *Al-Watan*, 658 F. Supp. 2d 816.

[95] Even if this Court determines that *McDonnell Douglas* burden-shifting provides useful guidance in evaluating indirect evidence of intentional discrimination here, the framework must be modified to recognize the highest priority given to safety in air commerce, the setting in which air carriers must make security decisions, and the air carrier's permissive right to decline transport. *See, e.g.*, *Dasrath v. Continental Airlines*, 476 F. Supp. 2d 431, 446 (D.N.J. 2006) (recognizing that, even in the context of *McDonnell Douglas* burden shifting, "the objective assessment of a carrier's decision must take into account all the circumstances surrounding the decision, including the (perhaps limited) facts known at the time; the time constraints under which the decision is made; and, not least, the general security climate in which events unfold."). With or without application of *McDonnell Douglas*, Southwest is entitled to summary judgment.

[96] *See, e.g.*, *Cerqueira*, 520 F.3d at 14.

alarmed about the behavior of two male passengers seated in the front row. After discussing the details of their behavior, which included fidgety body movements and nervous glancing, we decided to return to the gate and deplane them."[97] No physical description of the men was given to Captain Cannon, and he did not see them until the airplane was parked at the gate and the two men were being interviewed by security officials.[98]

Plaintiff's security expert agrees that Captain Cannon made the safest choice by returning the airplane to the gate.[99] Asked whether bad information from the flight attendants could have led to a bad decision by Captain Cannon, Southwest's Chief Pilot answered, "I think ultimately to err on the side of safety is a right decision, so to return to the gate, to stop the airplane is always the best decision and to figure it out."[100]

Clearly, the decision to return to the gate was neither arbitrary nor capricious.

### b. Captain Cannon's decision not to reboard the plaintiff was neither arbitrary nor capricious.

After the airplane returned to the gate and the security officials had interviewed the two removed passengers, they said to Captain Cannon, "'We spoke with the two gentlemen. Do you want to allow them back on the aircraft?' That's all they said."[101] They neither made any

---

[97] Cannon Irregularity Report at 1; Ramos Depo. at 40; *see also* Cannon Depo. at 8-9; *Al-Watan*, 658 F. Supp. 2d at 827 (holding that nothing in a flight attendant's report to the captain can be regarded as evidence of discrimination where flight attendant discussed passenger behavior, not race).

[98] Cannon Depo. at 18 ("Q. When you were called about these passengers by your crew members did they describe to you at any point the physical appearance of these two passengers? A. No."); Ramos Depo. at 43-44.

[99] Bryan Depo. at 90.

[100] Leonard Depo. at 24.

[101] Ramos Depo. at 42.

recommendation nor "sa[id] anything about the nature of their conversations with them at all."[102] "They offered no opinion one way or the other to me."[103]

Captain Cannon took into consideration the views of the two flight attendants.[104] He normally would "give quite a bit of weight" to the "opinion of TSA and airport police on security matters."[105] In this case, however, "they did not give any opinion on this issue."[106] As Southwest's Chief Pilot explained,

> [A]s the captain, I hope [TSA] would offer me some sort of guidance. Because the reason we came back to the gate was there was a suspicion, a thought, a feeling, whatever, so we came back to the gate. Until that suspicion, or that feeling, concern is verified, I don't have … an ability to overturn that feeling or – or suspicion, so to speak.[107]

Captain Cannon elected not to reboard the two passengers because his "A" and "C" flight attendants remained uncomfortable, having received nothing from the security officials to reassure them.[108] It is essential that the captain take seriously concerns from the cabin crew. "[I]t's important that the [crewmembers] trust each other because they have to work together."[109] The captain must, for example, consider how the flight attendants' performance would be affected if an individual who initially caused concern was allowed to reboard.[110]

---

[102] *Id.* at 42-43.
[103] Cannon Depo. at 34.
[104] Cannon Depo. at 35; Paschall Depo. at 26
[105] Cannon Depo. at 34.
[106] *Id.*
[107] Leonard Depo. at 34-5.
[108] Cannon Depo. at 34-35.
[109] Leonard Depo. at 52.
[110] Bohlin Depo. at 61; 65-66 ("If there's a situation where, for whatever reason, the flight attendants are preoccupied with the presence of a passenger or passengers because of a previous incident, they may well miss something – another security threat to the airplane, not necessarily from those individuals but they could be from others on the aircraft . . . . It might be an abnormal with the airplane. It might be an incident with smoke or fire. It could be a medical emergency with another passenger. There are a lot of things that are at play here. And part of this – part of it would be perhaps that they are, again, preoccupied by the presence of individuals."). *See also*

Moreover, because the cabin crew acts as the "eyes and ears" of the captain, it is essential that the captain not make flight attendants feel that information they report to the captain is undervalued or disregarded.[111] Doing so may shut down the flow of information from the cabin to the cockpit, "potentially a very dangerous situation."[112] "[W]hen they have a feeling and they have an inquiry or they smell an odor in the back, they need to know they can call me and I'm going to take their thought seriously."[113]

Also relevant in evaluating the captain's decision is the security setting in which the denial or reboarding is made.[114] 9/11, as well as subsequent terrorist attempts on air carriers, changed the security climate in which air carriers operate.[115] Captain Cannon was aware of the Boston Marathon bombing earlier that afternoon and knew it was a terrorist attack.[116] Not knowing who had perpetrated the bombing and whether or not it was part of a broader conspiracy, he was more alert for potential security issues.[117]

Captain Cannon's decision to decline plaintiff passage was neither arbitrary nor capricious.

---

*Continued from previous page*

*Lozada*, 2014 U.S. Dist. LEXIS 82441, at *16-17 ("[A] 'captain of an airplane is entitled without further inquiry to rely upon a flight attendant's representations that a … passenger might distract the flight attendant from performing his or her safety-related duties.'")

[111] Bohlin Depo. at 66.

[112] *Id.* at 66-67.

[113] Leonard Depo. at 53.

[114] *See Dasrath*, 476 F. Supp. 2d at 446 ("[T]he objective assessment of a carrier's decision must take into account … the general security climate in which events unfold.").

[115] *See id.* (holding that previous terrorist attacks, including 9/11 and the shoe-bomber's failed attempt to blow up an aircraft, should be considered when evaluating captain's decision to deny reboarding).

[116] Cannon Depo. at 26-27.

[117] *Id.*; *see also* Leonard Depo. at 16 ("[A]ny time something happens and there's a potential threat of terrorism, all of us in the industry pay attention.").

### 4. Recognition of a passenger's race does not render a 44902(b) decision arbitrary or capricious.

There is <u>no evidence</u> that race played any role in the decision to return to the gate or to exclude the plaintiff from the flight. Even if there were, however, section 44902(b) still immunizes air carriers from exclusion decisions that are neither arbitrary nor capricious. The First Circuit recognized in *Cerqueira* that air carriers do not lose their immunity because race somehow factored into the overall decision that a passenger's presence might be inimical to safety.[118] Holding otherwise would vitiate section 49902(b) and Congress's determination that safety in air travel is "the highest priority in air commerce." 49 U.S.C. § 40101(a)(1).

\* \* \*

Because there is insufficient evidence to support a conclusion that Captain Cannon's decisions to return to the gate and to refuse to reboard the plaintiff were arbitrary or capricious, summary judgment in favor of Southwest should be granted.

### B. Southwest cannot be liable for punitive damages because none of the standards for imputing punitive liability to an employer apply.

Summary judgment in Southwest's favor would, of course, dispose of the entire case. Even if the Court denied Southwest's motion for summary judgment, partial summary judgment would, nonetheless, be appropriate to resolve plaintiff's claim to punitive damages.

Southwest could be liable for punitive damages only upon proof that (a) one or more Southwest employees acted with "malice and evil motive, or recklessness and callous indifference to a federally protected right"[119] <u>and</u> (b) (1) Southwest authorized the doing and

---

[118] *See Cerqueira*, 520 F.3d 19 n.22 (holding that the trial court erred in instructing the jury that, if "'***one*** of the reasons that was actuating, driving, informing people,' but 'not the only reason,' was 'that person's perception of [plaintiff's] race or ethnicity,' then this was a 'forbidden reason.'"

[119] *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 441 (4th Cir. 2000) ("A prevailing plaintiff in a cause of action under § 1981 is entitled under the common law to punitive damages … for

manner of the act; (2) Southwest was reckless in employing the agent who committed the act; (3) the agent who committed the act was within the scope of employment in a managerial capacity; or (4) Southwest ratified or approved the act.[120] This is plaintiff's burden, and the evidence to support it does not exist.[121]

### 1. The crew of Flight 392 did not act with "malice and evil motive, or recklessness and callous indifference to a federally protected right."

The standard for punitive damages "cannot be satisfied by a showing of intentional discrimination alone."[122] In returning to the gate and declining to reboard plaintiff, Captain

---

*Continued from previous page*

conduct [by the defendant] exhibiting malice, an evil motive, or recklessness or callous indifference to a federally protected right …."); *Matarese v. Archstone Pentagon City (f/K/A Parc Vista)*, 795 F. Supp. 2d 402, 449 (E.D. Va. 2011) ("Punitive damages may be awarded in a civil rights case where the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally-protected rights of others."), *aff'd in part and vacated in part on other grounds*, 468 F. App'x 283, 2012 U.S. App. LEXIS 4130 (4th Cir. 2012).

[120] Although we did not find any Fourth Circuit cases that address the standard for awarding punitive damages in the public accommodations context, we found three such cases in the district courts of the Fourth Circuit. *See Thomas v. Freeway Foods, Inc.*, 406 F. Supp. 2d 610, 625 (M.D.N.C. 2005) ("[A]n employer may not be held liable for a [restaurant] server's misconduct unless the plaintiff produces evidence that the management ratified or approved the discriminatory acts of the server."); *Williams v. Cloverleaf Farms Dairy, Inc.*, 78 F. Supp. 2d 479, 486-7 (D. Md. 1999) (recognizing that, to hold the employer liable for the acts of a convenience store clerk, the plaintiff must meet one of the four alternatives provided in the Restatement (Second) of Torts § 909 (1979) and explaining "[t]his Court adopts the reasoning of *Fitzgerald* [*v. Mountain States Tel. & Tel. Co.*, 68 F.3d 1257 (10th Cir. 1995)]and holds that the Restatement (Second) of Torts § 909 standards control in claims for punitive damages under § 1981"); *Wilkins v. Denamerica*, No. 99cv102-T, 2000 U.S. Dist. LEXIS 21308 (W.D.N.C. Apr. 6, 2000) (Mag. R. & R.) (relying on *Kolstad v. American Dental Ass'n*, 527 U.S. 526 (1999), and *Cloverleaf Farms* for the proposition that the plaintiff must meet one of the four alternatives to hold an employer liable for punitive damages for the actions of restaurant employees).

[121] *Lowery*, 206 F.3d at 442 ("[P]laintiff must offer evidence sufficient to impute liability for punitive damages from the individual … to the employer.").

[122] *E.g., Guides, Ltd. v. Yarmouth Group Prop. Mgmt., Inc.*, 295 F.3d 1065, 1077 (10th Cir. 2002) ("Otherwise, every jury verdict in a successful § 1981 or § 1982 claim would include an award of punitive damages. Instead, we believe that a plaintiff must prove that the defendant acted with malicious, willful or gross disregard of a plaintiff's rights over and above intentional discrimination.").

Cannon did not act in the face of a perceived risk that his decision would violate federal law.[123] To the contrary, federal law provides airline captains with broad discretion to decline to transport a passenger whose presence may be inimical to safety.[124] Here, Captain Cannon relied on the concerns and reports of the flight attendants (his "eyes and ears"), which made no mention of plaintiff's race or appearance. And the TSA agent he spoke with did not provide him any information to assuage the concerns of the flight attendants. Captain Cannon would therefore reasonably believe that his decision was in support, not in violation, of federal law.[125] Moreover, Captain Cannon testified that race is not, and was not in this case, a factor in evaluating the threat a passenger may pose to security.[126]

    **2.    There is no basis on which to impute liability for punitive damages to Southwest.**

The record affirmatively demonstrates that none of the agency principles for punitive liability to the employer applies here. We review each one.

    **(i)    Southwest did not authorize removal of passengers on the basis of race.**

As to the first, Southwest does not, nor did it here, authorize intentional discrimination. The record is replete with evidence that Southwest trains its employees to base security decisions on behaviors, not demographics.[127] Moreover, Southwest's company policy provided that "Southwest Airlines provides equal service to all Customers regardless of race,

---

[123] Southwest incorporates by reference all of its arguments for summary judgment in support of the absence of malice or recklessness.

[124] 49 U.S.C. § 44902(b).

[125] *See Kolstad*, 527 U.S. at 537 (holding that for those "in which the employer discriminates with the distinct belief that the discrimination is lawful," punitive damages may not be awarded as a matter of law).

[126] Cannon Depo. at 30, 32-33.

[127] Cannon Depo. at 30; Alley Depo. at 16; Harper Depo. at 61, 63; Bohlin Depo. at 88-90, 93.

creed, or color."[128] All Southwest employees are taught the anti-discrimination policy and required to acknowledge it.[129]

> **(ii)** **Southwest was not reckless in employing the captain or flight attendants.**

As to the second alternative, despite each involved crewmember having at least 14 years of experience flying for Southwest, there is no evidence that the captain or the flight attendants had been the subject of any previous claims of racial discrimination.[130] There simply is no evidence that Southwest was reckless in employing them.

> **(iii)** **Neither the captain nor the flight attendants were employed in a managerial capacity.**

"[A]n employee must be important but perhaps need not be the employer's top management, officers or directors to be acting in a managerial capacity."[131] This third alternative is not triggered here because airline crewmembers are not managerial employees. The Restatement sets forth the following example of management capacity:

> A, a corporation owning a series of retail stores, employs B as operations manager to supervise the management of the units. While visiting a unit, B discovers facts that lead him to believe erroneously that one of the clerks has been stealing. He directs the local manager to imprison the clerk. In the ensuing interview he permits the local manager to use outrageous means of intimidation. In the clerk's action against the corporation, punitive damages can properly be awarded.[132]

---

[128] Declaration of Brent Harper; Leonard Depo. at 56 ("All employees of Southwest are taught our policy on discrimination. There's 14, 15, 16 protected groups, I'm not sure, but they're taught and they all acknowledge that policy.").

[129] *Id.*

[130] Mortensen Depo. at 16, Exhibit 12 at p. 5.

[131] *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 442 (4th Cir. 2000) (quoting *Kolstad*, 527 U.S. at 510).

[132] Restatement (Second) of Torts § 909 illus. 3.

An important indicia of managerial capacity is the authority to hire, fire, and discipline subordinates.[133] The crewmembers have no such authority. Indeed, the pilots and flight attendants at Southwest are all labor union members covered by collective bargaining agreements.[134]

Another important factor is the authority to make company policy.[135] Airline pilots and flight attendants do not have policy-making authority. Indeed, here the record shows that the crew was merely applying Southwest policy.

Twice addressing the issue of whether airline crewmembers act in a managerial capacity for purposes of vicarious liability for punitive damages, the United States District Court for the District of the Virgin Islands explained:

> A pilot, employed by a corporate master to fly an aircraft from one destination to another, while exercising total control over the aircraft under his command, but who has no decision making authority within the corporate structure, is like any other ordinary employee performing routine ministerial tasks. His actions could not be said to express corporate policy; and thus his wrongful actions would not amount to deliberate corporate participation therein. For these reasons, the pilot of the instant aircraft is not a managerial employee of defendant airline within the meaning of § 909(c) of the Restatement, Torts, Second. Accordingly, the motion for partial summary judgment will be granted.[136]

---

[133] *Anderson v. G.D.C., Inc.*, 281 F.3d 452, 461 (4th Cir. 2002); *Lowery*, 206 F.3d at 444.

[134] *See* Stipulation dated May 28, 2014, Exhibit A at 21-2, 27-9, 51, 86. The Southwest pilots are represented by the Southwest Airlines Pilots' Association, and the flight attendants are represented by the Transportation Workers of America, AFL-CIO, Local 556.

[135] *Fitzgerald v. Mountain States Tel. & Tel. Co.*, 68 F.3d 1257, 1263 (10th Cir. 1995) ("[A]lthough Ms. Sapp testified she was a 'manager in U.S. West' with a title of 'training instructor,' … we look at the stature and authority of the agent to exercise control, discretion and independent judgment over a certain area of a business with some power to set policy for the company."); *In re P & E Boat Rentals, Inc.*, 872 F.2d 642, 652 (5th Cir. 1989) (requiring agent to have policymaking authority before being deemed to have management capacity).

[136] *Shackelford v. Puerto Rico Intl. Airlines, Inc.*, 16 Av. Cas. (CCH) P17,259, 16 V.I. 342, 1979 U.S. Dist. LEXIS 11512, at *7-8 (D.V.I. 1979). *Accord Tyler v. American Airlines*, No. 76-369 (D.V.I.) (cited in *Shackelford*).

Even where the managerial capacity standard is met, the Supreme Court and the Fourth Circuit recognize a good-faith exception to employer liability for punitive damages.[137] "A plaintiff … must show that the employer did not engage in good faith efforts to comply …."[138]

If the Court were to hold that an airline captain has "managerial capacity," the good-faith exception takes on special importance. This is so because federal law, not the airline, vests the captain with his or her authority, dictating that the captain, as pilot-in-command, is the final authority as to the operation of the aircraft.[139] Federal law extends this authority to the discretion to exclude a passenger who is, or might be, inimical to safety.[140] So, if the captain is deemed a managerial employee, it would be due to federal law, not the policies of the airline. The airline's efforts to comply with anti-discrimination laws would thus provide a key defense to

---

[137] *Kolstad*, 527 U.S. 526, 542-6 (1999); *Lowery*, 206 F.3d at 441-42 ("[A]ny case law construing the punitive damages standard set forth in § 1981a, for example *Kolstad*, is equally applicable to clarify the common law punitive damages standard with respect to a § 1981 claim.); *Cloverleaf Farms Dairy, Inc.*, 78 F. Supp. 2d at 487 ("The Court also notes that the Supreme Court adopted § 909 of the Restatement (Second) of Torts as the starting point for determining the scope of respondeat superior liability allowed for punitive damages under Title VII…. Comparing the standards for scope of employment under the Restatement (Second) of Agency § 228 and the standards for awarding punitive damages in the respondeat superior context under the Restatement (Second) of Torts § 909, the Court ultimately determined that the latter would override the former so that an employer would not be held liable for punitive damages when its managerial agents acted in contravention of the employer's good faith efforts to comply with Title VII.").

[138] *Jones v. Billy Excavation & Equip. Corp.*, No. 1:09cv00048, 2010 U.S. Dist. LEXIS 23895 (W.D. Va. Feb. 22, 2010) (Mag. R. & R.) (citing *Lowery*, 206 F.3d at 442), *accepted and approved*, 2010 U.S. Dist. LEXIS 23607 (W.D. Va. Mar. 15, 2010); *Blasic v. Chugach Support Servs., Inc.*, 673 F. Supp. 2d 389, 405 (D. Md. 2009) (quoting *Lowery*, 206 F.3d at 442) ("'[A]n employer may be held vicariously liable for a punitive damage award … for the intentionally discriminatory conduct of its employee, whe[n] the employee served the employer in a managerial capacity, committed the intentional discrimination at issue while acting in the scope of employment, and the employer did not engage in good-faith efforts to comply.'").

[139] 14 C.F.R. § 91.3(a) ("The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft.").

[140] 49 U.S.C. § 44902(b).

the imputation of punitive damages, where the creation of a managerial employee is otherwise out of their hands.

Southwest makes good-faith efforts to comply with federal anti-discrimination laws. Southwest company policy prohibits all forms of discrimination.[141] All Southwest employees receive the guidelines for Employee Policy and Procedures, which prohibit discrimination on the basis of race.[142] Moreover, all employees are instructed on the company's anti-discrimination policy, which they must specifically acknowledge each year.[143]

The record also affirmatively demonstrates that Southwest trains its crews to focus on the behaviors — not the race — of its passengers to gauge whether a passenger is or may be a security threat.[144] Indeed, Captain Cannon testified that race, ethnicity, national origin, or religion of passengers simply have no place in security training and is never discussed.[145] Ms. Ramos also testified that Southwest does not discuss race, religion, or national origin during security trainings.[146] And when asked whether race is "ever a factor in making any kind of security determination," Ms. Alley responded with an emphatic and unequivocal "No."[147] Because Southwest engages in good-faith efforts to comply with federal anti-discrimination statutes, it cannot be liable for punitive damages here even if Captain Cannon is deemed a managerial agent.

---

[141] Harper Depo. at 60.
[142] Leonard Depo. at 82.
[143] *Id.* at 83.
[144] *See, e.g.*, Bohlin Depo. at 90 ("We do not teach any criteria based on age or race or gender. It's behavior.").
[145] Cannon Depo. at 30, 33-34.
[146] Ramos Depo. at 47.
[147] Alley Depo. at 17.

## (iv)     Southwest did not ratify or approve discrimination.

The fourth alternative does not apply because Southwest reviewed the incident and did not find any evidence that the crew of Flight 392 discriminated against plaintiff on the basis of race.[148]

The day after the removals, plaintiff called and emailed Southwest's Customer Relations Department.[149] His email described his experience and focused on "the flt attendant with blonde short hair and wearing glasses" who, he said, was looking at him and "continu[ed] to stare at me for no reason" before the airplane returned to the gate.[150] That afternoon, the Customer Relations Department emailed a number of company managers and others a form that sought information about the subject of plaintiff's complaint. The form, entitled "POSSIBLE DISCIPLINARY ACTION REQUIRED – WHAT YOU NEED TO DO," contained plaintiff's written complaint, stated that "[t]he Customer's correspondence alleges inappropriate behavior of one or more of our Employees, requested assistance including reports from the involved employees, and asked a series of questions."[151]

Within a few days, irregularity reports were received from Captain Cannon, Ava Alley, Shannon Ramos, Regina Paschall and Dulles Ramp Agent Supervisor Jason Hartman.[152] With the exception of the report by Ava Alley (who was not involved in the incident), none of the irregularity reports filed with Southwest mention race or other physical description of the two

---

[148] Harper Depo. at 60.
[149] Shah Depo. at 29-30.
[150] Shah Depo. at 29, Exhibit 1.
[151] Behrens Declaration.
[152] *See* Cannon Irregularity Report; Ramos Irregularity Report; Paschall Irregularity Report; Alley Depo., Exhibit 1. These were submitted in the normal course, not in response to the request initiated by the Customer Service Department. Cannon Depo. at 10; Paschall Depo. at 7; Alley Depo. at 14.

removed passengers.[153] Instead, each of the crewmembers' reports addresses behaviors of the two passengers.[154] Subsequently, the Customer Relations Department received reports from the Assistant Manager of Inflight Safety and the PHX Assistant Base Manager.[155]

The Assistant Manager of Inflight Safety noted, "I will allow our PHX Base Leaders a chance to read the reports and share their thoughts. The [flight attendants] did exactly what they are trained…they contacted the Pilots with their concerns. It was the Captain's call to return to the gate."[156] The PHX Assistant Base Manager reported:

> Thank you for reaching out to us to respond in this situation. I do agree with Elise May stating Flight Attendants Regina and Shannon acted appropriately in this situation as they were displaying their Crew Resource Management (CRM) as they are trained to do. It's difficult to say whether or not they over-reacted because they both witnessed something that did not set well. As I re-read their Irregularity Reports, the common thread in both is that they each noticed the peculiar behaviors of the individuals even before they discussed amongst each other their observations. When Regina and Shannon discussed their observations, their CRM kicked in and the decision to notify the flight deck was made. Please let me know if you have any other questions. Thank you.[157]

The focus of the involved crewmembers was on the behaviors of the passengers. There was no mention of race. The reports reflect Southwest's race-blind security training in practice; they do not evidence discrimination. Indeed, Southwest's expert Brent Harper, based on the reports, testified that the crew followed Southwest policy and procedure fully in this matter.[158] Southwest, therefore, did not take any adverse action against the crewmembers

---

[153] As previously noted, Alley's report states: "I did not witness the event" and mentions that "two police persons came aboard and escorted 2 middle eastern looking men off the plane."

[154] *See* Cannon Irregularity Report at 1; Ramos Irregularity Report at 1; Paschall Irregularity Report at 1.

[155] Behrens Declaration. The crewmembers were all based in Phoenix.

[156] Behrens Declaration.

[157] *Id.*

[158] Harper Depo. at 64.

because there was no indication that the decision to return to the aircraft to the gate and to decline reboarding was motivated by racial animus.

The Court should grant partial summary judgment on punitive damages.

## IV.  CONCLUSION

For the foregoing reasons, summary judgment should be granted to Southwest Airlines. No jury could reasonably conclude that Captain Cannon acted arbitrarily or capriciously in excluding plaintiff from Flight 392. Moreover, partial summary judgment as to punitive damages is warranted because none of the alternatives for imputing punitive liability to Southwest apply and because plaintiff's exclusion was neither reckless nor with malice.

Dated:  July 10, 2014                           Respectfully submitted,

                                                SOUTHWEST AIRLINES CO.
                                                By Counsel

SCHNADER HARRISON SEGAL & LEWIS LLP

By: /s/*Jonathan M. Stern*
Jonathan Stern (Va. Bar No. 41930)
Aaron Fickes (admitted *pro hac vice*)
Schnader Harrison Segal & Lewis LLP
750 Ninth Street, N.W., Suite 550
Washington, DC 20001-4534
Phone: 202-419-4202
Fax:    202-419-4252
Email: jstern@schnader.com

## CERTIFICATE OF SERVICE

I hereby certify that, on this 10th day of July 2014, I filed this Memorandum of Points and Authorities in Support of Southwest's Motion for Summary Judgment or, in the Alternative, for Partial Summary Judgment using the Court's ECF filing system, which will provide a copy to:

Thomas R. Breeden, Esq.
Thomas R. Breeden, P.C.
10326 Lomond Drive
Manassas, Virginia 20109
Telephone: (703) 361-9277; Telefax: (703) 257-2259
trb@tbreedenlaw.com

/s/*Jonathan M. Stern*
Jonathan M. Stern (Va. Bar No. 41930)
SCHNADER HARRISON SEGAL & LEWIS LLP
750 Ninth Street, NW
Suite 550
Washington, DC 20001
Telephone: (202) 419-4202
Telefax: (202) 419-4252
Email: jstern@schnader.com