IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

CHIRAG SHAH,                             |
                                         |
        Plaintiff,                       |
                                         |
vs.                                      |          Civil Action No. 1:13CV1481 AJT/JFA
                                         |
SOUTHWEST AIRLINES, *et al.*,            |
                                         |
        Defendants.                      |
_____ |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN OPPOSITION TO PLAINTIFF'S
## MOTION IN LIMINE FOR CERTAIN PRE-TRIAL ORDERS

## I.    INTRODUCTION

Plaintiff's Memorandum begins with a section labeled "Facts." It would more accurately be labeled "Misleading Argument." The substance is minimally relevant to the motion with which it was presented but does serve to highlight the importance of excluding from evidence the statement by the uninvolved "B" flight attendant, Ava Alley, in her Irregularity Report that "2 middle eastern looking men" were removed from the airplane.[1] Alley's reference to "middle eastern looking" is the only such reference in the whole record, but plaintiff's counsel already have shown how they would run with it at trial if not precluded from doing so.

They begin with a quote from a *New York Times* article, noting that, while "[i]t was unclear Monday evening who might be responsible for the blast[, …] investigators … were speaking to a Saudi citizen …."[2] Without any indication from the article or elsewhere that this information was disseminated before Southwest's crewmembers boarded Flight 392 (which was scheduled to depart from Dulles at 6:10 p.m. that day), they then assert—without citation—that "between the time of the bombing and the time the *New York Times* posted its first story online

---

[1] Southwest moved in Doc. No. 42 to exclude it.
[2] Doc. No. 44 at 2.

[which time is noted neither in the article nor in plaintiff's memorandum but likely was after the crew had boarded Flight 392],[3] speculation was already running rampant that people from the Middle East, presumably a Saudi national or member of the Muslim faith, were responsible for the explosions."[4]

They then assert that Shannon Ramos and Regina Paschall "decided that these two 'Middle Eastern looking' men might know each other,"[5] implying that Ramos and Paschall had referred to the two passengers as "Middle Eastern looking" and were aware of news blaming the Boston bombing on people from the Middle East. And, for good measure, they state that "Captain Cannon … later describe[ed] them as 'Middle Eastern looking.'"[6]

It is easy to distort the record when one skips the customary step of citing to the record to support one's assertions.[7] What the record actually reflects, however, is that Ava Alley was the only member of Flight 392's crew that referred to either of the removed passengers as "Middle Eastern looking," and she was not involved in the incident.[8] The Irregularity Reports of the other crewmembers that plaintiff seeks to exclude from evidence as hearsay address behaviors, not appearances.[9] The involved crewmembers, at least the two who were asked about it in their depositions, had no preconceived notions about the race, religion, or nationality of the

---

[3] The article refers to what the FBI did "Monday night," suggesting it could not have been written before Monday night.

[4] Doc. No. 44 at 2. Nonetheless, the article continues: "Some law enforcement officials noted that the blasts came at the start of a week that has sometimes been seen as significant for radical American antigovernment groups ….." Doc. 45-1.

[5] Doc. No. 44 at 3.

[6] *Id.*

[7] Other examples here are: (1) plaintiff's Hindu faith; (2) that plaintiff, during his deposition, identified the other removed passenger's Hindu name as being common in the southern part of India; and (3) that plaintiff had "high-level security clearances." The record does not reflect plaintiff's religion, and the word Hindu does not even appear in his deposition. *See* Doc. No. 36-17. Plaintiff testified that his clearances are of the "public trust" variety. Doc. No. 36-17 at 25-8.

[8] Doc. No. 41 at 1-2.

[9] Doc. Nos. 36-2, 36-7, 36-14, 36-16.

person or persons who might have perpetrated the Boston Marathon bombing.[10] And Captain Cannon used the phrase "Middle Eastern" only when asked in his deposition whether he had "any idea based on their complexion what part of the world they were from?" He then responded, "I suppose if I had to designate it they would appear Middle Eastern."[11] The remainder of the motion is an effort to strip from the trial the very relevant context of security concerns that airlines have and the reasons that they have them in this strange post 9-11 world.

Plaintiff seeks a variety of *in limine* orders. We will take them in the order they appear in plaintiff's motion and memorandum.

## II.   LIMITING ORDERS REQUESTED BY PLAINTIFF

**A.   Given plaintiff's punitive damage claim, the irregularity reports are admissible other than for the truth of the matters asserted, as corporate knowledge, but they also stand admitted pursuant to this Court's Order dated January 17, 2014, and they qualify as business records under Fed. R. Evid. 803(6).**

The irregularity reports prepared by Captain Cannon and Flight Attendants Shannon Ramos and Regina Paschall are admissible for three different reasons. First, they are admissible other than for the truth of the matters asserted. Plaintiff argues that "the only reason Defendants [sic] would have to seek their admission would be to prove the versions of events

---

[10] Cannon Deposition (Doc. No. 36-6) at 26-7 ("Q. You said you had heard about the Boston Marathon bombing that morning; is that correct? A. I believe it was early afternoon, yes, that's correct. Q. And at the time that you heard about that bombing did you know anything about the identity of the assailants in the Boston bombing? A. No. Q. Based on what you had heard did you know or assume that the Boston bombing was a terrorist attack? A. Yes. Q. Did you have any assumptions about the identity, or national origin, or the religion of people involved in the Boston Marathon bombing? A. No."); Paschall Deposition (Doc. No. 36-13) at 33-4 ("Q. At the time of the flight were you aware of what had happened in Boston, the Boston bombing? A. I had watched it on the news, yes. Q. Did you at that point know anything about the nationality of the people involved in the bombing? A. At that time I don't think any of that was known. It was basically it had happened and they weren't sure who had done it or –").
[11] Cannon Deposition (Doc. No. 36-6) at 36.

PHDATA 4987928_2

contained in the Irregularity Reports."[12] Plaintiff ignores that he is seeking an award of punitive damages and that the claim to punitive damages makes Southwest's response to the incident— and therefore the irregularity reports that informed the response—relevant whether or not true. As we already have briefed in the portion of our motion for summary judgment seeking summary adjudication or partial summary judgment on the claim for punitive damages, Southwest's response to the incident is relevant on the question of whether Southwest ratified discriminatory conduct.[13] Southwest management's knowledge of the circumstances comes through the submission of the irregularity reports.[14] The reports, therefore, are independently admissible for this purpose whether or not they constitute hearsay.[15]

---

[12] Doc. No. 44 at 6.

[13] *See* Doc. No. 37 at 21, 27-9.

[14] Cannon Deposition (Doc. No. 36-6) at 10 ("Q. Can you explain to us what the function of an irregularity report is? A. Whenever there's an occurrence out of the ordinary during a flight, or before a flight even, it's a way of conveying the information to Southwest Management the events of what occurred."); Declaration of Donald Brent Harper (attached as Exhibit 1) (hereinafter "Harper Decl."); Declaration of Robert Timothy Leonard (attached as Exhibit 2) (hereinafter "Leonard Decl.").

[15] *See, e.g., Arrington v. E.R. Williams, Inc.*, 490 Fed. Appx. 540, 544, 2012 U.S. App. LEXIS 16046 (4th Cir. 2012) (attached as Exhibit 3) ("Here, as the district court properly ruled, evidence of employee and client complaints about Arrington's performance was considered because ERW and Williams's 'decisionmaking was under challenge, and [they] explained it on the basis of the information [they] received,' *Crockett v. Abraham*, 284 F.3d 131, 134 (D.C. Cir. 2002). Where, as here, 'third-party statements concerning the plaintiff's performance are offered not for the truth of the matters asserted therein, but as an explanation of why [the employer] believed that terminating the plaintiff's employment … was necessary and appropriate,' evidentiary rules governing the consideration of hearsay are not implicated."); *Luckie v. Ameritech Corp.*, 389 F.3d 708, 716 (7th Cir. 2004) ("Neither of the two statements at issue is hearsay because they were not offered to prove the truth of the matter asserted…. Rather, each statement was offered to show Patterson's state of mind at the time she was evaluating Luckie's performance."); *Warren v. Tri Tech Labs., Inc.*, No. 6:12-cv-00046, 2014 U.S. Dist. LEXIS 8643 (W.D. Va. Jan. 23, 2014) (citing *Arrington*).

PHDATA 4987928_2

Second, the Cannon, Ramos, and Paschall irregularity reports stand admitted pursuant to this Court's January 17, 2014 Order.[16] Plaintiff listed all three on his exhibit list and Southwest did not object.[17] Interestingly, plaintiff also listed the irregularity report prepared by Flight Attendant Ava Alley and Southwest objected to this report and did not include it on its exhibit list.[18] Therefore, plaintiff has moved to exclude a report that he, but not Southwest, included on the exhibit list. For obvious reasons, we have no objection to this aspect of the relief sought by plaintiff.

The irregularity reports also qualify under the business records exception to the hearsay rule, Rule 803(6) of the Federal Rules of Evidence. This is the area to which the section of plaintiff's brief on irregularity reports is devoted, and we review each of the alleged deficiencies and demonstrate why the irregularity reports also qualify for admission as business records over plaintiff's hearsay objection.

The Federal Rules of Evidence provide:

The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:

*       *       *

**(6) Records of a Regularly Conducted Activity.** A record of an act, event, condition, opinion, or diagnosis if:
(A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
(B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
(C) making the record was a regular practice of that activity;
(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that

---

[16] Doc. No. 6 ("Objections to exhibits must be filed within 10 days after the conference; otherwise the exhibits shall stand admitted in evidence.").
[17] Doc. No. 31, Exhibits 5-7; Doc. No. 33.
[18] Doc. Nos. 26, 31, 33.

PHDATA 4987928_2

complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.[19]

The record evidence establishes that the irregularity reports satisfy the business records exception.[20] Nonetheless, plaintiff argues against admitting the reports as business records on the grounds that: (1) they are self-serving;[21] (2) they are "irregularity reports" and, therefore not "records of a regularly conducted activity";[22] (3) they were not submitted at or near the time of the events;[23] and Ms. Ramos and Ms. Paschall had ulterior motives, making them "unreliable sources."[24]

---

[19] Fed. R. Evid. 803(6).

[20] The qualification of the irregularity reports is shown through the testimony of the Southwest witnesses plaintiff has deposed. E.g., Paschall Deposition (Doc. No. 36-13) at 6-7 ("A. This is an irregularity report. Q. And what is an irregularity report? A. It is a report that is required to be written if there is any irregular -- anything that happens irregular during your flight. Q. And on the report it's indicated that you created the report; is that correct? A. Yes. Q. And you recognize the document because you wrote it; is that correct? A. Yes. Q. And how often do you file these irregularity reports? A. You only need to do it if something happens irregular during your trip or your day."); Cannon Deposition (Doc. No. 36-6) at 10 ("Q. Can you explain to us what the function of an irregularity report is? A. Whenever there's an occurrence out of the ordinary during a flight, or before a flight even, it's a way of conveying the information to Southwest Management the events of what occurred. Q. And do you make these reports regularly? I mean is this something common or is it very rare? A. It's fairly common. I believe I average about maybe two a year. Q. And is it usually for the same kind of purpose if there's a passenger issue on the plane? A. It can be a passenger issue, it can be a mechanical issue, it can be air traffic control related. It's really a wide range of possibilities."); Ramos Deposition (Doc. No. 36-15) at 22 ("Q. And what exactly is an irregularity report? A. An incident report if anything happens on the aircraft out of the -- well, for a lot of reasons. It's an incident report. Q. And on Page 2 of the document it's indicated that you created that report; is that correct? A. Yes, I created this report."). To the extent any additional foundation testimony is necessary, Southwest will present it, either by certification or by live witnesses, at trial.

[21] Doc. No. 44 at 4.

[22] Doc. No. 44 at 6-7.

[23] Doc. No. 44 at 7.

[24] *Id.*

PHDATA 4987928_2

### 1.      That evidence is self-serving is not a valid objection.

"All testimony — and all documents — offered by or on behalf of a party may fairly be said to be self-serving; why else would they be offered[?]"[25] The Fourth Circuit has observed that the objection that evidence is self-serving "is a misnomer that ought to be interred. It has long obscured the proper application of the hearsay rule to the reception of evidence, and is not an independent ground for objection."[26] "Whether self-serving, neutral, or disserving, a hearsay statement that does not fit within one of the exceptions to the hearsay rule is inadmissible, <u>and the reverse is true</u>."[27] Thus, the issue is not whether the evidence is self-serving but whether it meets the applicable evidentiary rules.

### 2.      It can be the *regular* practice of a business to make *irregularity* reports.

Plaintiff's objection to the irregularity reports based on their title reflects a misapprehension of the Rule's two "regularity" requirements. "To qualify under Rule 803(6), the records must, first, have been kept in the course of a regularly conducted activity of a business, occupation, or calling."[28] Second, the "making the record" must be "a regular practice" of the regularly conducted activity, whether it records a routine or a non-routine event or condition.[29] For example, the Fifth Circuit has approved the admission of a logbook that recorded malfunctions of an industrial machine that was the subject of the lawsuit.[30] While malfunctions,

---

[25] *Maher v. City of Chicago*, 406 F. Supp. 2d 1006, 1014 (N.D. Ill. 2006), *aff'd*, 547 F.3d 817 (7th Cir. 2008).

[26] *Chestnut v. Ford Motor Co.*, 445 F.2d 967, 972 (4th Cir. 1971).

[27] *Chestnut*, 445 F.2d at 972 (emphasis added).

[28] 5 Weinstein's Federal Evidence § 803.08 (Matthew Bender & Co. 2014) (construing Fed. R. Evid. 803(6)(B)).

[29] Fed. R. Evid. 803(6)(C).

[30] *Gulf South Machine, Inc. v. Kearney & Trecker Corp.*, 756 F.2d 377, 381 (5th Cir. 1985) ("The record shows that GSM kept logbooks of problems for most if not all of its machines and that the keeping of logbooks on machines was a regular practice even before the [machine at issue] was acquired.").

by definition, are not routine, the company's documentation of malfunctions was routine. Similarly, the Seventh and Eighth Circuits have approved the use of reports on the disciplining of employees as business records.[31] Employee discipline is not routine, but the companies' documentation of the discipline was their regular practice.

When the theory behind Rule 803(6) is considered, it makes sense that reports such as Southwest's irregularity reports should qualify.

> "Reports and documents prepared in the ordinary course of business are generally presumed to be reliable and trustworthy." … Records of that sort are considered trustworthy because "businesses depend on such records to conduct their own affairs; accordingly, the employees who generate them have a strong motive to be accurate and none to be deceitful" and secondly, because "routine and habitual patterns of creation lend reliability to business records."… In determining admissibility courts are to consider "the character of the records and their earmarks of reliability … from their source and origin and the nature of their compilation."[32]

Southwest's irregularity reports meet both regularity requirements. The regularly conducted activity is Southwest's conduct of commercial flight (i.e., air carrier) operations. The preparation of irregularity reports is "a regular practice" of the air carrier operations because Southwest <u>requires</u> its crewmembers and agents to submit irregularity reports in a broad variety of situations.

Crewmembers are required to submit irregularity reports for events ranging from the failure of a handheld device used to charge an alcoholic beverage on a credit card to the birth

---

[31] *Coates v. Johnson & Johnson*, 756 F.2d 524, 549-50 (7th Cir. 1985) (employee discipline reports admitted as business records).

[32] *Rambus, Inc. v. Infineon Techs. AG*, 348 F. Supp. 2d 698, 702 (E.D. Va. 2004) (quoting *Palmer v. Hoffman*, 318 U.S. 109, 114 (1943), and *Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d 200, 204-05 (4th Cir. 2000)), *aff'd in part, rev'd in part on other grounds, vacated, and remanded*, 318 F.3d 1081 (Fed. Cir. 2003).

PHDATA 4987928_2

of a baby on the airplane or a passenger being injured from an encounter with turbulence.[33]
Requirements for crewmembers to submit irregularity reports appear throughout Southwest's
Flight Operations Manual (applicable to the pilots),[34] the Flight Attendant's Manual,[35] and
elsewhere. For example,

- the Southwest Boeing 737 Airplane Operating Manual requires an irregularity report to
  be submitted if an airplane is landed at higher than the maximum specified landing
  weight;[36]

- both the Flight Operations Manual and the Flight Attendant Manual require the
  crewmembers to submit irregularity reports any time a tarmac delay exceeds two hours;[37]

- the Flight Attendant Manual requires each flight attendant working the flight to file an
  irregularity report when any one flight attendant believes an irregularity report is
  necessary;[38]

- the Flight Operations Manual requires an irregularity report from the captain for any
  event involving security procedures (e.g., TSA, FFDO, Flight Deck Crew screening).[39]

Southwest uses irregularity reports as the means of conveying information about
abnormal flight and cabin operations to management.[40] Management, in turn, relies on the
irregularity reports to make required reports to government authorities (e.g., DOT, FAA, NTSB,
TSA) within the requisite timeframes, assist in accident and incident prevention, improve
customer service, evaluate and change procedures, restock emergency equipment, discipline
employees, and the like.[41] It is the corporate reliance on these reports in managing its affairs and

---

[33] Harper Decl. at ¶¶ 4-9; Leonard Decl. at ¶¶ 4-7.
[34] Leonard Decl. at ¶¶ 4-5.
[35] Harper Decl. at ¶¶ 4-5.
[36] Leonard Decl. at ¶ 5.
[37] Leonard Decl. at ¶ 7(c); Harper Decl. at ¶ 9(cc).
[38] Harper Decl. at ¶ 7.
[39] Leonard Decl. at ¶ 7(b).
[40] Cannon Deposition (Doc. No. 36-6) at 10 ("Q. Can you explain to us what the function of an
irregularity report is? A. Whenever there's an occurrence out of the ordinary during a flight, or
before a flight even, it's a way of conveying the information to Southwest Management the
events of what occurred."); Harper Decl. at ¶ 13; Leonard Decl. at ¶¶ 11-12.
[41] Harper Decl. at ¶ 13; Leonard Decl. at ¶¶ 11-12.

PHDATA 4987928_2

the corporate duty of the employees to accurately report that gives irregularity reports the trustworthiness that is the hallmark of Rule 803(6).[42]

### 3. The irregularity reports were prepared near the time of the events they describe.

The irregularity reports were prepared anywhere from the morning following Flight 392 to the third morning following the flight, and they were prepared by persons with first-hand knowledge of what they reported. The half-day to two-and-a-half day space between event and report preparation easily satisfies the "near the time" requirement of Rule 803(6).

The "at or near the time" requirement is flexible and practically applied.[43] It "depends on whether the time span between the transaction and the entry was so great as to suggest a danger of inaccuracy by lapse of memory."[44] Thus, if the record in question recorded micrometer measurements to five decimal places, a delay of an hour might be too much. A period of years probably will be too long.[45] Where—as here—we are dealing with reports of

---

[42] *E.g., Doali-Miller v. SuperValu, Inc.*, 855 F. Supp. 2d 510, 516 (D. Md. 2012) (quoting *Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d 200, 204-05 (4th Cir. 2000)) (internal quotation marks omitted) ("businesses depend on such records to conduct their own affairs; accordingly, the employees who generate them have a strong motive to be accurate and none to be deceitful."); *accord Webster v. ACB Receivables Mgmt.*, No. SKG-12-3620, 2014 U.S. Dist. LEXIS 55575, at *29 (D. Md. Apr. 22, 2014).

[43] Michael H. Graham, 30C Federal Practice and Procedure, § 7047 (West 2011 Interim Edition). In *Missouri P. R. Co. v. Austin*, 292 F.2d 415, 422-23 (5th. Cir. 1961), the Fifth Circuit explained the requirement as follows:

> The requirement that the regular course of business included a timely recording is not to be [stingily applied]. Dealing with business records, account must be taken of practical considerations. This second element is not to be judged, then, by arbitrary or artificial time limits, measured by hours or days or even weeks. That will depend on the nature of the information recorded, the immutable reliability of the sources from which drawn and similar factors.

[44] 2 McCormick on Evidence, § 289 (Thomson Reuters 2013).

[45] *E.g., Goldsmith v. Commissioner*, 86 T.C. 1134, 1145 (1986); *Webster v. ACB Receivables Mgmt.*, No. SKG-12-3620, 2014 U.S. Dist. LEXIS 55575, at *30 (D. Md. Apr. 22, 2014); *Yisrael v. State*, 993 So. 2d 952, 957 (Fla. 2008).

events on board an airplane, several days is "near the time."[46] Consider that this flight crew was on a trip not only from Dulles to Denver, but then from Denver to Phoenix.[47] As a practical matter, the very earliest the reports could have been prepared was on April 16th, when three of them <u>were</u> prepared. The latest report was delayed two days because its author had to care for two young children and a parent with Alzheimer's while her husband was away on business.[48]

Plaintiff offers neither argument nor case law to explain why periods of half-a-day or two-and-a-half days between the events and the submission of the reports make the danger of inaccuracy due to lapse of memory too great. In one case, where the objector similarly offered no argument or case law to support a conclusion of not being "at or near the time," the Seventh Circuit deemed the issue waived.[49]

**4. Plaintiff has not met his burden to show that the irregularity reports are untrustworthy and, in any event, they are trustworthy.**

Despite the fact that he bears the burden of establishing a lack of trustworthiness,[50] plaintiff offers nothing but the meager assertion that "Ramos and Paschall are

---

[46] *See, e.g., Schmutz v. Bolles*, 800 P.2d 1307, 1312 (Colo. 1990) (incident reports within a few days of malfunctions of medical equipment probably sufficiently close in time to qualify).

[47] Declaration of Shannon Ramos (attached as Exhibit 4) (hereinafter "Ramos Decl.") at ¶ 2.

[48] *Id.* at ¶¶ 3-5.

[49] *Wheeler v. Sims*, 951 F.2d 796, 804 (7th Cir. 1992) ("Wheeler argues that some of the memoranda in Exhibit 11 were inadmissible under Rule 803(6) because they were 'prepared long after the alleged events described therein.' The specific argument is that since Document 1 was prepared nine days after the event, Document 2 was prepared three days after the event, Document 3 was prepared five days after the occurrence, Document 5 reported some incidents without stating when they occurred and Document 6 was prepared eleven days after the event, the memoranda were not prepared 'at or near the time' as required under Rule 803(6). As the appellant has failed to support his argument with any legal reasoning or case law interpreting 'at or near the time,' we deem this argument to be waived.… Moreover, because no decision has been presented to us and we have not uncovered any case law in support of the theory that an eleven-day interval is excessive, we believe this period of time is within the proper and logical interpretation of 'at or near the time' under Rule 803(6)).”

[50] *E.g., Jordan v. Binns*, 712 F.3d 1123, 1136 (7th Cir. 2013) (recognizing that the opponent of admission of the business record had the burden of proving untrustworthiness); *Shelton v. Consumer Prods. Safety Comm'n*, 277 F.3d 998, 1010 (8th Cir. 2002) ("Once the offering party

probably unreliable sources of information ….."[51] "[B]ecause their requests had delayed Flight 392," he argues, "they would have an interest in using the Irregularity Reports to justify their actions to their superiors."[52] Plaintiff cannot point to any aspect of the irregularity reports subject to any real question. The circumstances of their preparation and their content, in fact, demonstrate trustworthiness.

The irregularity reports prepared by flight attendants Paschall and Ramos were prepared without collaboration by two people who did not know each other prior to Flight 392

---

*Continued from previous page*

has met its burden of establishing the foundational requirements of the business records exception, the burden shifts to the party opposing admission to prove inadmissibility by establishing sufficient indicia of untrustworthiness."); *In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 288 (3d Cir. 1983) ("Placing [the burden of showing lack of trustworthiness of a business record] on the party opposing admission was correct."), *rev'd and remanded on other grounds*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Black Diamond Energy, Inc. v. Encana Oil & Gas (USA) Inc.*, 326 P.3d 904, 917 (Wyo. 2014) ("The party objecting to the admission of a business record has the burden of establishing that a lack of trustworthiness should keep the document out of evidence."); *Lacy v. CSX Transp., Inc.*, 520 S.E.2d 418, 437 (W. Va. 1999)) ("[A] record of a regularly conducted activity that meets the foundational requirements of Rule 803(6) is presumptively trustworthy, and the burden to prove that the proffered evidence was generated under untrustworthy circumstances rests upon the party opposing its admission."). *See also Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d 200, 204-05 (4th Cir. 2000) (noting a presumption of trustworthiness for records kept in the regular course of business); *United States v. Tsoa*, No. 1:13cr137 (JCC), 2013 U.S. Dist. LEXIS 155089 (E.D. Va. Oct. 29, 2013) ("The theory behind this exception is that '[r]eports and documents prepared in the ordinary course of business are generally presumed to be reliable and trustworthy.'"); Summary of The Report of The Judicial Conference Committee on Rules of Practice and Procedure, http://www.uscourts.gov/uscourts/RulesAndPolicies/rules/Reports/ST09-2013.pdf. (last viewed on July 15, 2014) at pp. 30-31(observing that "[m]ost courts impose the burden of proving untrustworthiness on the opponent …," and explaining that committee's proposal was to expressly include this in the wording of the Rule); Letters from Chief Justice John Roberts (Apr. 25, 2014) transmitting "the amendments to the Federal Rules of Evidence that have been adopted by the Supreme Court of the United States (last viewed at http://www.supremecourt.gov/orders/courtorders/frev14_3318.pdf (changing subsection (E) to read: "the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.").
[51] Doc. No. 44 at 7.
[52] *Id.*

and who have not worked together since.[53] Any comparison of the reports (as well as the Captain's) shows that, without reciting the events identically, they describe the same events and —therefore—corroborate one another. Moreover, while he might characterize his behavior differently, plaintiff's testimony goes a long way to supporting, rather than questioning, the content of the reports. The table attached as Exhibit 5 highlights the trustworthiness of the irregularity reports by comparing the content of the Ramos and Paschall irregularity reports with one another and with plaintiff's statements.[54]

## 5. Declarant availability is irrelevant to this exception to the hearsay rule.

Plaintiff closes this section of his argument with the assertion that "it is not necessary to admit the Irregularity Reports into evidence since any of the four Southwest employees who prepared the reports would be available to testify at trial …." This assertion misses the point. The very title of Rule 803 is "Exceptions to the Rule Against Hearsay – Regardless of Whether the Declarant Is Available as a Witness."[55] Records that qualify under Rule 803(6) "may be admitted even though the author is alive, well, and even in court."[56]

---

[53] Ramos Deposition (Doc. No. 36-15) at 5 ("Q. And was that the first time you had worked with Miss Regina Paschall? A. Yes. Q. Have you worked with her since? A. No. Q. Do you know Miss Paschall outside of work? A. No."), 6 (explaining that the first time after April 15 ,2013 that she spoke with Ms. Paschall was after they learned the lawsuit had been filed); Paschall Deposition (Doc. No. 36-13) at 5 (she had never worked with Shannon Ramos before and did not know her outside of work), 6, 39 (she did not speak with Shannon Ramos after the flight until after she was asked to give her deposition in this case).

[54] While the content of the reports is unchanged in the table, the order is changed so as to line up similar topics across rows.

[55] Fed. R. Evid. 803 (emphasis added).

[56] 1-9 Art of Advocacy - Documentary Evidence § 9.06 (Matthew Bender & Co. 2014); 2 McCormick on Evidence, § 289 (Thomson Reuters 2013). Of course, the flipside is true in this case. Plaintiff deposed each of the authors of the irregularity reports and questioned them about their reports.

**B.      The real-world context of threats to aviation security is highly relevant to the question the jury will be asked to decide: whether Captain Cannon acted arbitrarily or capriciously in excluding plaintiff from Flight 392.**

In argument section II of his memorandum, plaintiff seeks to have this case tried in a vacuum. In his view, the jury should learn nothing about the nature of the world in which Southwest operates. Examples of evidence that should be suppressed include Richard Reid, the shoe bomber, and any mention of 9/11 other than "oblique references to the September 11, 2001 terrorist attacks for the sole purpose of discussing the distinction between security procedures before and after that date."[57] The less the jury knows about the "bad guys," in plaintiff's view, the better. Plaintiff's narrow view of what is relevant is exemplified by his assertion that "the only facts that are relevant are facts relating to what was happening on the airplane and at Dulles International Airport on April 15, 2013."[58] Respectfully, we disagree.

The only way a jury could properly assess whether or not plaintiff's exclusion from Flight 392 was arbitrary or capricious is to have context. A jury that knows only "facts relating to what was happening on the airplane and at Dulles International Airport on April 15, 2013" is a jury that lacks context. But context is "relevant."[59] "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."[60]

---

[57] Doc. No. 44 at 8.

[58] Doc. No. 44 at 10.

[59] *See, e.g., Banks v. Workman*, 692 F.3d 1133, 1148 (10th Cir. 2012) ("The jury was entitled to know the context in which Mr. Banks made his statement, a context shedding light on his motives for speaking with the police and the likely truthfulness of his claim he had nothing to do with the rape or killing."); *Dias v. Sky Chefs, Inc.*, 919 F.2d 1370, 1375 (9th Cir. 1990) ("The jury was entitled to consider that context and the intent behind the manager's specific acts in its determination of outrageousness."), *vacated on other grounds and remanded*, 501 U.S. 1201 (1991).

[60] Fed. R. Evid. 401.

The context of efforts by terrorists to do harm, massive harm, attention-getting harm, is relevant. Context, in the words of Rule 401, "has a[] tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." The fact we intend to prove is that Captain Cannon's decisions to return the airplane to the gate and not to allow the plaintiff to reboard were neither arbitrary nor capricious. The importance of context is plain. Senior District Judge Debevoise of the District of New Jersey hit the nail on the head in *Dasrath v. Continental Airlines, Inc.*, 467 F. Supp. 2d 431 (D.N.J. 2006), where he explained: "The objective assessment of a carrier's decision must take into account all the circumstances surrounding the decision, including the (perhaps limited) facts known at the time; the time constraints under which the decision is made; and, not least, the general security climate in which events unfold."

Imagine that instead of Southwest Flight 392 leaving from Dulles to fly to Denver on April 15, 2013, plaintiff flew on the very first scheduled flight at Dulles on November 19, 1962. According to the history books, that would have put him on an Eastern Air Lines Super Electra turboprop airplane flying from Newark to Dulles. Imagine now that one of the two flight attendants (referred to at the time as "stewardesses") on the Electra entered the cockpit (yes, the cockpit door would not have been locked; in fact the door likely would have been wide open) just before takeoff from Newark and told the captain that she and the other flight attendants were very alarmed because two men in the front row were glancing about nervously and fidgeting. After the laughter from the three-_man_ crew died down, the captain likely would have told the flight attendant "not to worry and be seated for takeoff." But, if he had listened to her and returned to the gate to discharge the fidgety passengers, the answer to the question whether his

decision was arbitrary or capricious would be a very different one than with Flight 392. The reason for the difference is context.

Much has happened since 1962 to provide the relevant context. What is relevant goes well beyond the "facts relating to what was happening on the airplane and at Dulles International Airport on April 15, 2013." The crewmembers' knowledge of what happened on 9/11, of subsequent efforts by terrorists to bring down airplanes, and of continuing threats to aviation security is all highly relevant context in which this case must be decided.[61]

Plaintiff's fallback assertion, that if the evidence is relevant it should be excluded under Rule 403 because it would be unfairly prejudicial, also misses the mark. Rule 403 does not exclude evidence that will prejudice the objecting party's case as a "consequence of the 'legitimate probative force of the evidence.'"[62] Rule 403 can be used only when the evidence would "invoke emotion in place of reason as a decision making mechanism" or create "a genuine risk that the emotions of the jury will be excited to irrational behavior."[63] Even then, the danger of "unfair prejudice" must "substantially outweigh[]" the probative value of the evidence.[64]

Far from the case here, the context evidence is extraordinarily probative and the risk of an emotion-driven decision *de minimis*. Plaintiff expresses concern that "[m]ere mention of any dangerous terrorist figure could stoke jury members' irrational fears."[65] Unfortunately,

---

[61] The one narrow area in which we might agree with plaintiff is that terrorist acts, events, or efforts that have occurred since April 15, 2013, likely would not be relevant. That is the most that we can take from the quote from *Williams v. Trans World Airlines* on page nine of plaintiff's memorandum.

[62] *United States v. Sarr*, 678 F. Supp. 2d 433, 436 (E.D. Va. 2010) (citing *United States v. Mohr*, 318 F.3d 613, 619 (4th Cir. 2003)), *aff'd*, 441 Fed. Appx. 178, 2011 U.S. App. LEXIS 15703 (4th Cir. 2011).

[63] *Sarr*, 678 F. Supp. 2d at 436 (quoting *United States v. Queen*, 132 F.3d 991, 998 (4th Cir. 1997), and *Mohr*, 318 F.3d at 618).

[64] Fed. R. Evid. 403.

[65] Doc. No. 44 at 10.

16

such fears would not be irrational. It is those fears that justify our Federal Government's expenditure of billions of dollars for the TSA's passenger screening program, not to mention the cost to the industry of hardened cockpit doors, self-defense training, the arming of pilots, and numerous other aviation security countermeasures.[66] Just this week, the former members of the 9/11 Commission released, through the Bipartisan Policy Center, a report entitled *Today's Rising Terrorist Threat and the Danger to the United States: Reflections on the Tenth Anniversary of The 9/11 Commission Report*.[67] Some of the highlights from their new report on this subject include the following:

- The struggle against terrorism is far from over—rather, it has entered a new and dangerous phase…. al Qaeda in the Arabian Peninsula has advanced bombmaking capabilities and has already attempted several attacks on U.S. aviation targets. While the various al Qaeda spinoffs are primarily focused on regional conflicts, they hate the United States and will not forego opportunities to strike at the U.S. homeland…. America cannot afford to let down its guard. Strenuous counterterrorism efforts will remain a fact of our national life for the foreseeable future. [68]

- Counterterrorism fatigue and a waning sense of urgency among the public threaten U.S. security. Many Americans think that the terrorist threat is waning—that, as a country, we can begin turning back to other concerns. They are wrong. The absence of another major attack on the homeland is a success in itself but does not mean that the terrorist threat has diminished. The threat remains grave, and the trend lines in many parts of the world are

---

[66] The 2015 budget request for TSA is $7.3 billion. *See* Statement of John S. Pistole, Administrator, Transportation Security Administration, U.S. Department of Homeland Security Before the United States House of Representatives Committee on Appropriations Subcommittee on Homeland Security, March 25, 2014 (last viewed on July 21, 2014 at https://www.tsa.gov/sites/default/files/publications/TSA_HAC-HS_03-25-14.pdf). "Beginning [this week], the federal Sept. 11 security fee that helps fund the Transportation Security Administration will more than double on many new tickets sold. The fee on a basic domestic nonstop round-trip ticket will go to $11.20 from $5. A one-way trip will cost $5.60 instead of $2.50 per flight segment. What's more, the current $10 per-ticket cap has been dropped, so a trip with multiple stops that last longer than four hours could see a whopping TSA fee multiplying with each additional leg of the itinerary." For Travelers, This Summer's New Fee on Airline Tickets, The Wall Street Journal (July 2, 2014) (last viewed on July 21, 2014 at http://online.wsj.com/articles/for-travelers-this-summers-new-fee-on-airline-tickets-1404361606).

[67] A copy of the report (hereinafter the "2014 Report") is attached as Exhibit 6.

[68] 2014 Report at 7.

pointing in the wrong direction. We cannot afford to be complacent—vigorous counterterrorism efforts are as important as ever.[69]

- As 9/11 fades into the rearview mirror, we must keep in mind that terrorists have repeatedly targeted aircraft. It would be a mistake to retreat from post-9/11 gains or lose focus on this critical area.[70]

- In sum, the terrorist threat has evolved, but it is still very real and very dangerous. The absence of another 9/11-style attack does not mean the threat is gone: As 9/11 showed, a period of quiet can be shattered in a moment by a devastating attack.[71]

It is these legitimate concerns, and the fears they generate, that inform the efforts that crewmembers take to ensure that their passengers, airplanes, selves, and even persons and property on the ground are protected.

Plaintiff also asserts that "[m]ention of dangerous terrorist figures could … confuse the issues because it could lead jurors to make the baseless conclusion that Plaintiff's behavior on the airplane on April 15, 2013 was similar to, for example, the behavior of the shoe bomber."[72] Plaintiff does not explain why a baseless conclusion should be expected, and Southwest has no intention of offering up names of terrorists without providing evidence to explain their relevance to the case.

**C.     Because Southwest's defense would be severely, and unfairly, handicapped by such orders, Southwest's experts should not be precluded from relying on Sensitive Security Information and the jury should understand the context of SSI to explain why certain information will not be shared.**

The thrust of plaintiff's Argument section III is that, if one side or the other has to proceed to trial with a handicap, it should be Southwest. The problem with this suggestion is that it ignores the statutory means that plaintiff has had at his disposal to seek access to the SSI, it is contrary to the public policy behind 49 U.S.C. § 44902(b), and it fails to recognize that in

---

[69] *Id.* at 8.
[70] *Id.* at 29.
[71] *Id.* at 15.
[72] Doc. No. 44 at 10.

PHDATA 4987928_2

analogous situations such cases are dismissed as non-justiciable. Moreover, pertinent to these principal points, Southwest has acted in good faith with respect to SSI issues in this case and the jurors should understand that laws involving SSI may limit the evidence they will hear and that neither party is responsible for withholding information from them.

Plaintiff also exaggerates the degree to which Southwest's case, or the anticipated testimony of Southwest's experts, will rely on SSI. Review of the expert disclosure and reports (Doc. No. 45-2) reveals that much of the anticipated testimony is not SSI and has been disclosed. The principal themes are that crewmembers are trained to maintain situational awareness, observe passenger behaviors, note behavioral patterns that are out of the ordinary, heed gut and instinct, and "say something" if they "see something." Moreover, Southwest will face similar handicaps with plaintiff's security expert, who could not disclose SSI on which she claims to rely for her opinions.[73]

### 1.    Southwest has acted in the utmost good faith with respect to Sensitive Security Information.

Plaintiff's arguments suggest that Southwest somehow is to blame for his lack of access to Sensitive Security Information (hereinafter "SSI"), but that could not be further from the truth. Plaintiff writes:

- "[B]oth Southwest and TSA have refused to disclose any SSI to Plaintiff."[74]

- "Southwest and its witnesses have consistently refused to produce anything designated as SSI or to testify concerning SSI. Moreover, the TSA has not responded to Plaintiff's requests to release the SSI at issue here. Nor has Southwest taken the legal steps

---

[73] Doc. No. 36-5 at 21, 24, 69 ("Q Okay. And is that SSI? A Yes. Q So you can't tell me? A Right. I'd have to kill you. Q We wouldn't want you to have to do that, so don't tell me."), 87-88, 91-92. Ms. Bryan testified that, despite her retirement from the Federal Government in 2007, she continues to receive SSI through consulting engagements. *Id.* at 19-21, 24, 29.
[74] Doc. No. 44 at 12.

necessary to compel TSA to make the SSI public – despite the fact that Southwest's case so heavily relies on the SSI content."[75]

• "Southwest and its witnesses refuse to disclose the content of these trainings, procedures, and policies, and they refuse to take the legal steps necessary to compel the TSA to make the information public."[76]

Southwest has "refused to produce anything designated as SSI or to testify concerning SSI" because to do so is against the law.[77] TSA takes seriously its SSI designations and terminates federal employees or pursues civil penalties against others for violations of its regulations.[78] Southwest, in turn, takes seriously its obligations to protect SSI.

In the process of working with TSA to facilitate its review of documents Southwest withheld from production, TSA advised counsel for Southwest:

> SSI may only be disclosed to "covered persons who have a need to know, unless otherwise authorized in writing by TSA." Id. § 1520.9(a)(2); see also U.S.C. § 114(r)…. Plaintiff and his attorney are not "covered persons who have a need to know." Id. § 1520.9(a)(2); see also id. § 1520.7 (defining "covered persons"). Southwest is prohibited from disclosing SSI to Plaintiff and his attorney without TSA's express authorization.[79]

As for "refus[ing] to take the legal steps necessary to compel the TSA to make the information public," we do not wish—nor should we need—to tilt at windmills. SSI is protected and dissemination tightly limited because of policy decisions made in the halls of government.

---

[75] Doc. No. 44 at 14.

[76] Id. at 17.

[77] 49 U.S.C. § 114(r); 14 C.F.R. §§ 1520.7, 1520.9.

[78] "Violation of this part is grounds for a civil penalty and other enforcement or corrective action by DHS, and appropriate personnel actions for Federal employees. Corrective action may include issuance of an order requiring retrieval of SSI to remedy unauthorized disclosure or an order to cease future unauthorized disclosure." 49 C.F.R. § 1520.17. See, e.g., Lacson v. United States Dep't of Homeland Sec. & Transp. Sec. Admin., 726 F.3d 170, 406 U.S. App. D.C. 402 (2013) (involving termination of federal air marshal who shared SSI); MacLean v. Dep't of Homeland Sec., 543 F.3d 1145 (9th Cir. 2008) (involving termination of federal air marshal who shared a text message that federal air marshal's would not be on overnight flights for a stated period) (a related case will be reviewed by the Supreme Court following grant of certiorari. Dep't of Homeland Sec. v. MacLean, 134 S. Ct. 2290, 189 L. Ed. 2d 172 (U.S. 2014)).

[79] Declaration of Jonathan M. Stern (attached as Exhibit 7) (hereinafter "Stern Decl.") at ¶ 14.

PHDATA 4987928_2

TSA has extremely broad discretion to designate categories of information as SSI.[80] Only the federal courts of appeals have jurisdiction to review TSA's determinations that particular information is SSI.[81] The courts of appeals' review of TSA is extremely circumscribed.[82]And the decision whether to disclose SSI belongs to TSA, the Coast Guard, or the Secretary of DOT,[83] not to Southwest.

Southwest also has gone above and beyond the call of duty with respect to lending assistance to plaintiff to obtain TSA's review for possible declassification from SSI status.[84] Southwest was under no legal obligation to do so but, nonetheless, took numerous steps to assist in and accelerate the process.[85] Southwest's counsel, in mid-March, initiated discussions with plaintiff's counsel about the need to involve the TSA early in the process if he wished to have TSA review documents Southwest would be withholding from production for possible removal from the SSI categorization.[86] At every step of the process, Southwest has assisted in that process.[87]

---

[80] 49 U.S.C. § 114(r); 49 C.F.R. § 1520.5(b); *see, e.g., Robinson v. Napolitano*, 689 F.3d 888, 892 (8th Cir. 2012) (explaining that review of TSA's SSI designations in the federal courts of appeals is limited to review for arbitrary and capricious classification).
[81] 49 U.S.C. § 46110; *Blitz v. Napolitano*, 700 F.3d 733, 735 (4th Cir. 2012) ("§ 46110 of Title 49 vests exclusive jurisdiction in an appropriate court of appeals with respect to a challenge to an order issued by the Administrator of the Transportation Security Administration …."); *Chowdhury v. Northwest Airlines Corp.*, 226 F.R.D. 608, 614 (N.D. Cal. 2004) ("Congress, however, has determined that review of TSA non-disclosure determinations must be performed exclusively by the Court of Appeals.").
[82] *Lacson v. United States Dep't of Homeland Sec. & Transp. Sec. Admin.*, 726 F.3d 170, 171-2, 406 U.S. App. D.C. 402 (2013).
[83] *See* 49 C.F.R. § 1520.9
[84] Stern Decl. at ¶¶ 3-21.
[85] *Id.*
[86] Stern Decl. at ¶ 3.
[87] *Id.*, at ¶¶ 3-21.

## 2.    Plaintiff has not sought to utilize the statutory means he has to access the SSI.

Plaintiff claims he is handicapped by his lack of access to SSI.[88] But the alternative he urges, to preclude Southwest's experts from considering SSI, is unfathomable. Moreover, plaintiff has, but has not invoked, a means of gaining access to the SSI for his use in this case, and he may have waited too long to invoke it, given the September 8th trial date.

A federal statute enacted seven years ago provides a means for him to petition this Court to deem him a "covered person" under 49 C.F.R. § 1520.7 in order to gain "access to the SSI at issue in the case …."[89] The statute provides a means for a plaintiff in a civil action, or his counsel, to "be designated as a covered person under 49 CFR Part 1520.7 [sic] in order to have

---

[88] For example, "Allowing Southwest to testify to the existence of secret training and procedures, without disclosing their content to the jury, would be highly prejudicial to Plaintiff …." Doc. No. 44 at 12.

[89] Section 525(d) of the Department of Homeland Security Appropriations Act of 2007, Pub. L. No. 109-295, 120 Stat. 1355 (Oct. 4, 2006); *see Ibrahim v. Dep't of Homeland Sec.*, No. C 06-00545 WHA, 2009 U.S. Dist. LEXIS 122598 (N.D. Cal., Dec. 17, 2009), *aff'd in part and rev'd in part on other grounds*, 669 F.3d 983 (9th Cir. 2012). Section 525(d) provides the following:

> That in civil proceedings in the United States District Courts, where a party seeking access to SSI demonstrates that the party has substantial need of relevant SSI in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the information by other means, the party or party's counsel shall be designated as a covered person under 49 CFR Part 1520.7 in order to have access to the SSI at issue in the case, provided that the overseeing judge enters an order that protects the SSI from unauthorized or unnecessary disclosure and specifies the terms and conditions of access, unless upon completion of a criminal history check and terrorist assessment like that done for aviation workers on the persons seeking access to SSI, or based on the sensitivity of the information, the Transportation Security Administration or DHS demonstrates that such access to the information for the proceeding presents a risk of harm to the nation: Provided, That notwithstanding any other provision of law, an order granting access to SSI under this section shall be immediately appealable to the United States Courts of Appeals, which shall have plenary review over both the evidentiary finding and the sufficiency of the order specifying the terms and conditions of access to the SSI in question: Provided further, That notwithstanding any other provision of law, the Secretary may assess a civil penalty of up to $50,000 for each violation of 49 CFR Part 1520 by persons provided access to SSI under this provision.

PHDATA 4987928_2

access to the SSI at issue in the case." In order to do so, he must "demonstrate[] substantial need

of relevant SSI in the preparation of [his] case and [an inability] without undue hardship to

obtain the substantial equivalent of the information by other means…," essentially the same

standard used to obtain non-opinion work product under Rule 26 of the Federal Rules of Civil

Procedure.[90] TSA advised plaintiff's counsel on April 14th of this statutory procedure.[91] He has

not sought to invoke it.

### 3. The jury should know about the concept of Sensitive Security Information.

Part of the relief plaintiff seeks is to preclude "witnesses from mentioning or

discussing the existence of SSI."[92] Like the context of terrorist efforts to down commercial

airliners or to use them as missiles that plaintiff seeks to keep from the jury, the fact of SSI is

relevant context. The practical reality is that, if the case proceeds to trial, members of the jury

will be aware that information is being kept from them. They should know why there are gaps in

the information they are given and that neither of the parties is responsible for withholding the

information.

### 4. The experts should be allowed to rely on Sensitive Security Information.

Another part of the relief plaintiff seeks is to "to prohibit expert witnesses from

assuming the existence of any procedures or policies designated SSI when forming any expert

opinion."[93] We contend that such a prohibition cannot work. If the expert witnesses must ignore

the procedures and policies they <u>know</u> to have been in place, their opinions could be unfounded,

in violation of Rule 702 and *Daubert* and its progeny. In the words of Rule 702, such opinions

---

[90] *See* Fed. R. Civ. P. 26(b)(3)(A)(ii).
[91] Stern Decl. at ¶ 15.
[92] Doc. No. 44 at 18.
[93] *Id.* at 18.

PHDATA 4987928_2

might not be "based on sufficient facts or data" and might not be "the product of reliable principles and methods."

Imagine experience has shown that, when undertaking a mission, terrorists likely will wear blue baseball caps and seven out of 10 times they will avoid speaking to any of the crewmembers onboard the airplane. This information is SSI. Both plaintiff's and defendant's experts know this information. A man wearing a blue baseball cap who spoke with one of the flight attendants when he boarded a flight has been removed as a potential security threat. Plaintiff's expert opines that the man should not have been viewed as a security threat. Although she cannot disclose the SSI grounds for her opinion, she relies on the fact that the man spoke to the flight attendant when he boarded. The defense expert opines that the man appropriately was viewed as a security threat because he was wearing a blue baseball cap and three out of 10 terrorists on a mission speak with a crewmember. He, too, cannot disclose the SSI grounds for his opinion. It should be apparent that, if they are required not to consider the SSI, their opinions will not be based on sufficient facts or data or the product of reliable principles and methods.

The order plaintiff requests could preclude the use of security experts in the case to provide any opinions on the reasonableness of the crewmembers' actions. Such preclusion presumably would apply to plaintiff's security expert as well as Southwest's. Such a result is unnecessary. There are many situations in which some of the bases for an expert's opinion are not shared with the jury.

Since 2000, the Federal Rules of Evidence have allowed experts to rely on inadmissible facts or data "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject …."[94] Nonetheless, absent special

---

[94] *See* Fed. R. Evid. 703, advisory committee notes.

circumstances, they cannot "disclose them to the jury …."[95] A similar approach can be taken

here, allowing expert testimony based in part on SSI without disclosing the SSI to the jury.

> **5.** **The policy behind section 44902(b) would be harmed by hamstringing air carriers in their defense of lawsuits challenging passenger removals.**

As we have shown numerous times before, section 44902(b) of Title 49 reflects a

federal policy intended to encourage air carriers to err on the side of safety.[96] "Federal law …

appropriately grants airlines latitude in making decisions necessary to safeguard passengers from

potential security threats. Section 44902(b) recognizes airlines' boarding practices as a specific

area of federal concern."[97] Handicapping an air carrier in its defense of litigation arising out of

its exercise section 44902(b) authority would adversely affect safety. Both carriers and their

crewmembers would be discouraged from exercising their authority by the prospect of lengthy

litigation and the liability that necessarily would flow from having to defend cases with one hand

tied behind their back.

> **6.** **The alternative is dismissing the case for lack of justiciability, not handicapping Southwest.**

No doubt this case could more easily be tried if certain of the evidence could be

disclosed to the jury. But if plaintiff has a problem with the limitations created by SSI and the

laws concerning SSI, the answer is not to hamstring Southwest in its defense; it is to dismiss the

case for lack of justiciability. That is how the federal courts deal with cases that can be

prosecuted or defended only by revealing state secrets.[98] "[I]f the circumstances make clear that

---

[95] Fed. R. Evid. 703.

[96] *E.g.*, Doc. No. 37 at 13-16.

[97] *Smith v. Comair, Inc.*, 134 F.3d 254, 257-58 (4th Cir. 1998).

[98] *See, e.g., Tenet v. Doe*, 544 U.S. 1 (2005); *El-Masri v. United States*, 479 F.3d 296 (4th Cir. 2007) ; *see also Al-Aulaqi v. Panetta*, No. 12-1192 (RMC), 2014 U.S. Dist. LEXIS 46689, at *5 n.5 (D.D.C. Apr. 4, 2014) (citing *Totten v. United States*, 92 U.S. 105, 107 (1876)); *Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1077 (9th Cir. 2010) (*en banc*)) (internal quotation

sensitive military secrets will be so central to the subject matter of the litigation that any attempt to proceed will threaten disclosure of the privileged matters, dismissal is the proper remedy."[99]

### D.   Crew resource management is highly relevant to the question the jury will be asked to decide.

In his Argument section II(B), plaintiff argues Southwest should be prohibited from discussing—or presenting any evidence on the concept of—crew resource management, or CRM.[100] He reasons that the promotion of harmony, trust, and cohesion among the crew, while an admirable goal for Southwest, "is utterly irrelevant to permissive refusal to transport under § 44902."[101] For either of two reasons, we again disagree.

First, CRM should be understood to have as its ultimate goal the management of human error.[102] It is "the effective use of all the resources available to crewmembers, including each other, to achieve a safe and efficient flight."[103] As explained by Chief Pilot Leonard in his expert report,

> Crew Resource Management is a comprehensive system that
> Southwest Airlines uses to enhance crew performance…. Crew
> Resource Management is the effective use of all the resources

---

*Continued from previous page*

marks omitted) ("The state secrets privilege encompasses two applications: one completely bars adjudication of claims based on state secrets, which requires dismissal, and the other excludes privileged evidence from the case, which may result in dismissal…. The state secrets privilege is premised on the recognition that in exceptional circumstances courts must act in the interest of the country's national security to prevent disclosure of state secrets, even to the point of dismissing a case entirely.").

[99] *El-Masri v. United States*, 479 F.3d 296, 306 (4th Cir. 2007) (quoting *Sterling v. Tenet*, 416 F.3d 338, 348 (4th Cir. 2005); *DTM Research, LLC v. AT & T Corp.*, 245 F.3d 327, 334 (4th Cir. 2001)) (internal quotation marks omitted).

[100] Plaintiff does not give it that label, but CRM is what he is arguing should be excluded from trial.

[101] Doc. No. 44 at 18.

[102] *See, e.g.,* Robert L. Helmreich, Ashleigh C. Merritt, & John A. Wilhelm, *The Evolution of Crew Resource Management Training in Commercial Aviation*, Int. J. Aviat. Psychol., 9(1), 19-32 (1999) (attached as Exhibit 8) (this paper provides useful background on the development of CRM).

[103] 14 C.F.R. § 121.907.

available to crewmembers, including each other, to achieve a safe and efficient flight…. In the past, airline captains were viewed with fear and reverence. The captain's decisions were always right and it was considered disrespectful to question the captain. As a result, there was little, if any, input from co-pilots, flight engineers, navigators, dispatchers, ground agents or other flight crewmembers such as flight attendants.

Several accidents led to recognition that steps should be taken to encourage other crewmembers to speak up if they had concerns about the safety of the captain's decisions or actions. The idea was that humans are capable of errors and that engaged teams could prevent human errors from leading to tragedy. Initially, the new system was known as "cockpit resource management," and it was intended to encourage cockpit crewmembers to speak up.

More recently, cockpit resource management has become "crew resource management," and its use has expanded outside of aircraft operations. Seeing the benefits of CRM in the airline industry, other industries, including healthcare, have adopted CRM.

While earlier generations of CRM focused on error management, more recently threat management has become part of CRM. One such threat is terrorism.

CRM encompasses a wide range of knowledge, skills, and attitudes including communications, situational awareness, problem solving, decision making and teamwork. CRM can be viewed as a management system that utilizes all available resources, equipment, procedures, and people, to promote safety and security.[104]

Harmony, trust, and cohesion are just stepping stones toward good error management and the overall promotion of safety and security. Therefore, CRM's relevance is to the manner in which the decision whether plaintiff's presence on the airplane was inimical to safety was made.[105]

---

[104] Doc. No. 45-2 at 23 (paragraph numbering omitted).

[105] Southwest is by no means advocating the captain's abdication of authority. As explained by pilot security trainer Elaine Bohlin, "It is still ultimately the captain's decision based on that information that he gets. He will evaluate that information that is given to him, but he does so with the understanding that his crew is well trained and professional and will be providing him good information." Bohlin Depo. (Doc. No. 36-4) at 53. "From the aspect of crew resource

PHDATA 4987928_2

Second, one of the expressed concerns in the harmony, trust, and cohesion area is that safety would be compromised were the captain to ignore the concerns of the flight attendants. The idea is that plaintiff's presence on Flight 392 would be inimical to safety because the flight attendants who were alarmed by his behavior—and that of the other removed passenger—could become preoccupied.[106] In both cases, the CRM issues are relevant to Southwest's section 44902(b) defense.

Also notable is the fact that this may be the issue most central to the determination of whether Captain Cannon acted arbitrarily or capriciously on April 15, 2013, and it involves little or no SSI. Plaintiff's security expert agrees that Captain Cannon's decision to bring the airplane back to the gate was the safest course of action.[107] Thus, the principal focus of the case is the decision by Captain Cannon not to reboard the plaintiff. A decision made using CRM principles is at its core.

**E.     The crewmember witnesses should not be precluded from wearing in the courtroom the same clothing they wear on the job.**

Much like plaintiff's desire to keep the truth about the security threats to aviation from the jury, he wishes also to diminish the fact that Captain Cannon has not only the privilege but also the awesome responsibility of being the pilot-in-command of Southwest's Boeing 737s. Without a single case to support his request, he asks the Court to order Captain Cannon to refrain

---

*Continued from previous page*

management and also from a safety and security aspect of the flight, it's very, very important that the crew is able to act as one and for the cabin crew to know that their -- their input is valued and they will not -- their information is not discounted. Q. Does that mean the captain is going to blindly follow what they say? A. No, sir." Bohlin Depo. (Doc. No. 36-4) at 62-3.

[106] Doc. No. 45-2 at 7 ("The ability of the cabin crew to appropriately function if they were preoccupied with the two passengers could be jeopardized."); Bohlin Depo. (Doc. No. 36-4) at 61 ("And in the absence of any further information -- or even if there was further information, he would still be consulting with his crew to see how this might affect them and their -- their duties and their ability to safely perform their duties and ensure the safety and security of others on the flight, their functions as flight attendants").

[107] Bryan Depo. (Doc. No. 36-5) at 90.

PHDATA 4987928_2

from wearing his uniform, and the flight attendants to refrain from wearing their uniforms, to trial. In other words, plaintiff seeks to preclude the crewmembers from wearing to court the very same uniforms they wore during the events in question. Plaintiff's argument for such unusual relief is that he would be unduly prejudiced because the uniforms "would create an aura of authority," thereby discouraging the jury from judging the crewmembers.[108]

To the extent that there is any law in this area, it goes against plaintiff.[109] It would be one thing to order a party not to come to trial dressed as something he is not. It would be understandable, for example, that a court might prohibit a neurosurgeon from taking the stand dressed as Superman. We would not want someone not a priest taking the stand wearing a cleric's collar. But the priest is entitled to take the witness stand with his collar in place,[110] the rabbi with his yarmulke,[111] the policeman in uniform,[112] the soldier with his Army uniform.[113]

---

[108] Doc. No. 44 at 22.

[109] *State v. Fergerstrom*, 101 P.3d 652, 670 (Hawaii Ct. App.) ("[A]bsent a mode of dress that is obscene, disruptive, distractive, or depreciative of the solemnity of the judicial process, or that will create an atmosphere of unfairness, a party or a witness may decide what to wear in court."), *aff'd*, 101 P.3d 225 (Hawaii 2004); *Ryslik v. Krass*, 652 A.2d 767, 769 (N.J. Super. App. Div. 1995) ("If a party is a member of the armed services, a firefighter, or a priest, when appearing in court he or she should be entitled to dress in a manner ordinary to him or her.").

[110] *E.g.*, *O'Reilly v. New York Times Co.*, 692 F.2d 863, 870 n.8 (2d Cir. 1982) ("Rev. O'Reilly is not a lawyer who happens also to be a priest; he is a priest who happens also to be a pro se plaintiff in a civil action. There is little question that were he to appear at trial only as a party and a witness in his own behalf he would not be expected to remove his collar."); *Ryslik v. Krass*, 652 A.2d 767, 769-72 (N.J. Super. App. Div. 1995) (reversing trial court that had granted a new trial because plaintiff, a priest, wore his collar when he testified); *State v. Hodges*, 695 S.W.2d 171 (Tenn. 1985) (defendant could not be barred from dressing as a chicken absent the trial judge determining that his asserted religious grounds for doing so were disingenuous).

[111] *Close-It Enterprises, Inc. v. Weinberger*, 64 A.D.2d 686 (N.Y. App. Div. 2d Dep't 1978) (orthodox Jew must be permitted to wear skullcap when appearing as party); *see also In re Palmer*, 386 A.2d 1112, 1116 (R.I. 1978) (same).

[112] *Edwards v. Ellis*, 478 So. 2d 282, 286 (Miss. 1985) (reversal not warranted when defendant highway patrolman allowed to wear uniform when sued for conduct unrelated to official duties); *Wirsing v. Krzeminski*, 213 N.W.2d 37, 44 (Wis. 1973) (no error where trial court allowed defendant police officer to testify wearing uniform with American flag patch).

PHDATA 4987928_2

Appellate courts repeatedly have reversed trial judges for precluding parties or witnesses from wearing a uniform they were entitled to wear.[114]

## III.   CONCLUSION

        For the foregoing reasons, plaintiff's Motion in Limine for Certain Pre-trial Orders should be denied.

Dated:  July 25, 2014          Respectfully submitted,

                                     SOUTHWEST AIRLINES CO.
                                     By Counsel

SCHNADER HARRISON SEGAL & LEWIS LLP

By: /s/*Jonathan M. Stern*
Jonathan Stern (Va. Bar No. 41930)
Schnader Harrison Segal & Lewis LLP
750 Ninth Street, N.W., Suite 550
Washington, DC 20001-4534
Phone: 202-419-4202
Fax:     202-419-4252
Email: jstern@schnader.com

---

*Continued from previous page*

[113] *E.g., People v. Garcia*, 2010 Cal. App. Unpub. LEXIS 6947 (Cal. App. 4th Dist. Aug. 31, 2010) (attached as Exhibit 9); *Johnson v. Commonwealth*, 19 Va. App. 163, 449 S.E.2d 819 (1994) (error for trial judge to have precluded defendant from wearing his Navy uniform on the witness stand); *cf. Forgey v. State*, 886 N.E.2d 16, 21 (Ind. Ct. App. 2008) ("*Johnson*, however, can be easily distinguished from the instant matter. Here, Forgey was not on active duty when the trial court denied his request to wear his uniform at trial, but rather had been honorably discharged nearly fourteen years prior to trial. Further, had the trial court allowed Forgey to wear his uniform at trial, it would have been a violation of federal law…."); *see also Ford v. Nationwide Mut. Fire Ins. Co.*, 214 F. Supp. 2d 11 (D. Me. 2002) (denying motion for new trial based on trial court's refusal to order witness to remove American flag pin while testifying).
[114] *E.g., O'Reilly v. New York Times Co.*, 692 F.2d 863, 870 n.8 (2d Cir. 1982); *Ryslik v. Krass*, 652 A.2d 767, 769-72 (N.J. Super. App. Div. 1995).

PHDATA 4987928_2

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on this 25th day of July 2014, I

1.    filed this Memorandum of Points and Authorities In Opposition To Plaintiff's Motion in Limine For Certain Pre-Trial Orders using the Court's ECF filing system, which will provide a copy to:

> Thomas R. Breeden, Esq.
> Thomas R. Breeden, P.C.
> 10326 Lomond Drive
> Manassas, Virginia 20109
> Telephone: (703) 361-9277; Telefax: (703) 257-2259; and

2.    I also emailed a copy to Mr. Breeden at trb@tbreedenlaw.com.

> By: /s/ *Jonathan M. Stern*
> Jonathan M. Stern (Va. Bar No. 41930)
> SCHNADER HARRISON SEGAL & LEWIS LLP
> 750 Ninth Street, NW
> Suite 550
> Washington, DC 20001
> Telephone: (202) 419-4202
> Telefax: (202) 419-4252
> Email: jstern@schnader.com

PHDATA 4987928_2