IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| CHIRAG SHAH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION No. 1:13CV1481 |
| | ) |
| SOUTHWEST AIRLINES, et al | ) |
| | ) |
| Defendant. | ) |

**Plaintiff's Memorandum of Law in Opposition to
Defendant's Motion *In Limine* to Exclude Evidence of
Ava Alley's Reference to "Middle Eastern Looking Men" in her "Company Report"**

Plaintiff respectfully asks this Court to deny Defendant's Motion *In Limine* to Exclude Evidence of Ava Alley's Reference to "middle eastern looking men" in her "Company Report." What Defendant now refers to as "company reports" are none other than the "irregularity reports" filed by Flight 392's pilot and flight attendants in the days following April 15, 2013, when Plaintiff was excluded from that flight because of his race. As explained below, Alley's reference to "middle eastern looking men" is probative of at least two issues: First, Alley's credibility as a witness; and, second, whether the other members of the Flight 392 crew discussed Plaintiff as "middle eastern looking."

I.  Ava Alley's "Irregularity Report," like the reports prepared by the other two flight attendants and the captain, is inadmissible hearsay

1

For the reasons set forth in Plaintiff's pending motion *in limine*, all of the "Irregularity Reports," including Ava Alley's, are inadmissible hearsay.[1] Nevertheless, if the reports do come in – or are referred to or admitted on cross-examination – for the reasons set forth below, it is important that Plaintiff be allowed to refer to them in their entirety, including the reference to Plaintiff and the other passenger as being "middle eastern looking men."

    II.    **Because it is relevant to the credibility, state of mind, and thought processes of *all* of the flight attendants, including Ms. Alley, and the reasons for the captain and crew deciding to first remove Mr. Shah and then to refuse to re-board him, Ava Alley's description of Mr. Shah – and the other passenger removed from the plane – as "middle eastern looking men" is undoubtedly relevant**

"Evidence is relevant if: (a) it has a tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."[2] Here, Plaintiff expects Ms. Alley's credibility to be an issue at trial. The day after the events on the Southwest airlines flight, and the day of her deposition, Ms. Alley had a crystal clear recollection of Mr. Shah and the other passenger being "middle eastern looking." But her memory disappeared in a puff of smoke when she was asked whether she discussed the issue with the rest of the crew when she was waiting with them on the jetway. In other words, to exclude Ms. Alley's statement from her "Irregularity Report," this Court would have to make its own finding of fact that Ms. Alley was telling the truth, when all indications are that she is not.

---

[1] *See* Dkt. 43-45.
[2] Fed.R.Evid. 401.

Here is Ms. Alley's full "Narrative" in her irregularity report:

> I did not witness the event,.. all I knew was that we had aborted take-off from the Captain announcing we had to go back to the gate for a passenger incidence. As soon as we arrived at the gate, & the doors were disbarment, two police persons came aboard and escorted 2 middle eastern looking men off the plane. After some time, we closed the doors and pushed back without them.[3]

Notice that Ms. Alley carefully avoided any mention of her discussions with the other flight attendants, Ms. Paschell and Ms. Ramos, or with the captain while on the jetway. Nevertheless, here, one day after the events, she was refreshingly candid in describing the two passengers as "middle eastern looking."

This is in marked contrast to her defensive and sarcastic deposition testimony a year later, in which her memory evaporated in response to a key question. Here is the relevant section of Ms. Alley's testimony:

> Q. And you already explained what the function [of an Irregularity Report] is. In the report I believe you indicate that two Middle Eastern looking men were escorted off the plane; is that correct?
>
> A. Yes. I came to the front to note color hair, color skin. If they were green I would have noted that. I'm not being sarcastic, I'm being kind of funny.
>
> Q. But you did mention in your report there were two Middle Eastern looking men; is that correct?
>
> A. They could have been East Indian.
>
> Q. On that day, in your report it mentions that they were –
>
> A. Looking, yes.

---

[3] Alley Irregularity Report (Dkt. 36-2).

3

Q. Can you just tell us when you created this report why did you assume that they were -- did you assume they were Middle Eastern or were just Middle Eastern looking in your opinion?

A. They just looked Middle Eastern.

Q. Can you describe what Middle Eastern looking is?

A. Dark hair.

Q. You can point at me.

A. No. Dark hair, darker skin.

MR. STERN: Why, are you Middle Eastern?
MR. MAZAHERI: Yes.
THE WITNESS: Dark hair, darker skin. But there have been -- I've seen the rare occasion lighter, you know, lighter skin, too.
BY MR. MAZAHERI:
Q. Did any of the other flight attendants speak with you about these two gentlemen at any point?

A. Afterwards.

Q. And did they describe these men as Middle Eastern to you?

A. Not that I can recall.[4]

In summary, on April 16, 2013, Ms. Alley had a clear recollection of the two dark-haired dark-skinned men as being Middle Eastern looking one day after the Boston bombing and one day after they were removed from the plane she was flying on. And she recalled these key facts one year later at her deposition. It follows that their appearance was memorable enough to warrant mention in her Irregularity Report and to stick in her mind for a year. Yet at her deposition, she couldn't seem to remember whether she discussed the men's dark skin and supposed Middle

---

[4] Alley Deposition (Dkt. 36-1) at 14-15.

Eastern origins with the other crew members on the jetway, at the key moment when the captain and crew decided not to allow them to reboard. Thus, Ms. Alley's notation decision to record the passengers' appearance as "middle eastern looking" undermines her credibility as to her testimony concerning what was discussed on the jetway.

Put another way, would Ms. Alley have taken note in her report of the fact that Mr. Shah and the other passenger were "middle eastern looking" if this observation had not played a key role in the decision by the captain and crew to have them removed from the plane and to refuse to allow them to reboard? After all, not a single other basis for their removal and refusal to allow reboarding is mentioned anywhere in Ms. Alley's Irregularity Report.[5] If she had been told by the other flight attendants that the passengers were acting suspicious or fidgety, wouldn't that be something one would expect to make its way into her report, which was prepared only a day later?

Not only does the notation undermine her own credibility, it also undermines the credibility of the captain's testimony and the testimony of the other crew members – tending to show, in fact, that the crew did discuss Mr. Shah's race before kicking him off the flight. Here is what Flight Attendant Paschall had to say about Mr. Shah's race and ethnicity: "He seemed to be maybe about mid 30s as well, dark hair, brown skin."[6] She was then asked, "At that time if you had to guess would you

---

[5] *See* Alley Irregularity Report (Dkt. 36-2).
[6] Paschall Deposition (Dkt. 36-13) at 11.

say that they may have been from the same part of the world?"[7] Her response was, "The one on this side could have been Hispanic, you know, 1C. But this one [Mr. Shah] I started to watch him more and I would have guessed that he was from India or Middle East, you know."[8] And in an earlier question, Ms. Paschall had already stated that she thought the passenger in 1C was Hispanic or Indian.[9] In other words, race, ethnicity and national origin were right at the top of her mind when she and Ms. Ramos decided to ask the captain to return to the gate. Thus, it seems passing strange that after standing together on the jetway and discussing with each other and the captain whether to allow Mr. Shah to reboard, the only salient detail that made it into Ms. Alley's Irregularity Report was the fact that Mr. Shah and the other passenger were "middle eastern looking."[10] A reasonable jury could conclude, based on this evidence, that Flight 392's crew did indeed discuss Mr. Shah's supposed race while standing on the jetway.

But the most evasive testimony on the score of Mr. Shah's national origin, race and ethnicity came from Flight Attendant Ramos, who repeatedly testified that Mr. Shah was "dark haired and tanned."[11] So well prepared was she for her deposition that she could not even bring herself to state what every other crew member had affirmatively stated – that at the time of the events, every crew

---

[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *See* Alley Irregularity Report (Dkt. 36-2).
[11] Ramos Deposition (Dkt. 36-15) at 11 and 13.

6

member thought that Mr. Shah was "middle eastern looking" or possibly Indian. Ms. Ramos' actual testimony on this score is illuminating:

- "Q. Do you recall their complexion, what they [i.e., Mr. Shah and the other passenger] looked like besides the dark hair?" "A. Dark hair, tanned – maybe tanned skin."[12]
- "Q. You described him [i.e., the other passenger] as dark hair, tanned skin, and you described the passenger in 1F [i.e., Mr. Shah] as also dark hair, tanned skin; is that correct?" "A. Yes."[13]

But when asked the following question – "Based on your observation that day that he was a man with dark hair and tanned skin did you make any assumptions about his nationality or what part of the world he came from?" – her answer was: "No."[14] In other words, every member of the crew remembered a year later that at the time they thought Mr. Shah and the other passenger were "middle eastern looking" – as recorded by Ms. Alley – with the sole exception of Ms. Ramos. A reasonable jury could conclude that Ms. Ramos's testimony was less than truthful.

Thus, Ms. Alley's recording of the one key fact that led to the removal of Mr. Shah – that he was "middle eastern looking" – undercuts Ms. Ramos's testimony. And because Ms. Alley did not observe Mr. Shah or the other passenger on the plane, her decision to record the fact that the two men were "middle eastern looking," together with her remarkably selective recollection of whether race,

---

[12] *Id.* at 11.
[13] *Id.* at 13.
[14] *Id.* at 45.

7

ethnicity or national origin were discussed on the jetway, further undercuts Ms. Ramos's already evasive testimony.

Finally we have the testimony of the captain, Mr. Cannon, who testified during his deposition a year later that Mr. Shah and the other passenger "appeared to be darker skinned people. I'm not sure which race, but they appeared darker skinned and dark hair."[15] And based on his observations on the jetway, Mr. Cannon thought that Mr. Shah and the other passenger were Middle Eastern. In his words, "I suppose if I had to designate it they would appear to be Middle Eastern."[16] And in response to a follow-up question – "And at the time when you observed these darker skinned people, at that time did you have an opinion as to where they were from?" – Mr. Cannon answered "Yes" and stated that he thought the passengers were "Middle Eastern."[17] Thus, Ms. Alley's Irregularity Report shows what was really on the minds of the captain and crew that day.

## Conclusion

In sum, we have Ms. Alley's Irregularity Report which appears to have been based on her observation of Mr. Shah and the other passenger on the jetway, coupled with her conversations with the captain and crew that she can no longer recall, and the only salient fact that she deemed important enough to mention the following day in her "Irregularity Report" was that Mr. Shah and the other passenger were "middle eastern looking." If the captain and crew had discussed

---

[15] Cannon Deposition (Dkt. 36-6) at 18.
[16] *Id.* at 36.
[17] *Id.*

suspicious behavior and fidgeting, wouldn't that be more likely to make it into her Irregularity Report? Thus, the fact that Ms. Alley believed this one item to be important enough to include speaks volumes about what she really discussed with her fellow crew members on the jetway on the day of the Boston bombing. A reasonable jury could conclude that they discussed Mr. Shah's physical appearance and what they believed to be his race. Accordingly, if the Irregularity Report comes in, it should be admitted in full and not be selectively hidden from the jury.

For these reasons, Defendant's motion *in limine* should be denied.

Dated:  July 25, 2014

                                            CHIRAG SHAH
                                            By Counsel
                                            _____/s/_____
                                            Thomas R. Breeden

Thomas R. Breeden, VSB # 33410
Thomas R. Breeden, P.C.
10326 Lomond Drive
Manassas, VA 20109
Tel (703) 361-9277, facsimile (703) 257-2259
trb@tbreedenlaw.com

Sanjay Sethi
Reza Mazaheri (*Admitted Pro Hac Vice*)
Sethi & Mazaheri, LLC
9 Polifly Road, 2nd Floor
Hackensack, NJ  07601
201-606-2267
Facsimile 201-595-0957
sethi@sethimaz.com

Brian L. Bromberg (*Admitted Pro Hac Vice*)
Bromberg Law Office, PC
26 Broadway, 21st Floor
New York, NY 10004
Tel (212) 248-7906 Fax (212) 248-7908
brian@bromberglawoffice.com
*Counsel for Plaintiff*

9

## CERTIFICATE OF SERVICE

I certify that on the 25th day of July, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Jonathan M. Stern (VSB# 41930)
Schnader Harrison Segal & Lewis LLP
750 Ninth Street, NW
Suite 550
Washington, DC  20001
(202) 419-4202
(202) 419-4252 fax
jstern@schnader.com
*Counsel for Defendant*

_____/s/_____
Thomas R. Breeden, Esquire
(VSB #33410)
THOMAS R. BREEDEN, P.C.
10326 Lomond Drive
Manassas, Virginia  20109
(703) 361-9277 Telephone
(703) 257-2259 Facsimile
trb@tbreedenlaw.com
*Counsel for Plaintiff*