IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| CHIRAG SHAH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION No. 1:13CV1481 |
| | ) |
| SOUTHWEST AIRLINES, et al | ) |
| | ) |
| Defendant. | ) |

**Plaintiff's Memorandum of Law in Opposition to Southwest's
Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment**

Respectfully submitted,

Thomas R. Breeden, VSB # 33410
Thomas R. Breeden, P.C.
10326 Lomond Drive
Manassas, Virginia 20109
Tel (703) 361-9277 Fax (703) 257-2259
*trb@tbreedenlaw.com*

Sanjay Sethi
Reza Mazaheri
Sethi & Mazaheri, LLC
9 Polifly Road, 2nd Floor
Hackensack, NJ 07601
Tel (201) 606-2267 Fax (201) 595-0957
sethi@sethimaz.com

Brian L. Bromberg
Bromberg Law Office, PC
26 Broadway, 21st Floor
New York, NY 10004
Tel (212) 248-7906 Fax (212) 248-7908
brian@bromberglawoffice.com
*To Be Admitted Pro Hac Vice*
*Counsel for Plaintiff*

# I.     Preliminary Statement

On April 15, 2013, Plaintiff Chirag Shah was not free to move about the country. Mr. Shah, who was born and raised in Gujarat State, India,[1] boarded a flight out of Dulles International Airport. But 400 miles away, in Boston, April 15, 2013 was anything but routine. At about 2:49 p.m., two bombs exploded near the finish line of the Boston Marathon.[2] By the time Mr. Shah arrived at the airport in Virginia, CNN and other news networks were already broadcasting footage from the site of the explosion.[3]

As explained below, on a day in which America suffered a horrific terrorist act, two Southwest flight attendants saw two passengers whom they supposed to be Middle Eastern and got spooked. In the flight attendants' shoes, many people may have experienced the same "gut feeling." But not many people – certainly no one who could be called reasonable or rational – would have done what the pilot did, which was to refuse Mr. Shah passage without any evidence that he was inimical to safety – and substantial evidence that Mr. Shah was perfectly safe. The pilot's act was the very definition of "arbitrary and capricious." For these and other reasons explained below, Mr. Shah asks this Court to deny Southwest's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment.

# II.     Legal Context, Questions Presented & Summary Judgment Standard

Plaintiff's surviving claim, listed as Count II in the Complaint, alleges that Southwest violated Mr. Shah's equal right, under 42 U.S.C. § 1981, to make and enforce contracts. "To establish a claim under § 1981, a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race

---

[1] *See* Deposition of Chirag Shah ("Shah Depo."), ECF#36-17, at 7. *See also* accompanying Declaration of Plaintiff Chirag Shah ("Shah Decl."), at ¶ 2.
[2] *See* Stipulation of Material Facts ("Stip."), ECF#27, ¶ 1.
[3] *See Id.* at ¶ 1, ¶ 2.

by the defendant; and (3) the discrimination concerned one of more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.)."[4] "The principles on the order and allocation of proof under Title VII outlined in *McDonnell Douglas Corp. v. Green* . . . in general are also applicable to claims under § 1981."[5] This means that "(1) The plaintiff has the initial burden of proving a prima facie case of discrimination; (2) the burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for [its] actions; (3) finally, the plaintiff has the opportunity to prove by a preponderance of the evidence that defendant's proffered reason is merely pretextual."[6]

In its Motion for Summary Judgment, Southwest argues that it is entitled to immunity under 49 U.S.C. § 44902(b), which reads, in pertinent part: "[A]n air carrier . . . may refuse to transport a passenger . . . the carrier decides is, or might be, inimical to safety." Several cases have interpreted § 44902(b), most notably the Second Circuit case of *Williams v. Trans World Airlines*. There, the court held that "[t]he test of whether or not the airline properly exercised its power under . . . [§ 44902(b) to refuse passage to an applicant or ticket-holder rests upon the facts and circumstances of the case as known to the airline at the time it formed its opinion and made its decision and whether or not the opinion and decision were rational and reasonable and not capricious or arbitrary in the light of those facts and circumstances."[7] Plaintiff agrees that, if Southwest's refusal to transport him was motivated solely by a decision that he was, or might have been, "inimical to safety" (as interpreted in *Williams*), his § 1981 must fail.

But that is where the parties' agreement ends. In its Motion for Summary Judgment,

---

[4] *Mian v. Donaldson, Lufkin & Jenrette Securities Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993).
[5] *Meyers v. Ford Motor Co.*, 659 F.2d 91, 93 (8th Cir. 1981), *citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (other citations omitted).
[6] *Meyers*, 659 F.2d at 93 (citations omitted).
[7] *Williams v. Trans World Airlines*, 509 F.2d 942, 948 (2d Cir. 1975).

Southwest lists "five principles" it claims "apply to the determination of whether an air carrier's decision to refuse transport is arbitrary or capricious."[8] Southwest cites to the First Circuit case of *Cerqueira v. American Airlines, Inc.*[9] for all five. But each is dicta and, more importantly, each is irrelevant to the outcome of this case. Myriad facts touching on the basis of Southwest's decision remain in dispute, and, contrary to Fed. R. Civ. P. 56, Southwest fails to support many of its "Material Facts" with admissible evidence.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[10] "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."[11]

### III.    Plaintiff's Response to Southwest's Material Facts & Objections to Admissibility

The numbered points below Plaintiff's responses and objections to Southwest's "Material Facts as to Which There Is No Genuine Issue." To make Plaintiff's responses more intelligible, Plaintiff has reorganized the rambling fact section of Southwest's brief into numbered points. The list of Southwest's "Material Facts" that has been reorganized into numbered format is attached as **Exhibit A** to the accompanying declaration of attorney Thomas R. Breeden.

1-12.    Admit.

13.    Admit; however, the Paschall Irregularity Report is inadmissible hearsay.

14.    Deny. The Paschall Irregularity Report is inadmissible hearsay. Additionally, pg. 8 of the Paschall Depo. contains no support for this assertion.

---

[8] Memorandum of Law in Support of Southwest's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment ("SJM Memo"), ECF#37, at 14.
[9] 520 F.3d 1 (1st Cir. 2008).
[10] Fed.R.Civ.P. 56(a).
[11] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

15-20. Deny. The Paschall Irregularity Report is inadmissible hearsay.

21. Deny. Plaintiff, who was seated in 1F, was not behaving erratically. Plaintiff has testified that he was not acting nervous.[12] In fact, Plaintiff was quite calm during the initial portion of the airplane's taxi.[13] For no reason at all, one of flight attendants began staring at him, causing Plaintiff to become self-conscious, at which point Plaintiff looked away from the flight attendant, then looked back at her.[14] During this initial portion of the taxi, Mr. Shah was not looking across the aisle to his left, in the direction of the windows or any passengers on the other half of the plane; to the contrary, Mr. Shah makes clear in his deposition testimony that he did not look in this direction until after the airplane had already made a U-turn to head back to the gate – i.e., *after* Ms. Ramos called the cockpit.[15] When Plaintiff did eventually look toward the left side of the airplane, he looked in that direction, at most, twice.[16] In short, Plaintiff's actions and demeanor on the airplane were no different from the other passengers on the airplane.

22. Deny. See *supra* Plaintiff's response to No. 21.

23. Deny. See *supra* No. 21. Moreover, Defendant's placement of this excerpt of Ms. Ramos's deposition at this point in its narrative is misleading. Ms. Ramos, in this portion of her deposition, is describing how she perceived Mr. Shah's actions later in the sequence of events. This is evident from the fact that, in this portion of the deposition, Ms. Ramos states that Mr. Shah's seatbelt was buckled. As is made clear as Defendant's statement of facts progresses, at this point, Mr. Shah's seatbelt was not yet buckled. See Southwest Material Fact No. 35.

24. Admit that Ms. Ramos had been a flight attendant for 14 years, but deny that she

---

[12] *See* Shah Depo., ECF#36-17, at 23, 53. *See also* Shah Decl. at ¶ 6.
[13] *See* Shah Depo., ECF#36-17, at 38. *See also* Shah Decl. at ¶ 22.
[14] *See* Shah Depo., ECF#36-17, at 23, 38. *See also* Shah Decl. at ¶ 25, ¶ 26.
[15] *See* Shah Depo., ECF#36-17, at 36-37. *See also* Shah Decl. at ¶ 27-29.
[16] *See* Shah Depo., ECF#36-17, at 37. *See also* Shah Decl. at ¶ 29.

had never seen "behavior like this" before. Defendant's Material Fact No. 24 is taken from pg. 17 of the Ramos Depo., while Defendant's Material Fact No. 23 is taken from pp. 14-15 of the Ramos Depo. In context, Ms. Ramos's statement on pg. 17 is responsive to Counsel for Plaintiff's question, "Do you recall any other time before this event or after this event where you had a similar experience? In particular, observing an erratic passenger?" As stated above, Plaintiff was not acting erratically. See *supra* Plaintiff's response to No. 21. Because Plaintiff was not acting the way the flight attendants have described, Plaintiff is entitled to the reasonable inference that Ms. Ramos's statement is an exaggeration for the purposes of summary judgment.

25.     Deny. See *supra* Plaintiff's response to Nos. 15-20.

26-27.  Deny. The Ramos Irregularity Report is inadmissible hearsay.

28-29.  Deny. The Ramos Irregularity Report is inadmissible hearsay. Moreover, Plaintiff's behavior was not odd or erratic. See *supra* Plaintiff's response to No. 21. Because Plaintiff was not acting oddly or erratically, Plaintiff is entitled, for the purposes of summary judgment, to the reasonable inference that Ms. Ramos did not describe to Ms. Paschall any erratic behaviors that concerned her, and did not harbor the thought described in statement 29.

30.     Deny. The Irregularity Reports are inadmissible hearsay.

31.     Admit that Ms. Ramos believed Plaintiff and the 1C passenger were "together," but deny that the basis of this belief was Plaintiff's behavior. Plaintiff was not engaging in any behavior that would have led a reasonable and rational person to believe that he was in any way associated with the 1C passenger. At this point in the taxi – before Captain Cannon had turned the plane around to take it back to the gate – Plaintiff was not looking to his left, in the direction of seat 1C. See *supra* Plaintiff's response to No. 21. Because Plaintiff was not "nearly out of his seat trying to look over in [1C's] direction," Plaintiff is entitled to the reasonable inference that

Ms. Ramos did not have this thought while the airplane was taxiing. Moreover, based on these and other facts, a reasonable jury could conclude that the only reason Ms. Ramos believed Mr. Shah and the 1C passenger were together is because they shared the same skin color.

32.     Deny. The Paschall Irregularity Report is inadmissible hearsay. Moreover, before Captain Cannon had turned the plane around to take it back to the gate, Plaintiff was not looking in the direction of seat 1C, much less making eye contact with its occupant. See *supra* Plaintiff's response to No. 21. Therefore, Plaintiff is entitled, for the purposes of summary judgment, to the reasonable inference that Ms. Ramos did not have this thought while the airplane was taxiing.

33.     Deny. See *supra* Plaintiff's response to Nos. 15-20.

34.     Admit that Ms. Ramos and Ms. Paschall concluded that Plaintiff and the occupant of seat 1C might be "together." But deny that this conclusion had any basis in Plaintiff's behavior. Before Captain Cannon had turned the plane around to take it back to the gate, Plaintiff was not looking in the direction of seat 1C, much less making eye contact with its occupant. See *supra* No. 21. Because Plaintiff was not acting "differently" than other passengers, Plaintiff is entitled to the reasonable inference that the flight attendants did not reach this conclusion for the reasons they claim. A reasonable jury could conclude that the reason the flight attendants believed Mr. Shah and passenger 1C were together is because they shared the same skin color.

35.     Admit.

36.     Deny. The Ramos Irregularity Report is inadmissible hearsay. Moreover, Plaintiff denies that his behavior would have caused any reasonable and rational person to become "extremely uncomfortable, uneasy, and alarmed." See *supra* No. 21. Because Plaintiff was not acting erratically, Plaintiff is entitled to the reasonable inference that the flight attendants did not experience these feelings for the reasons stated while the airplane was taxiing.

37.     Deny. Plaintiff states that no reasonable or rational person would have suspected a danger to security or searched for "Able Bodied Assistants" based on his behavior – which, as stated above, was not erratic. See *supra* Plaintiff's response to No. 21. Because Plaintiff was not acting erratically, Plaintiff is entitled, to the reasonable inference that the flight attendants did not search for able-bodied assistants for the reasons stated while the airplane was taxiing. Moreover, Plaintiff submits that, even if Southwest's description of Mr. Shah's behavior is accurate, no reasonable or rational person would have responded by searching for "Able Bodied Assistants."

38.     Deny. The Ramos Irregularity Report is inadmissible hearsay. Moreover, Plaintiff denies that his behavior would have caused any reasonable and rational person to become so uneasy that she would not want to be alone at the front of the airplane. See *supra* No. 21. Because Plaintiff was not acting erratically, Plaintiff is entitled to the reasonable inference that Ms. Ramos did not experience this feeling for the reasons stated while the airplane was taxiing.

39.     Deny. The Ramos Irregularity Report is inadmissible hearsay. Moreover, even if Ms. Ramos and Ms. Paschall were conversing, deny that the content of their conversation related to Plaintiff's behavior as described in Defendant's Statement of Material Facts. Plaintiff's behavior was not erratic nor in anyway resembled Defendant's representation of his behavior. See *supra* Plaintiff's response to No. 21. Because Plaintiff was not acting erratically, Plaintiff is entitled, for the purposes of summary judgment, to the reasonable inference that the flight attendants did not have this conversation for the reasons stated while the airplane was taxiing.

40.     Admit.

41.     Admit that, after the door to the flight deck has been closed, pilots' eyes and ears are generally unable to see or hear what happens in the cabin, and thus that pilots' knowledge of what is happening is generally limited to what flight attendants choose to relay them via the

intercom. Deny that a pilot's eyes and ears are unable to see or hear what happens in the cabin when the pilot is in the cabin, or that a pilot's eyes and ears are unable to see or hear what happens on a jet bridge when the pilot is on the jet bridge.

42-46. Admit.

47. Deny. The portion of the Chaussee Depo. cited in the footnote makes no mention of crewmembers' training "to recognize and report unusual passenger behaviors." Similarly, the portion of the Bohlin Depo. cited in the footnote makes no mention of crewmembers' training "to recognize and report unusual passenger behaviors." Moreover, Southwest's statement that "crewmembers [are] trained to recognize and report unusual passenger behaviors" is a conclusory statement. Southwest has claimed that the details of this purported training constitute Sensitive Security Information ("SSI"), and Southwest has refused to produce any documents containing details of any such training.[17] When asked under oath, Southwest's employees have also consistently refused to disclose any details of the purported training or what types of "unusual passenger behaviors" the training addresses.[18] Without facts concerning the content of the training and the logic underlying the content, it is impossible for any finder of fact to assess whether the conclusory statement, "crewmembers [are] trained to recognize and report unusual passenger behaviors" is relevant to the legal standard at issue here: whether a reasonable and rational person would have decided that Plaintiff might have been inimical to safety.

48. Deny. The portions of the record cited by Defendant simply provide no support for this statement. On pages 11-12 of the Harper Depo., Mr. Harper states that flight attendants are required to undergo training, but does not elaborate the content of the training, and simply

---

[17] *See, e.g.*, Deposition of John Chaussee ("Chaussee Depo."), ECF#6-8, at 52, 60, 73; Deposition of Donald Harper ("Harper Depo."), ECF#36-9, at 13; Deposition of Robert Leonard ("Leonard Depo."), ECF#36-11, at 64-65.
[18] *See supra* note 17.

makes no mention of "situational awareness and being observant." In pages 18-19 of the Harper Depo., Mr. Harper – far from saying that flight attendants are taught techniques for "maintaining situational awareness and being observant" – agreed that "[t]he crew is trained to rely on their gut and their instinct" in making determinations. The Expert Report of Mr. Harper is inadmissible hearsay and ought not be considered as evidence here. Pages 50-51 of the Bohlin Depo. do discuss Ms. Bohlin's personal opinions on what behaviors are or are not suspicious; however, she does not discuss anything having to do Southwest's training program for instilling "situational awareness and being observant." Finally, on page 93 of the Bohlin Depo., Ms. Bohlin states that, because Southwest does not take race into account when determining whether a person is a security threat, "we have to watch behaviors of – of individuals." This is a far cry from alleging that Southwest trains all of its flight attendants to "maintain[] situational awareness and being observant." Moreover, this statement is conclusory. Southwest has claimed that the details of this purported training constitute Sensitive Security Information ("SSI"), and Southwest has refused to produce any documents containing details of any such training.[19] When asked under oath, Southwest's employees have also consistently refused to disclose any details of the purported training or what types of techniques for "maintaining situational awareness and being observant" the training addresses.[20] Without facts concerning the content of the training and the logic underlying the content, it is impossible for any finder of fact to assess whether this conclusory statement is relevant to the legal standard at issue here: whether a reasonable and rational person would have decided that Plaintiff might have been inimical to safety.

   49. Deny. See *supra* Plaintiff's responses to Nos. 47 and 48.

   50. Admit that flight attendants are trained to listen to their gut and involve other

---

[19] *See supra* note 17.
[20] *See supra* note 17.

crewmembers, but deny that, in Southwest's training program, there is a connection made between "listen[ing] to their gut and involve[ing] other crewmembers," on one hand, and on the other hand "observ[ing] behavior that is odd or otherwise out of the ordinary." Also deny that Southwest's training programs instruct flight attendants in how to "observe behavior that is odd or otherwise out of the ordinary." See *supra* Plaintiff's responses to Nos. 47 and 48.

51.    Deny. See *supra* Plaintiff's responses to Nos. 47 and 48.

52.    Admit that Southwest teaches its crewmembers to use their judgment and instinct, but deny that Southwest teaches its crewmembers to observe behaviors. See *supra* Nos. 47 & 48.

53.    Admit that "If you see something, say something" is a familiar colloquialism, but deny that it applies with special force to the cabin crew. Plaintiff objects to the inclusion of No. 53 in Defendant's statement of material facts on grounds of relevance and lack of foundation. What Defendant means by "applies with special force" is anyone's guess, and the term "something" is so vague and ambiguous as to be unintelligible. Moreover, the colloquialism itself is irrelevant to any material issue in this case. Whether a crew member saw "something" is not the operative legal standard (or any kind of standard at all). The operative legal standard is whether, based on the facts and circumstances known to Southwest at the time, Southwest decided that Plaintiff was or might have been inimical to safety; and, if so, whether a reasonable and rational person would have made the same decision based on those facts and circumstances.

54.    Admit that Southwest may have an internal policy of encouraging the flow of information; deny Defendant's statement that captain "must take seriously" the concerns of the flight crew to ensure passenger and crew safety. Pg. 52 of the Leonard Depo. simply does not provide support for this statement. Mr. Leonard says, "So it's important that they [captains and crew members] trust each other because they have to work together." He then gives an example

of a situation of when a *flight attendant* must trust a *pilot*, in a type of situation that has nothing

to do with aviation security, or with necessity in every circumstance of "taking seriously" the

concerns of the flight crew. Moreover, the terms "must" and "take seriously" are so vague and

ambiguous that it is impossible to determine what Defendant means. "Take seriously" could

mean anything from simply listening to the flight attendants' concerns,[21] to not laughing or

making fun of the flight attendants' concerns,[22] to seriously weighing their concerns, to always

acting on their concerns no matter the evidence to the contrary. Similarly, "must" could have any

number of possible meanings: "must, as a matter of law," "must, as a matter of company policy,"

"must, as a matter of practical wisdom," "must, as a matter of morality," "must, as a matter of

necessity," etc. In short, Defendant Statement of Material Fact No. 54 – like many others – is not

a fact at all, but mere rhetoric, and it was wholly inappropriate for Defendant to include it in a

"Statement of Material Facts as to Which There is No Genuine Issue."

      55.    Admit that crewmembers *in fact* rely on gut and intuition when making no-fly

decisions, but deny that crewmembers *must* do so, whatever Defendant means by the term

"must." See *supra* Plaintiff's response to No. 54. Otherwise, Plaintiff denies and objects to the

inclusion of No. 55 in Defendant's "Material Facts as to Which There is No Genuine Issue." The

term "no-fly decision" is vague and ambiguous; it is unclear whether Defendant is referring to

decisions to abort takeoff or decisions to remove passengers from airplanes. "[C]rewmembers

have little if any time to investigate" is a general statement with no relevance to this case; there is

no evidence in the record, or any suggestion in Defendant's statement of material facts, that

Flight 392 was ahead of schedule, behind schedule, or right on time. Neither is there evidence

that Flight 392's crewmembers were under any kind of pressure related to timing or scheduling.

---

[21] *See* Leonard Depo., ECF#36-11, at 53-54.
[22] *See Id.*

Finally, for reasons that have already been explained, Plaintiff denies the existence of behavioral training for Southwest employees and denies that any such training has any connections "no-fly decisions." See *supra* Plaintiff's responses to Nos. 47 and 48.

56.     Admit that the pilots signaled that Flight 392 had been cleared for takeoff. Admit that Ms. Ramos and Ms. Paschall looked at each other. Deny that Ms. Ramos and Ms. Paschall "knew we could not go" contemporaneous with looking at each other. This statement is a quotation from the Ramos Irregularity Report and inadmissible hearsay. Moreover, as explained above, Plaintiff's behavior was not erratic in any way. See *supra* No. 21. For this reason, the flight attendants would not have "kn[own] we could not go" based on Plaintiff's behavior, nor would any reasonable or rational person have drawn the conclusion that "we could not go."

57.     Admit.

58.     Admit that Ms. Ramos called the cockpit, but deny that she "explained the situation to Captain Cannon." The Ramos Irregularity Report is inadmissible hearsay. Moreover, the portion of the Ramos Depo cited does not support this purported fact. In fact, pg. 4 of the Ramos Depo. says nothing whatsoever about calling the cockpit or any conversation with Mr. Cannon. Furthermore, according to Mr. Cannon's testimony, the flight attendants did not give a full and accurate description of the situation to Mr. Cannon. Mr. Cannon was told only that "there were two passengers in the front row of the airplane acting suspiciously and causing concern to the flight attendants. . . . I was told nervous glancing and fidgety body movements."[23] This is not a full explanation of the situation, based on the flight attendants' own retellings of what they saw in the cabin. In any case, this was not an accurate description, since Plaintiff was not acting nervous nor fidgeting. See *supra* No. 21. Because Plaintiff was not acting erratically,

---

[23] *See* Deposition George Cannon ("Cannon Depo."), ECF#36-6, at 8-9.

Plaintiff is entitled, for the purposes of summary judgment, to the reasonable inference that Ms. Ramos did not explain any erratic behavior on the part of Mr. Shah to Mr. Cannon.

59.     Deny. The Cannon Irregularity Report is inadmissible hearsay. In the portion of the Cannon Depo. cited, Mr. Cannon testified that he had been told only "there were two passengers in the front row of the airplane acting suspiciously and causing concern to the flight attendants. . . . I was told nervous glancing and fidgety body movements."[24] Thus, in Mr. Cannon's testimony, he reported being told that the flight attendants were "concerned" – not that they were "very alarmed."

60.     Admit that the pilots decided to return to the gate and admit that Mr. Cannon decided to deplane Plaintiff and passenger 1C. Deny that the crew members "discussed" the "details" of any passengers' behavior. This statement is a quotation from the Cannon Irregularity Report and inadmissible hearsay. In Mr. Cannon's testimony, there is no indication that there was a back-and-forth, two-way conversation between Mr. Cannon and the flight attendants, in which Mr. Cannon asked questions or stated any opinions; moreover, the flight attendants' report to Mr. Cannon was neither detailed nor accurate. See *supra* Plaintiff's response to No. 58 & 59.

61.     Admit that Ms. Ramos did not tell Mr. Cannon the races of the two passengers, but deny that she did not give any physical description to Mr. Cannon. Defendant's own Statement of Material Facts is internally inconsistent on this point. In material fact No. 59, Southwest actually states that Mr. Cannon had been told that the flight attendants "were very alarmed about the behavior of two *male* passengers." Here, Southwest asserts that the flight attendants gave no physical description of the passengers to Mr. Cannon.

62-67.  Admit.

_____

[24] *See Id.*

68.     Deny. The portion of the Shah Depo. cited by Defendant does not lend support to this statement. Moreover, the Ramos Irregularity Report is inadmissible hearsay.

69.     Admit that the officials boarded the plane to retrieve Plaintiff and the individual seated in 1C, but deny that Ms. Ramos and Ms. Paschall described their observations to the officials beforehand. See *supra* Plaintiff's response to No. 68.

70-82.  Admit.

83.     Admit that Mr. Cannon, Ms. Ramos, and Ms. Paschall described the possible races of Plaintiff and the passenger seated in 1C in their respective depositions; deny that this was "the only time" they did so. Defendant's statement rests on a serious logical flaw. The portions of the depositions cited by Defendant are the portions in which the deponents discuss Plaintiff's race. In their respective depositions, the three crew members did not assert that they had never before described the passengers' physical appearances or possible races.

84.     Deny. There is no support in the cited portions of the Alley Depo. for the proposition that Ms. Alley "had no involvement whatsoever in the events or the decision to remove the passengers." Moreover, the Alley Irregularity Report is inadmissible hearsay.

85-91.  Admit.

92.     Admit that the Phoenix Assistant Base Manager made the quoted statement, but deny that the flight attendants in fact acted appropriately in the situation. The Phoenix Assistant Base Manager's own email is contradictory on this point, in that it goes on to say, "It's difficult to say whether or not they over-reacted . . . ." Moreover, flight attendants cannot be said to have acted appropriately because Plaintiff was not acting erratic in any way. See *supra* Plaintiff's response to No. 21. Because Plaintiff was not acting erratically, Plaintiff is entitled to the reasonable inference that the flight attendants did not act appropriately in the situation.

93.     Deny. This statement should be stricken because Southwest does not cite to any evidence whatsoever for this assertion, as is required by Local Rule 56(B).

### IV. Plaintiff's Statement of Additional Material Facts as to Which There is Not Genuine Issue

1.      Mr. Cannon decided to abort the initial takeoff of Flight 392 and return the airplane to the gate solely on the basis of the following 3 facts: "[1] I was told there were two passengers in the front row of the airplane acting suspiciously and causing concern to the flight attendants. . . . I was told [2] nervous glancing and [3] fidgety body movements."[25]

2.      At no time did Mr. Cannon speak to Mr. Shah or the 1C passenger.[26]

3.      After Mr. Cannon had returned the airplane to the gate, and after Mr. Cannon had left the flight deck and walked to the jet bridge, but *before* Mr. Cannon decided to refuse Mr. Shah and the 1C passenger reboarding, Mr. Cannon saw Mr. Shah and the 1C passenger.[27]

4.      When he saw Mr. Shah, Mr. Cannon noted that he was a "darker skinned" person,[28] immediately formed the opinion that Mr. Shah was Middle Eastern.[29]

5.      After agents of the TSA had questioned Mr. Shah and the passenger in 1C, one TSA agent approached the Flight 392 crew and said, "We spoke with the two gentlemen. Do you want to allow them back on the aircraft?"[30]

6.      A reasonable person would interpret the TSA agent's statement to mean that TSA had screened Mr. Shah and the 1C passenger according to TSA's standards and found them

---

[25] *See* Cannon Depo., ECF#36-6, at 8-9. *See also Id.* at 37-38 (admitting that flight attendants did not tell him about the passengers' failure to timely strap themselves in or about Mr. Shah's possession of a glass bottle; also admitting that flight attendants did not relate any details of the passengers' "fidgety" behavior).
[26] *See Id.* at 14-15.
[27] *See Id.* at 17-18.
[28] *See Id.* at 18.
[29] *See Id.* at 36.
[30] *See* Deposition of Shannon Ramos ("Ramos Depo."), ECF#36-15, at 42.

eligible to reboard.[31]

7.      A reasonable person in Mr. Cannon's position would have asked the TSA agent to state the results of his investigation into Mr. Shah and the 1C passenger.[32]

8.      Mr. Cannon has testified that he would have given the opinion of a TSA agent or airport police officer "quite a bit of weight" in aviation security matters.[33]

9.      Mr. Cannon had already aborted Flight 392's takeoff and parked the airplane at the gate, and TSA's screening, interview, or investigation was complete while Mr. Cannon and the rest of the crew were standing on the jet bridge; it is therefore reasonable to infer that simply asking the TSA agent about the results of the screening, interview, or investigation would not have caused unreasonable further delay to Flight 392.

10.      During the discussion between Mr. Cannon and the flight attendants on the jet bridge, the flight attendants stated that "they had concerns about security based on the passengers' actions."[34]

11.      Nevertheless, Mr. Cannon did not ask the flight attendants what type of security concern they had.[35]

12.      Moreover, during the conversation between the flight attendants and Mr. Cannon on the jet bridge, the flight attendants did not add any more detail to their descriptions of the removed passengers' behavior, beyond what they had already told Mr. Cannon: "just nervous glancing and fidgety body movements"[36]

13.      A reasonable and rational person in Mr. Cannon's shoes would have tried to

---

[31] *See* Leonard Depo., ECF#36-11, at 37.
[32] *See Id.*
[33] *See* Cannon Depo., ECF#36-6, at 34.
[34] *See Id.* at 19.
[35] *See Id.* at 34.
[36] *See Id.* at 11.

obtain more detailed information from the flight attendants by asking them questions.[37]

14.    In fact, Ms. Paschall did not believe that either Mr. Shah or the passenger in 1C posed any specific kind of security threat; her conclusions were based only on the feelings that they were "suspicious" and that she "didn't feel safe with them going."[38]

15.    The sole basis for Mr. Cannon's decision to exclude Mr. Shah and the passenger in 1C from Flight 392 was that the flight attendants were "uncomfortable."[39]

16.    It did not occur to Mr. Cannon,[40] Ms. Ramos,[41] or Ms. Paschall,[42] that there could have been other passengers or property, apart from Mr. Shah and the gentleman in 1C, who had a relationship with Mr. Shah or the passenger in 1C, or who otherwise posed a threat to the flight.

17.    Therefore, after Mr. Shah and the passenger in 1C were removed from the flight, Flight 392 pushed away from the gate without any further investigation or security screening.[43]

18.    Less than one minute after Mr. Shah walking out of the jet bridge – while Flight 392 was still on the ground – an agent of Southwest was offering to rebook Mr. Shah on a flight later in the day on April 15, 2013.[44]

## V.    Argument

### A. Title 49 U.S.C. § 44902(b) contains a subjective requirement – that Southwest must *in fact* have decided that Mr. Shah was or might have been inimical to safety – that has not been demonstrated.

Southwest, in its Motion for Summary Judgment, launches into an argument that Mr. Cannon's decision was not arbitrary and capricious. In its rush to do so, it neglects to address a

---

[37] *See* Leonard Depo., ECF#36-11, at 49, 77.
[38] *See* Deposition of Regina Paschall ("Paschall Depo."), ECF#36-13, at 26.
[39] *See* Cannon Depo., ECF#36-6, at 35.
[40] *See Id.* at 21.
[41] *See* Ramos Depo., ECF#36-15, at 39, 45.
[42] *See* Paschall Depo., ECF#36-13, at 28-29.
[43] *See* Cannon Depo., ECF#36-6, at 21-22.
[44] *See* Shah Decl. at ¶ 44-45;

more fundamental question: Exactly what did Mr. Cannon decide? It is, of course, undisputed that Mr. Cannon decided to exclude Mr. Shah and one other dark-skinned passenger perceived to be "Middle Eastern looking" from Flight 392. But 49 U.S.C. § 44902(b) – the statute behind which Southwest is attempting to hide – requires a very particular kind of decision: "an air carrier . . . may refuse to transport a passenger . . . *the carrier decides is, or might be, inimical to safety*."[45] Look carefully at Southwest's Memorandum in Support:  Nowhere does Southwest even assert that Mr. Cannon decided that Mr. Shah was, or might have been, inimical to safety. The closest Southwest comes to making such an assertion is its statement, in its Material Facts as to Which There Is No Genuine Issue, that "Captain Cannon ultimately declined to reboard 1F [Mr. Shah] and 1C because the flight attendants were still uncomfortable."[46]

Southwest's Memorandum in Support of its Motion for Summary Judgment elaborates on exactly what Southwest and Mr. Cannon mean when they say that the basis of the decision was that "the flight attendants were still uncomfortable." Mr. Cannon chose to exclude Mr. Shah and the 1C passenger because: "it's important that the [crewmembers] trust each other because they have to work together";[47] because he was "consider[ing] how the flight attendants' performance would be affected . . . .";[48] because he did not want to make the "flight attendants feel that the information they report to the captain is undervalued or disregarded";[49] because he did not want to "shut down the flow of information from the cabin to the cockpit . . . ."[50] But § 44902(b) does not permit airlines to exclude passengers for any of those reasons – and that is fatal to

---

[45] 49 U.S.C. 44902(b) (emphasis added).
[46] *See* SJM Memo, ECF#37, at 10.
[47] *See Id.* at 18 (citing Leonard Depo., ECF#36-11, at 52).
[48] *See* SJM Memo, ECF#37, at 18 (citing Deposition of Terri Bohlin ("Bohlin Depo."), ECF#36-4, at 61, 65-66).
[49] *See* SJM Memo, ECF#37, at 19 (citing Bohlin Depo., ECF#36-4, at 66).
[50] *See* SJM Memo, ECF#37, at 19 (citing Bohlin Depo., ECF#36-4, at 66-67).

Southwest's Motion for Summary Judgment. Mr. Cannon never decided that Mr. Shah himself was or might have been inimical to safety – and for that reason § 44902(b) is not applicable.

It is worth noting the definition of "inimical." Merriam-Webster's Online Dictionary defines "inimical" as "being adverse often by reason of hostility or malevolence; having the disposition of an enemy; reflecting or indicating hostility."[51] And the online version of the American Heritage Dictionary of the English Language defines the term as "injurious or harmful in effect; adverse; unfriendly; hostile."[52] The text of the statute makes clear that an airline may exclude a passenger only after deciding that the passenger *himself* is or might be inimical to safety. The airline's decision need not be certain – hence the "might be" language – but the perceived threat to safety must be sufficiently connected to the actual passenger to be excluded.

Here, Mr. Shah did nothing to indicate that he was hostile, adverse, or unfriendly to the safety of Flight 392 – and Mr. Cannon did not decide that Mr. Shah was hostile, adverse, or unfriendly Flight 392's safety. Rather, Mr. Cannon decided that Mr. Shah made his flight attendants feel "uncomfortable." The fact that Mr. Cannon did not ask the flight attendants to describe Mr. Shah's behaviors in further detail – or ask them whether there was a specific potential threat they feared – is evidence of this. By his own testimony, Mr. Cannon considered only how members of his crew felt, how those feelings might affect trust and communication, and whether certain crew members would become distracted by those feelings.

And a flight attendant's reluctance to report future legitimate security threats might affect aviation safety. Even though a passenger's appearance or innocent behaviors "distract" a flight attendant, or hypothetically make a flight attendant somewhat reluctant to report future

---

[51] Merriam-Webster, "inimical," http://www.merriam-webster.com/dictionary/inimical (last visited July 25, 2014).
[52] The Free Dictionary by Farlex, "inimical," http://www.thefreedictionary.com/inimical (last visited July 25, 2014).

legitimate threats, these are not bases for refusing passage under § 44902(b). Those sorts of connections between the passenger and the supposed risks are more attenuated than anything contemplated by the text of the statute. The stature requires a decision that the passenger *himself* is or might be hostile, adverse, or unfriendly to the flight's safety. By adding to the text of the statute, Southwest advocates for a rule that would have outrageous results: a pilot could kick off a passenger who bore a strong resemblance to a flight attendant's ex-spouse, or a passenger with an physical deformity, because those passengers might distract the flight attendant from carrying out her safety duties – and ignoring the flight attendant's feelings toward those passengers might contribute to the breakdown of trust and communication between the crew members.

In several previous cases, airlines have defeated lawsuits on the basis of § 44902(b) immunity, but never has a court condoned the removal of a passenger when the connection between the removed passenger and the perceived risk was this attenuated. *Lozado v. Delta Airlines, Inc.*,[53] which Defendant cites in its brief, illustrates this perfectly. There, Delta moved for summary judgment, alleging that, "prior to boarding[,] Lozado showed clear signs of intoxication and was acting belligerently, loudly demanding free alcohol for the passengers to compensate for the delay. . . . [T]his highly disruptive behavior continued once she boarded the plane, where she made more demands for free drinks and incessantly pressed the flight attendant call button. Delta contend[ed] that such behavior continued even after the issuance of warnings from the flight crew that such actions may result in her removal from the flight."[54]

In Lozado's response to the summary judgment motion, she testified generally that she had done nothing wrong, but otherwise failed to challenge Delta's specific allegations.[55] In the

---

[53] No. 13 Civ. 7388(JPO), 2014 WL 2738529 (S.D.N.Y. June 17, 2014).
[54] *Id.* at *1.
[55] *See Id.* at *6.

passage of the decision that Southwest hopes to apply here, the court held that "a captain of an airplane is entitled without further inquiry to rely upon a flight attendant's representations that a passenger might distract the flight attendant from performing his or her safety-related duties."[56] But the "distraction" discussed in *Lozado* is wholly different from the "distraction" Southwest alleges here. Lozado was actively interfering with the flight attendant's safety duties, and the flight attendants' report of these events formed the basis of the pilot's decision.[57] Here, the basis of the pilot's decision was the flight attendants' vague sense of unease alone, without any concrete explanatory facts – and if anything it was the flight attendants' irrational feeling of discomfort that would have distracted them, as opposed to anything Mr. Shah actually did. In other words, whereas in *Luzado* the pilot decided that the actual passenger was inimical to safety, here, Mr. Cannon decided that, for whatever reason, the flight attendants were experiencing feelings that might prove inimical to safety – and kicking Mr. Shah off the plane would alleviate those uneasy feelings. The former is permitted by § 44902(b); the latter is not.

    Another illustrative case is *Ruta v. Delta Airlines, Inc.*,[58] where, prior to takeoff, a flight attendant had reported to the pilot that a passenger had assaulted one of the other flight attendants and was also loudly shouting "free booze!" and acting disruptive. The pilot, deciding that such behavior was adverse to the safety of the flight, removed the passenger from the airplane. Here, in contrast, Mr. Cannon decided that Mr. Shah made the flight attendants feel uncomfortable, after observing the color of Mr. Shah's skin and hearing only vague reports of fidgety body movements and nervous glancing. A final example is *Christel v. AMR Corp.*,[59] where a pilot decided that a passenger who had intentionally defied a flight attendant's safety

---

[56] *Id.* (internal citations and quotation marks omitted).
[57] *See Id.* at *2.
[58] 322 F.Supp.2d 391, 397 (S.D.N.Y. 2004).
[59] 222 F.Supp.2d 335 (S.D.N.Y. 2002).

instructions was inimical to safety.[60] *Lozado*, *Ruta*, and *Christel* all demonstrate that airlines may take shelter under § 44902(b) only if the pilot has decided that the passenger is or might be hostile, adverse, or unfriendly to the safety of the flight. Because Southwest doesn't even claim that Mr. Cannon made such a decision – and there is no evidence in the record to suggest that he did – Southwest is not entitled to summary judgment on the § 44902(b) immunity issue.

**B. Title 49 U.S.C. § 44902(b)'s objective test – that the decision be rational and reasonable, not arbitrary and capricious – has not been satisfied.**

Even assuming that Mr. Cannon decided that Mr. Shah was or might have been inimical to safety, that decision was arbitrary and capricious, not rational and reasonable. Just before takeoff, Mr. Cannon decided to turn the airplane around and return to the gate based on the following report from Ms. Ramos: "I was told there were two passengers in the front row of the airplane acting suspiciously and causing concern to the flight attendants. . . . I was told nervous glancing and fidgety body movements."[61] At that moment, Mr. Cannon needed to make an immediate decision to either takeoff or return to the gate. Relying on the report of the flight attendant, Mr. Cannon chose the latter.

Mr. Cannon's later decision, in which he refused to allow Mr. Shah reboard the airplane, is impossible to justify. It is important to remember that it is the decision that Mr. Shah might have been hostile, adverse, or unfriendly to the safety of the flight that must be tested – *not* the decision to bar Mr. Shah from the flight. In other words, the probability that Mr. Shah might be inimical to safety is not one factor to be weighed reasonably among many, since, as discussed above, hostility, adversity, or unfriendliness to safety is the *only* basis for refusing passage under

---

[60] *See Id.* at 340-41.
[61] *See* Cannon Depo. at 8-9. *See also Id.* at 37-38 (admitting that flight attendants did not tell him about the passengers' failure to timely strap themselves in or about Mr. Shah's possession of a glass bottle; also admitting that flight attendants did not relate any details of the passengers' "fidgety" behavior).

§ 44902(b). Rather, it is the actual determination that Mr. Shah might have been inimical to safety that must be rational and reasonable as opposed to arbitrary and capricious.[62]

No reasonable person in Mr. Cannon's shoes would have concluded that Mr. Shah was or might be hostile, adverse, or unfriendly to the safety of the airplane. After parking the airplane at the gate, Mr. Cannon exited onto the jet bridge, where he had a conversation with Ms. Ramos and Ms. Paschall. Mr. Shah and the 1C passenger were already being interviewed by the TSA, further up the jet bridge. Mr. Cannon saw Mr. Shah, noticed Mr. Shah's brown skin, and immediately formed the opinion that Mr. Shah was Middle Eastern. The flight attendants reiterated that the removed passengers had been engaging in nervous glancing and fidgety movements, but added no detail. The flight attendants spoke not of specific events they thought might materialize, but of the vague sense of unease the Indian passengers stirred up within them.

Finally, the TSA agent who had spoken to Mr. Shah approached Mr. Cannon and the flight attendants and said, "We spoke with the two gentlemen. Do you want to allow them back on the aircraft?" Any reasonable person would have interpreted this statement to mean that the TSA had finished its investigation and, in its opinion, Mr. Shah posed no threat whatsoever. At the very least, a reasonable would have asked for clarification. Mr. Cannon was not in a hurry; Mr. Cannon had already made the decision to abort takeoff and fully shut down the plane. Presumably, the flight was already behind schedule, and asking one simple question – "Do you think he's safe to fly?" – would not have caused substantial additional delay. Moreover, the fact that Mr. Cannon did not ask that one simple question is evidence that Mr. Cannon had already arbitrarily and capriciously made up his mind to exclude the passengers based on nothing but

_____

[62] In *Black's Law Dictionary* (West 9th ed. 2009) at 119, "arbitrary and capricious" is defined under the word "arbitrary" as follows: "(Of a legal decision) founded on prejudice or preference rather than on reason or fact. This type of decision is often termed *arbitrary and capricious*."

two conclusory statements ("nervous glancing and fidgety body movements") and the color of the passengers' skin. Mr. Cannon freely admits that the TSA's opinion in a security matter is entitled to "quite a bit of weight." Yet Mr. Cannon didn't ask the TSA agent the question because, to him, the answer wouldn't have mattered – his mind was already made up.

The other evidence that Mr. Cannon was acting arbitrarily and capriciously is the fact that he took no steps whatsoever to determine if any security threat remained after Mr. Shah and the 1C passenger had been ejected. Mr. Cannon admits that the thought that there might have been other persons or property aboard never even occurred to him. But how is it possible for a reasonable and rational person – after kicking off two people, suspected of being associates, and both suspected of being hostile to the safety of the airplane – fail to have that thought? The idea that a pilot, after concluding that two people might be working in tandem to harm his flight, would not even perform a quick scan to see if any suspicious passengers remained, is terrifying.

But of course, that is not what was happening here. Mr. Cannon did not suspect Mr. Shah or the 1C passenger of anything. He knew his flight attendants were uncomfortable, he knew they were on edge because of the Boston Marathon Bombing a few hours earlier, and he knew Mr. Shah was brown and Middle Eastern looking. Armed with those facts, Mr. Cannon couldn't get Mr. Shah and the other Indian gentleman off his plane fast enough. Mr. Cannon's decision, and the process by which he made it, are the very definition of "arbitrary and capricious," and as such, Southwest is not entitled to immunity under § 44902(b).

### C. The *Cerqueira* case and its "Five Principles."

As demonstrated above, Mr. Cannon did not decide that Mr. Shah was or might be inimical to safety – and even if he did, that decision was arbitrary and capricious. Neither the

First Circuit case of *Cerqueira v. American Airlines, Inc.*,[63] nor the "Five Principles" Southwest claims it espouses, can save Southwest here since § 44902(b)'s requirements for permissive refusal were not met. At the outset, it should be noted that *Cerqueira*'s entire discussion of § 44902(b) is dicta. The Ninth Circuit has recognized as much.[64] In *Cerqueira*, the state police officer – not the defendant airline – made the decision to exclude the plaintiff passenger from the flight.[65] Application of § 44902(b) – which governs only permissive refusal to transport by airlines – should not have been an issue before the First Circuit.

It is also worth noting the truly bizarre behavior in which the *Cerqueira* passengers engaged before their removal. This behavior included a suspicious comment made directly to the pilot before boarding;[66] looking into the cockpit upon boarding and again making a suspicious comment;[67] extended use of a lavatory (a vulnerable area of the airplane) before takeoff;[68] insistence that they be seated in exit rows;[69] extreme interest in the flight attendants' safety duties;[70] and making loud, bizarre interruptions during the flight attendants' safety presentation.[71] In addition, there were reports that, earlier, the TSA had confiscated box cutters from the suspicious passengers.[72] The pilot eventually decided to evacuate the entire airplane and

---

[63] 520 F.3d 1 (1st Cir. 2008).

[64] *See Eid v. Alaska Airlines, Inc.*, 621 F.3d 858, 868 (9th Cir. 2010) ("[T]he court's discussion of the issue is entirely dicta . . . . It is thus unclear why the First Circuit thought it necessary to expound at length on the issue.").

[65] *See Cerqueira*, 520 F.3d at 8 (noting that, according to the pilot's testimony, "a state police officer approached me and told me, point blank, 'These three gentlemen are not traveling with you today. It's out of your hands'").

[66] *See Id.* at 4-5.

[67] *See Id.* at 6.

[68] *See Id.*

[69] *See Id.* at 5.

[70] *See Id.* at 7.

[71] *See Id.* at 6.

[72] *See Id.* at 7-8.

inspect it, to make sure that no dangerous weapons were aboard.[73] In short, there is simply no analogy to the events at issue in *Cerqueira* and the events at issue here.

Here, Mr. Cannon did not decide that Mr. Shah was or might be inimical to safety, and, even if he did, that decision was arbitrary and capricious. There is nothing in *Cerqueira* that excuses Mr. Cannon's unreasonable and irrational behavior. Plaintiff agrees with Southwest's "first principle"[74] – it is undisputed that, under federal law, the captain of a flight has final authority over whether a passenger is excluded. Thus, in the context of passenger that has actually been removed from a flight, the decision of the pilot is attributed to the airline.

The "second principle"[75] – that the decision is evaluated solely on the information the captain possessed when the decision was made – is not at issue here. The analysis of Mr. Cannon's decision above demonstrates that Mr. Cannon possessed only five pieces of information relevant to the exclusion of Mr. Shah: the conclusory "nervous glancing" statement; the conclusory "fidgety movements" statement; the fact that the flight attendants were uncomfortable; the race of the two excluded passengers; and the fact that the TSA agent who interviewed Mr. Shah on the jet bridge cleared him to fly. Plaintiff's whole point is that Mr. Cannon possessed no information that could have formed the basis for § 44902(b) refusal. In fact, it is Southwest – not Plaintiff – that attempts to introduce facts not known to Mr. Cannon (such as the fact that Mr. Shah did not timely fasten his seatbelt and that he possessed a glass bottle) by including them in its statement of material facts.

To be clear, a reasonable jury most certainly could conclude that Mr. Cannon knew that the TSA agent on the jet bridge had cleared Mr. Shah to fly, and Plaintiff is entitled to that

---

[73] *See Id.* at 8.
[74] *See* SJM Memo, ECF#37 at 14.
[75] *See Id.*

inference for purposes of Defendant's Summary Judgment Motion. In any case, Southwest's repeated insistence on the fact that the TSA agent did not tell Mr. Cannon the results of the interview is misplaced. No one alleges that the TSA agent refused to share more information with Mr. Cannon. Mr. Cannon's refusal to ask even a single, simple question of the TSA agent is nothing more than willful ignorance – something that the law never favors.

Similarly, Southwest's "third principle" – "the captain is not obligated to investigate"[76] – is also not at issue here. Plaintiff does not argue that Mr. Cannon was obligated to conduct an investigation into Mr. Shah or to the gentleman seated in 1C. Nor was Mr. Cannon obligated to achieve certainty before making a final decision. Indeed, this was not possible given the circumstances, and likely never is in the context of aviation security. But Mr. Cannon *was* obligated to arrive at his decision reasonably and rationally, rather than arbitrarily and capriciously. A reasonable person asks a question of the person standing in front of him, who possesses a vital piece of information, and who is willing to share that piece of information. Mr. Cannon didn't do that. Asking one simple question of a person standing in front of you is not an "investigation" within the meaning of *Cerqueira*. Indeed, the whole rationale between the "no obligation to investigate" rule is that a prolonged investigation is not possible when a decision must be made immediately. Under these circumstances, asking the TSA agent a single question, after the takeoff had already been aborted and the airplane already parked at the gate, would not have contributed substantial further delay. Any reasonable person would conclude that it would be worth taking an additional 30 seconds to get the decision right.

Southwest's "fourth principle,"[77] like principles two and three, are not relevant here. Plaintiff does not argue that the biases of the flight attendants are attributed to the Mr. Cannon

---

[76] *See Id.*
[77] *See Id.* at 15.

for purposes of evaluating Mr. Cannon's decision. That being said, Mr. Cannon *could* have reasonably inferred, based on what the flight attendants had told him and his observation of Mr. Shah's skin color, that the flight attendants were biased. In other words, a jury could reasonably conclude that Mr. Cannon knew that the flight attendants were experiencing discomfort solely because of the race of Mr. Shah and the 1C passenger. Mr. Shah is entitled to this reasonable inference for purposes of Southwest's Motion for Summary Judgment.

Finally, the "fifth principle"[78] is also irrelevant here. The burden of proof, and how that interacts with § 1981 burden shifting, becomes an important issue when determining jury instructions, but is of no importance here, on Defendant's Motion for Summary Judgment. Here, it is unquestionably Southwest's burden to demonstrate that there is no genuine issue of material fact, and that it is entitled to judgment on the § 44902 issue as a matter of law. As has been amply demonstrated, Southwest has made no such showing.

> ### D. That Southwest offered to rebook Mr. Shah less than a minute after he exited the jet bridge proves that Southwest did not view him as dangerous.

Finally, the fact that, mere seconds after Mr. Shah had left the jet bridge, an agent of Southwest was offering to book him on another flight later that day demonstrates beyond all doubt that Southwest is not entitled to summary judgment. That is, after the TSA agent told Mr. Shah that Mr. Cannon had decided to bar Mr. Shah from reboarding, Mr. Shah walked directly to the Southwest desk just outside the jet bridge door. He stepped up to the counter – there was an available Southwest agent and no line – and the Southwest agent immediately offered to rebook Mr. Shah on a different flight leaving the same day. Less than one minute elapsed between the moment Mr. Shah left the jet bridge and the moment when Southwest offered to rebook him.

As Southwest itself points out in its brief, Mr. Cannon's decision to exclude Mr. Shah

---

[78] *See Id.*

from Flight 392 stands for the decision of Southwest.[79] But under the law of agency, the actions of the gate agent who was trying to rebook Mr. Shah also stand for the actions of Southwest. The fact that Southwest excluded Mr. Shah from Flight 392 in one breath, then invited him onto a later flight in the next breath proves that the former decision was either based on something other than safety issues, or else that the decision was arbitrary and capricious. If nothing else, the fact that the gate agent tried to rebook Mr. Shah immediately corroborates Mr. Shah's contention that there was nothing suspicious about his appearance or this behavior.

### E.  Southwest is not entitled to partial summary judgment on punitive damages.

Finally, Southwest has not demonstrated that it is entitled to summary judgment on the issue of punitive damages. Based on the above analysis, it is possible – indeed, likely – that a reasonable jury would find Southwest liable for punitive damages. A jury could find that either Ms. Ramos or Ms. Paschall or both acted with malice or evil motive.[80] After all, Mr. Shah's entire course of behavior while sitting in seat 1F is in dispute. If the jury concludes that Mr. Shah's version of events is entirely accurate, it would probably infer that the flight attendants' intercom call to the pilot was motivated solely by racial animus. Similarly, the jury could easily conclude that Mr. Cannon acted with callous indifference to a federally protected right. Under § 1981, Mr. Shah enjoys a federal right to make and enforce contracts on a footing equal to anyone else, regardless race. That Mr. Cannon refused to ask even one simple question of a TSA agent standing in front of him demonstrates how recklessly indifferent Mr. Cannon was. Clearly, the flight attendants' "comfort" was far more important to Mr. Cannon than Mr. Shah's civil rights.

---

[79] *See Id.* at 14.

[80] If the jury finds that Southwest is not entitled to immunity under § 44902(b), then this case turns into an ordinary § 1981 burden-shifting case. At that point the flight attendants' actions can be attributed to Southwest – even if the flight attendants' biases cannot be attributed to Mr. Cannon for purposes of the § 44902(b) analysis.

Likewise, a jury could reasonably determine that punitive damages ought to be imposed vicariously on Southwest. One of the bases for vicarious liability for punitive damages is ratification or approval of the agent's act by the principal. Here, several Southwest managers reviewed the documents related to Mr. Shah's exclusion from Flight 392 and, without fail, managers have praised the actions of both flight attendants and the pilot. Oddly, Southwest admits as much in its discussion of ratification in the Summary Judgment Motion.[81] To a person, all of the Southwest managers deposed in this action praised the Flight 392 crew, declaring they did just what Southwest trained them to do.[82] Moreover, to this day Southwest refuses to apologize for its employees' shameful behavior.[83] A jury could certainly find Southwest vicariously liable for punitive damages on this record.

## VI. Conclusion

At this state of the case, issues of fact abound. If a jury were to believe Plaintiff's evidence, it could reasonably find that Mr. Cannon never even decided that Mr. Shah was or might have been inimical to safety. A reasonable jury could decide that, even if Mr. Cannon made that decision, he did so arbitrarily and capriciously. Finally, a reasonable jury could find that the criteria for vicariously imposing punitive damages are present. For these reasons, Plaintiff respectfully requests that the Court to deny Southwest's Motion for Summary Judgment, or, in the Alternative, Partial Summary Judgment.

Dated: July 25, 2014

Respectfully submitted,

_____/s/_____

Thomas R. Breeden

---

[81] *See* SJM Memo, ECF#37 at 28. *See also Id.* at 11-12.
[82] Bohlin Expert Report, ECF#36-4, at 39; Chaussee Depo., ECF#36-8, at 78; Harper Depo., ECF#36-9, at 64; Leonard Depo., ECF#36-11, at 81.
[83] *See* Shah Decl. at ¶ 48.

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 25, 2014, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will send a notification of such

filing (NEF) to the following:

Jonathan M. Stern (VSB# 41930)
Schnader Harrison Segal & Lewis LLP
750 Ninth Street, NW
Suite 550
Washington, DC  20001
(202) 419-4202
(202) 419-4252 fax
jstern@schnader.com
*Counsel for Defendant*

　

　

_____/s/_____
Thomas R. Breeden, Esquire
(VSB #33410)
THOMAS R. BREEDEN, P.C.
10326 Lomond Drive
Manassas, Virginia  20109
(703) 361-9277 Telephone
(703) 257-2259 Facsimile
trb@tbreedenlaw.com
*Counsel for Plaintiff*