IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA - ALEXANDRIA DIVISION

| | | |
|---|---|---|
| CHIRAG SHAH, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION No. 1:13CV1481 |
| | ) | |
| SOUTHWEST AIRLINES, et al | ) | |
| Defendant. | ) | |

## PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION IN LIMINE FOR CERTAIN PRE TRIAL ORDERS

COMES NOW, Plaintiff, by counsel, and provides his Reply Memorandum in Support of Plaintiff's Motion in Limine for Certain Pre Trial Orders, states as follows:

### The Irregularity Reports are not admissible

**I.      The Reports are not admissible for punitive damage purposes because they do not reflect corporate knowledge, but rather are documents contrived for the purpose of making the business look better if it was sued.**

Defendant argues that the Irregularity Reports are admissible to show corporate knowledge of the circumstances surrounding the events at issue. However, as outlined in Section III below, the reports were not in fact created to record knowledge of the events, but rather were meticulously contrived and vetted by Southwest's customer service and legal departments in order to make Southwest look better in this litigation. As such, they have no bearing on the Defendant's knowledge of the events.

1

**II.    By placing Defendant's Irregularity Reports on the list of exhibits Plaintiff may seek to introduce, Plaintiff preserved their use as impeachment evidence**

Defendant claims that by Plaintiff including Defendant's Irregularity Reports on the list of exhibits he may introduce, Plaintiff has waived any objections to their admissibility.[1] This is a transparently false statement. In his objections, Plaintiff objected to Defendant's exhibit list to any attempts by Defendant to introduce the Irregularity Reports, but specifically preserved his rights to introduce the documents.[2] In other words, Defendant cannot introduce the Irregularity Reports, because they are inadmissible hearsay and do not fall within the business records exception. This does not mean, however, that Plaintiff cannot seek to introduce them at trial either affirmatively, as statements against interest, or as impeachment evidence. What may be inadmissible for Defendant may be admissible for Plaintiff, and the exhibit lists and objections filed with the Court reflect this dual nature of the rules of evidence.

**III.   Because Southwest prepared the Irregularity Reports specifically in preparation for this litigation and for trial, they are not admissible as business records**

Faced with documents that are clearly hearsay, that is, the "Irregularity Reports," Southwest is now seeking to recast them as "business records" under Federal Rule of Evidence 803(6). But Southwest must fail in this regard. The Irregularity Reports here were not, as Defendant would have this Court believe, prepared in the regular conduct of business. To the contrary, Southwest's own records show that Southwest directed the captain and crew – under

---

[1] Doc 44, at 5.
[2] Doc 34, at 3.

penalty of disciplinary action – to prepare the self-serving Irregularity Reports in direct response to the fear of possible litigation by Mr. Shah.

Under the business records exception to the hearsay rule, without regard to the availability of a declarant, a memorandum, report, record, or data compilation of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge is excepted from the hearsay rule if 1) it was kept in the course of a regularly conducted business activity; 2) it was the regular practice of that business activity to make the record; and 3) the source of information or the method of preparation did not indicate a lack of trustworthiness.[3]

The reliability of a business record admissible under this exception is ensured by the following requirements: 1) The person providing the relevant information has personal knowledge; and 2) the record of the report is kept in the course of a regularly conducted business activity. Adequate reliability is found in systematic checking and regularity that produces habits of precision, reliance on the records, and the employees' duty to make accurate records that exist in the court of a regularly conducted activity. The custodian or other qualified witness must testify that all participants, including the participant furnishing the information, were acting routinely, under a duty of accuracy and with expectation the employer would rely on the result. For example, an accident report by a railroad engineer prepared for use in litigation, not railroading, is not within the course of the railroad's regularly conducted activity.[4]

Thus, the quintessential example of a document that does not fall under the business-records exception is a self-serving memorandum prepared for use in litigation. The best example

---

[3] Fed. R. Evid. 803(6).

Plaintiff could find comes from a 2004 decision penned by Judge Richard Posner of the Seventh Circuit, *Lust v. Sealy,* Inc.[5] Sealy complained on appeal about the exclusion of three memos that a supervisor had written when Lust complained to him that she was being passed over for promotion for discriminatory reasons.  In upholding the district court's refusal to admit the memos, the Seventh Circuit observed: "There is no more facile a method of creating favorable evidence than writing a self-exculpatory note. Such notes have no warrants of reliability and allowing them to be placed in evidence would operate merely as a subsidy to the forest-products industry."[6]

After finding that the memos did not fall within the spontaneity exceptions, Fed.R.Evid. 803(1)-(3), the Seventh Circuit turned to Sealy's argument that the memos were admissible as "records of regularly conducted activities" under Fed.R.Evid. 803(6). The Circuit found that they "were business records in the literal sense, or perhaps *a* literal sense, of being documents created for a business purpose—namely to create evidence of nonliability!"[7] The Circuit went on to hold that the memos "were not the kind of business record to which the business-records exception to the hearsay rule refers, as is apparent from the requirement that it be 'the regular practice of that business activity to make' the record. Because a business depends on the accuracy of its recordkeeping, its records, although of course not sworn, are likely to be at least reasonably accurate, or at least not contrived for the purpose of making the business look better if it is sued."[8]

---

[4] Fed. R. Evid. 803(6), Adv. Comm. Notes (1972).
[5] 383 F.3d 580 (7th Cir. 2004).
[6] *Id*. at 588
[7] *Id*. at 588 (emphasis in original).
[8] *Id.*

In sum, the Seventh Circuit held that the

> memos were not created as a part of the regular recordkeeping
> processes of the Sealy mattress company. Those processes include
> the making of personnel records, but Sealy does not contend that
> memos that … [the supervisor] makes of conversations with
> employees become part of the employee's personnel record. Their
> only purpose was to create evidence for use in Lust's anticipated
> lawsuit, and that purpose disqualifies them from admission as
> business records.[9]

Here, we have a similar situation. Mr. Shah and the other passenger were removed from
the plane on April 15, 2013. The following morning, at 9:12 a.m. Eastern Time (8:12 a.m. at
Southwest's Texas headquarters), April 16, 2013, Mr. Shah called Southwest Customer Service
to complain and then electronically filed a complaint with Southwest Airlines about the "very
DISTURBING AND HUMILIATING experience" he had suffered on the flight.[10] That morning,
starting at 10:06 a.m. Central Time, Southwest noted a need to request reports. And later that
day, at 4:24 p.m. Central Time, Southwest noted that it was "requesting reports from PHX [i.e.,
Phoenix] Inflight and IAD GO [presumably, Dulles Airport Ground Operations]." At
approximately 4:27 p.m. Central Time, Southwest circulated Mr. Shah's written complaint to
multiple email accounts stating that "[i]t is essential that Customer Advocacy, General Counsel,
and other relevant departments have a full picture of the event, including a factual and detailed
report from the Employee(s) involved."[11] The purpose of this was "to address this Customer's

---

[9] *Id.* citing *Echo Acceptance Corp. v. Household Retail Services, Inc.*, 267 F.3d 1068, 1091 (10th
Cir.2001); *Certain Underwriters at Lloyd's v. Sinkovich*, 232 F.3d 200, 204–06 (4th Cir.2000);
*Scheerer v. Hardee's Food Systems, Inc.*, 92 F.3d 702, 706–07 (8th Cir.1996).

[10] Breeden Decl, at ¶4-6 Exhibit A, SWA000001 attached thereto.

[11] Breeden Decl, at ¶4-6, Exhibit B, SWA000339-341; Exhibit A, SWA000002 attached
thereto.(emphasis in original).  (SWA000339-341 have a time of 5:27 pm, but is unclear whether
it is Eastern or Central time.  By comparison to SWA000002, it can easily be determined that the
time is in fact Eastern time, thus making the time 4:27 pm Central Time).

concerns and meet our regulatory and legal obligations." The heading on the email was

"POSSIBLE DISCIPLINARY ACTION REQUIRED."[12] Thus, no later than 4:27 p.m. Central

Time on April 16, 2013, Southwest had entered litigation mode.

 Mr. Shah's complaint, as can be seen from Southwest's email, set off alarm bells.

Although the captain, Mr. Cannon, may not have known of Mr. Shah's complaint when he filed

his Irregularity Report at 10:28 a.m. Central Time on April 16th, there is no doubt that all three

flight attendants did. The irregularity reports of the flight attendants – Ms. Paschall, Ms. Ramos,

and Ms. Alley – show that they knew of the complaint and prepared their Irregularity Reports in

direct response to the email from customer service warning of possible legal action. Moreover,

they appear to have been prepared at the request of, and possibly with the assistance of, a

Southwest employee by the name of Marsha L. Roberts. Tellingly, even this was not enough –

Southwest determined that these "business records" had to be further vetted, this time by their

legal team, to ensure that they sufficiently protected Southwest's interests. Therefore, on April

30, 2013, Southwest employee Floyd Shaw noted the following in Southwest's computer:

> Working with Elizabeth Behrens to get additional reports from
> Inflight Managers for this incident. She stated this may take a few
> days to complete and this response will have to be reviewed by
> Legal. Trey CR x2069.[13]

 The proof is on the Irregularity Reports themselves. When Mr. Shah filed his complaint

electronically on April 16, 2013, customer service sent him an email confirming receipt at 10:50

a.m. and designating his complaint as "Inquiry No. SR #213660741679." This number then

appeared on an email sent by Southwest the same day, in which Mr. Shah was advised that "In

---

[12] Breeden Decl, at ¶4-6, Exhibit B, SWA000339-341 attached thereto.
[13] Breeden Decl, at ¶4-6, Exhibit A, SWA000002 attached thereto.

order to address the issues raised in your correspondence, we are conducting research with the

Employees involved in your travel." This email, too, referred to Mr. Shah's "Inquiry" using the

number "SR #213660741679." At 4:27 p.m. Central Time that day, Customer Service sent out

the email discussed above – the one that demanded "a factual and detailed report from the

Employee(s) involved." This email, too, used the identification number assigned to Mr. Shah's

"Inquiry": "SR #213660741679." And every document sent internally about Mr. Shah used this

inquiry number on its file names or in its subject line, as did all of the notes turned over by

Southwest in this case.

      Now here is where matters get interesting. The Irregularity Reports for all three flight

attendants – Ms. Paschall, Ms. Ramos, and Ms. Alley – all state that they were prepared in

response to a "Customer Relations Request" "Created" by a "Marsha L. Roberts" on April 16,

2013, in connection with "Reference #" "SR #213660741679." And the file names given by

Southwest to the Irregularity Report computer reports when they were circulated internally were

as follows: "Ava Alley SR 213660741679.pdf"; "Regina Paschall SR 213660741679.pdf"; and

"Shannon Ramos: SR 213660741679.pdf".[14] In other words, the Irregularity Reports themselves

prove that they were created in direct response to Mr. Shah's online complaint and in preparation

for possible legal action. Thus, Southwest's claim that these Irregularity Reports were created in

the regular course of business is a fabrication. Regardless of whether there was a regulatory or

business obligation for each of the flight attendants to create Irregularity Reports within 24 hours

of the incident, as Southwest claims, that is not what happened here – Ms. Paschall, Ms. Alley,

and Ms. Ramos created their reports in anticipation of legal action, had them vetted by

---

[14] Breeden Decl, at ¶4-6, Exhibit B, SWA000339-341 attached thereto.

Southwest's Legal Department, and submitted them to attempt to create evidence of nonliability.

In sum, as in *Lust v. Sealy, Inc.*, the Irregularity Reports were "created for *a* business purpose—namely to create evidence of nonliability!"[15] That is, by their own notations, they are apparently not even likely to be at least reasonably accurate, having been "contrived for the purpose of making the business look better if it is sued."[16] As in the Seventh Circuit case, their only purpose was to create evidence for use in this anticipated lawsuit, and that purpose disqualifies them from admission as business records.

> **B.      Because this case is about Mr. Cannon's decision not to allow Mr. Shah to reboard solely because the cabin crew was "uncomfortable," Southwest should not be allowed to inflame the passions of the jury by mentioning the events of 9/11, the actions of Richard Reid or any other irrelevant terrorist incident, or any irrelevant individual who has been accused or convicted of terrorist activities**

Over the course of almost five pages in its opposition brief, Southwest seeks to inflame the passions of this Court by discussing 9/11, Richard Reid, and other terrorist acts, coupled with a discussion of "the cost to the industry of hardened cockpit doors, self-defense training, the arming of pilots, and numerous other aviation security countermeasures." Southwest then seeks to inflame matters even further with lengthy single-spaced quotations from a document entitled *Today's Rising Terrorist Threat and the Danger to the United States*. Southwest even includes a bizarre footnote in which Southwest appears to be trying to blame Mr. Shah for anticipated security-related hikes in airline ticket prices. In sum, nothing demonstrates the need to hold Southwest in check at trial better than its own opposition brief.

---

[15] *Id*. at 588 (emphasis in original).

[16] *Id.*

All of Southwest's claims of having to provide context as to what happened might be probative if they were in any way relevant to what happened to Mr. Shah. If there were expert testimony proffered which in some fashion connected other incidents of aviation terrorism and Mr. Shah's actions, those other incidents might be probative.[17] But Southwest and its experts have provided no factual opinions that there is a nexus between other terrorist attacks and Mr. Shah's actions. The initial question is not whether Mr. Cannon's decision to remove Mr. Shah, and then refuse to allow him to reboard, was arbitrary and capricious. The more fundamental question is whether Mr. Cannon decided that Mr. Shah was, or might have been, inimical to safety, as is required by the relevant statute. Southwest's position, as reflected in its motion for summary judgment, is that "Captain Cannon ultimately declined to reboard 1F [Mr. Shah] and 1C because the flight attendants were still uncomfortable."[18]

In other words, the jury shouldn't operate in a vacuum – the jury should have a clean view of the case put before them – two "middle eastern looking men" were publicly removed from a flight because two flight attendants were jumping at shadows the day of the Boston bombings and the captain's sole stated reason for refusing to reboard Mr. Shah was that the flight attendants were still "uncomfortable." That is Southwest's entire defense – nowhere is there any indication that Mr. Shah or the other passenger presented any danger to anyone. As elaborated in Southwest's Memorandum in Support of its Motion for Summary Judgment, Mr. Cannon chose to exclude Mr. Shah and the 1C passenger because: "it's important that the [crewmembers] trust

---

[17]In fact, Southwest appears to recognize this, and states "Southwest has no intention of offering up names of terrorists without providing evidence to explain their relevance to the case".   Doc. 53 at 18. However, Southwest's experts were unwilling to provide any explanation as to any connection with other terrorist events at depositions or in their reports, instead hiding behind SSI.
[18] *See* SJM Memo, ECF#37, at 10.

each other because they have to work together";[19] because he was "consider[ing] how the flight

attendants' performance would be affected . . . .";[20] because he did not want to make the "flight

attendants feel that the information they report to the captain is undervalued or disregarded";[21]

because he did not want to "shut down the flow of information from the cabin to the

cockpit...."[22] There can be no possible relevance between discussions of 9/11 or Richard Reid

and Mr. Cannon's decision to refuse to reboard Mr. Shah based on the flight attendants'

discomfort.

> **C.      Southwest had the burden of establishing, in an admissible format, the SSI
> facts upon which its experts rely**

As argued extensively in the earlier briefs by both parties, a large portion of Southwest's

defense revolves around expert opinions that have been formed and based on SSI material, which

has not been disclosed to Plaintiff.  Southwest casts the blame for this on the Plaintiff, arguing

that it has done everything it can to accommodate and assist Plaintiff in obtaining the clearance

for this material, but that Plaintiff has failed to properly follow up on this material.  While the

Plaintiff agrees that counsel have worked well and amicably together in this case, and have

attempted to facilitate the exchange of information with each other, Plaintiff disagrees that it is,

or has been, the Plaintiff's burden to chase after the facts which Southwest's experts purportedly

rely upon in forming their opinions.

It is well established that in order for an expert to present an opinion, a proper foundation

must be made: the expert must show, among other things, the facts upon which he or she bases

---

[19] *See Id.* at 18 (citing Leonard Depo., ECF#36-11, at 52).

[20] *See* SJM Memo, ECF#37, at 18 (citing Deposition of Terri Bohlin ("Bohlin Depo."), ECF#36-4, at 61, 65-66).

[21] *See* SJM Memo, ECF#37, at 19 (citing Bohlin Depo., ECF#36-4, at 66).

the opinion.[23] A Court cannot screen the proposed expert testimony for reliability if the facts

underlying said testimony is not disclosed.  If the factual basis for the opinion is not there, the

opinion will not be allowed to be presented.  Further, allowing expert testimony without the

safeguard of requiring disclosure of the facts upon which they are based interferes with the

Plaintiff's right, under Fed. R. Evid. 705 to cross examine based on those facts.  As noted in the

Advisory Committee notes to Fed. R. Evid. 705:

> If a serious question is raised under Rule 702 or 703  as to the
> admissibility of expert testimony, disclosure of the underlying
> facts or data on which opinions are based may, of course, be
> needed by the court before deciding whether, and to what extent,
> the person should be allowed to testify. This rule does not preclude
> such an inquiry.

Here, each of Defendant's expert witnesses have presented opinions without providing

the factual basis for them.  When asked about the factual basis, the experts merely state that the

information is SSI.[24] But relying on secret, undisclosed information as the basis for an expert

opinion is insufficient.

Southwest argues that it could not disclose the SSI material, because to do so would

violate the law.  But Southwest knew from the beginning, in April 2013, when it started planning

its defense and having its document vetted by its legal department, that it would be basing its

---

[22] *See* SJM Memo, ECF#37, at 19 (citing Bohlin Depo., ECF#36-4, at 66-67).
[23] Fed. R. Evid 702; Smithers v C&G Custom Module Hauling, 172 F.Supp.2d 765, 771 (E.D. Va. 2000) (a Court's role is to, in effect, "screen" proposed expert evidence to insure that it is sufficiently reliable and likely to assist the fact finder in order to be admissible at trial);Green v Ford Motor Co., 2001 WL 1530254 at*5 (W.D. Va. 2001) (As this court has noted in addressing prior *Daubert* challenges in this action, of primary concern is whether the basis for an expert's opinion is sufficiently transparent to allow the opposing party to utilize the adversary system to rebut that expert's testimony through cross-examination and the presentation of contrary evidence if such evidence exists.)

defense on purported SSI material.  It has had since that time to seek permission from TSA to disclose the limited SSI material at issue in this case.  At a minimum, it has had since December 2, 2013, when this lawsuit was filed, to start the TSA review process. Instead, Southwest did not submit the review to TSA until April 4, 2014, when Plaintiff suggested a consent order for the Court to have TSA conduct such a review.[25]

The information contained in the SSI materials is not information which Plaintiff needs in order to prove his case – it is information which the Defendant needs in order to raise its defenses. As such, it was Defendant's burden to gather these facts and make sure they were admissible. Thus, any assistance which Southwest provided in the process was in actuality actions Southwest needed to take. Plaintiff cooperated and assisted at every step of the way.

Defendant's argument related to Section 525(d) of the Department of Homeland Security Appropriations Act of 2007 is likewise misplaced. While it is true that either party can petition the Court under Section 525(d), the relief under this Act is limited – it merely would allow production of documents to a party and counsel.  It would not deal with whether the material is in fact SSI, nor would it allow the jury to have access to the material claimed to be SSI. The importance of having the jury review the facts upon which opinions are based is in fact highlighted by Defendant's analogy of the blue baseball cap.  In the scenario presented by the analogy, neither expert should be allowed to testify, since the factual basis for their testimony would not be available and there would be no means to cross examine their opinions. The jury would have absolutely no basis for determining which expert to believe, and would have to

---

[24] Examples of these SSI based opinions have been detailed in Plaintiff's Memorandum in Support of Plaintiff's Motion in Limine for Certain Pre Trial Orders, at 12-16.
[25] Declaration of Jonathan M. Stern, Doc 53-7, at Exhibit 2, 3.

engage in sheer guesswork. Otherwise, it would be far too easy for a party to flagrantly

discriminate, have its in-house expert invent an opinion, support it with fabricated SSI, and

defeat any claim brought against it. The SSI claim would be in fact a "get out of jail free" card,

trumping any attempt to have a jury inspect the incident and determine whether there was in fact

discrimination, or a security threat.  In addition, as noted by the TSA, Plaintiff could not petition

under 525(d) until after TSA had made a determination that the material was in fact SSI.[26] To

date, TSA still has not made a determination that any material withheld is in fact SSI.[27]

Defendant also argues that the Federal Rules of Evidence allows experts to rely on

inadmissible facts or data.  But Defendant misconstrues the advisory committee notes. Fed. R.

Evid. 703 allows for an expert to rely on evidence that the propounding party would not be able

to submit. Fed. R. Evid. 705 allows the opposing party to cross examine based on that same

evidence and disclose the facts to the jury.

Defendant's last-ditch effort to avoid facing the ramifications of its discriminatory

actions is to argue that the case should be dismissed for lack of justiciability. In support,

Defendant cites to *Tenet v Doe*,[28] *El-Masri v United States*,[29] *Mohamed v Jeppesen Dataplan,

Inc.*,[30] and *DTM Research LLC v AT&T*.[31] Unfortunately for Defendant, none of these cases

support its argument, and in fact they are all in opposition to Defendant's argument.  In *Tenet*,

the case involved a former spy arguing that he was entitled to compensation by the US

---

[26] **Error! Main Document Only.**Declaration of Jonathan M. Stern, Doc 53-7, at Exhibit 5, page 2 of 3.
[27] Declaration of Jonathan M. Stern, Doc 53-7, at ¶22.
[28] 544 U.S. 1 (2005).
[29] 479 F3d. 296 (4th Cir. 2007).
[30] 614 F.3d 1070 (9th Cir. 2010).
[31] 245 F.3d 327 (4th Cir. 2001).

government for his espionage services.  The US Government argued that the very crux of the lawsuit involved state secrets.  The Court agreed, holding that suits **against the government** based on covert espionage agreements are barred.  The Court was very clear that the ruling was limited to suits against the government.  The Court pointed out that this policy would not exclude judicial review of constitutional claims made by a former CIA employee for discrimination:

> In reaching that conclusion, we noted the "serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim"[32]

Likewise, in *El-Marsi*, the Fourth Circuit reiterated that the state secrets privilege may only be raised by the government.  When a court is faced with a state secrets privilege question, it must first ascertain whether the procedural requirements for invoking the privilege have been met.  This procedural requirement is that a formal claim of privilege must be lodged by the head of the department at issue, after actual personal consideration of the matter by that officer.  The privilege belongs to the Unites States, and cannot be claimed by a private party.[33]

*Mohamed* reaches the same conclusion.[34]

### D.      If Southwest's witnesses insist on wearing their uniforms, then based on the cases submitted by Defendant, a corrective charge should be given

As Defendant notes, many courts allow witnesses to dress as they would normally dress for their day-to-day jobs. But Defendant fails to mention that a number of cases adopt the position that a corrective charge should be given. For example, in the New Jersey intermediate appellate case of *Ryslik v. Krass*,[35] cited with approval *three times* by Defendant, the Court

---

[32] *Tenet*, 544 U.S. at 10.
[33] *El-Marsi*, 479 F.3d at 304.
[34] *Mohamed*, 614 F.3d at 1080.
[35] 652 A.2d 767, 769-72 (N.J. Sup. Ct., App. Div. 1995).

reversed a trial court that had granted a new trial because the plaintiff, a priest, wore his collar when he testified. What Defendant fails to mention, however, is the holding by the appellate court that "[t]he judge should appropriately charge [the jury] … that no undue weight should be given to the testimony of the particular witness by reason of a profession."[36] Accordingly, if Southwest continues to insist on having Mr. Cannon and the flight attendants testify in uniform, then under *Ryslik* a corrective charge should be given.

Dated: August 1, 2014

CHIRAG SHAH
By Counsel

_____/s/_____
Thomas R. Breeden, VSB # 33410
Thomas R. Breeden, P.C.
10326 Lomond Drive
Manassas, Virginia 20109
Tel (703) 361-9277, facsimile (703) 257-2259
trb@tbreedenlaw.com

Sanjay Sethi
Reza Mazaheri
Sethi & Mazaheri, LLC
9 Polifly Road, 2nd Floor
Hackensack, NJ  07601
201-606-2267
Facsimile 201-595-0957
sethi@sethimaz.com

Brian L. Bromberg
Bromberg Law Office, PC
26 Broadway, 21st Floor
New York, NY 10004
Tel (212) 248-7906 Fax (212) 248-7908
brian@brianbromberglawoffice.com

---

[36] *Id*.

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on the 1st  day of August, 2014, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to

the following:

Jonathan M. Stern, Esq. (VSB# 41930)
Schnader Harrison Segal & Lewis LLP
750 Ninth Street, NW
Suite 550
Washington, DC  20001
(202) 419-4202
(202) 419-4252 fax
jstern@schnader.com
*Counsel for Defendant*

_____/s/_____
Thomas R. Breeden, Esquire
(VSB #33410)
THOMAS R. BREEDEN, P.C.
10326 Lomond Drive
Manassas, Virginia  20109
(703) 361-9277 Telephone
(703) 257-2259 Facsimile
trb@tbreedenlaw.com
*Counsel for Plaintiff*